# Exhibit 24

## (Part 2)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

sample,[95] followed by "a series of instructions and information about the conjoint tasks,"[96] followed by choice-based conjoint tasks.[97]   The conjoint survey presented to each respondent included 13 choice tasks, whereby a choice task had three ovens with seven attributes (and varying attribute levels) each.[98]  Contained in **Table 5** is a summary of all the product attributes and levels used by Mr. Weir in his conjoint survey.

**Table 5**
**Attributes And Levels Used In Mr. Weir's Conjoint Survey**[99]

| Attributes | Levels Used Of The Attributes |
|---|---|
| Brand | Whirlpool Brand Oven<br>Maytag Brand Oven<br>Kitchen Aid Brand Oven<br>Jenn-Air Brand Oven<br>Kenmore Brand Oven |
| Oven Type | A wall mount/built-in/slide-in oven (without a cooktop)<br>A combination cooktop and oven |
| Fuel | Electric oven<br>Natural gas/liquid propane oven<br>Dual fuel oven |
| Finish | Stainless Steel<br>Black<br>White |
| Features | Digital Controls<br>Convection<br>Number of Racks<br>Control Lockout<br>Front vs. Rear Controls |
| Cleaning Features | Pyrolytic self-clean (i.e., high-heat self-clean)<br>AquaLift self-clean<br>AquaLift partial-clean (i.e., Mr. Weir's description of AquaLift as he represents its functioning)<br>Manual clean (no self-clean) |
| Price | Range of $600 to $1,200 |

c. Conjoint Survey Sample (Respondents).  The sample for Mr. Weir's conjoint survey was drawn from the general population of the U.S. who had purchased at least one Whirlpool

---

[95] Weir Declaration, pp. 8 – 9.

[96] Weir Declaration, pp. 9 – 10.

[97] Weir Declaration, p. 12.

[98] Weir Declaration, p. 12.

[99] Weir Declaration, pp. 10 – 12.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

branded oven during the last 36 months.[100]   Mr. Weir sampled 560 respondents for his conjoint survey.[101]

41.    Mr. Weir used the results of his survey to perform a market simulation in which he compared two Whirlpool branded ovens that are identical in all respects except that one offers an AquaLift self-cleaning feature while the other offers an AquaLift partial-cleaning feature (which is assumed to be a non-misleading claim by Mr. Weir).[102]   Mr. Weir used the simulator to determine the price for the hypothetical Whirlpool AquaLift partial-clean product at which the share of respondents likely to have chosen the AquaLift partial-clean product was equal to the share of respondents likely to have chosen the AquaLift self-clean product.[103]   The difference between these two prices (i.e., the price of the AquaLift self-clean product and the price of the AquaLift partial-clean product that yields equal shares of respondents in the simulator) was treated by Mr. Weir as the price premium attributable to AquaLift.[104]   Based upon his market simulation using the survey data, Mr. Weir opined to a claimed price premium of 10.58% attributable to the alleged misrepresentation of AquaLift.[105]

### C. Calculation Of Claimed Price Premium Damages

42.    Mr. Weir estimated total dollar sales of the Challenged Products during the January 2012 to January 2017 time period, based upon total wholesale unit sales and corresponding average retail prices.[106]   Mr. Weir applied the aforementioned claimed price premium percentages to his

---

[100]   Weir Declaration, p. 15.

[101]   Weir Declaration, p. 15.

[102]   Weir Declaration, p. 19.

[103]   Weir Declaration, p. 19.

[104]   Weir Declaration, p. 19.

[105]   Weir Declaration, pp. 19 – 20.   Mr. Weir discussed "supply side considerations" that he claimed to have evaluated in his determination of damages.   (Weir Declaration, pp. 21 – 26.)

[106]   Weir Declaration, p. 40.

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

estimate of total dollar sales of the Challenged Products to calculate claimed price premium damages. [107]   Plaintiffs' claimed price premium damages as calculated by Mr. Weir are summarized in **Table 6**.

**Table 6**
**Plaintiffs' Claimed Price Premium Damages As Calculated By Mr. Weir[108]**

| Approach | Price Premium Factor | Estimated Dollar Sales | Claimed Damages |
|---|---|---|---|
| Conjoint Analysis | 10.58% | Reda | Red |
| Hedonic Regression | 10.83% | Reda | Red |

## IX.   MR. WEIR'S PERCENTAGE PRICE PREMIUM APPROACH ASSESSES CLAIMED DAMAGES ON ATTRIBUTES UNRELATED TO AQUALIFT

43.   Mr. Weir proposed to calculate damages by multiplying a claimed "*%Price Premium Factor: Claim*" by dollar sales of the Challenged Products during the putative Class period.[109]   Mr. Weir stated that these calculations "can be performed on a class-wide basis, across different geographies, and for any defined time period, including the proposed Class Period(s) in this litigation."[110] However, even under Mr. Weir's assertions regarding such calculations, Mr. Weir's proposed calculations would extrapolate the results of (a) a single conjoint survey or (b) a preliminary regression analysis of H.H. Gregg sales data to all Challenged Product sales made across all retailers during the entirety of the putative Class period.

44.   In both his conjoint analysis and preliminary regression analysis, Mr. Weir calculated a claimed percentage price premium attributable to the alleged misrepresentation of AquaLift [111]   while

---

[107]   Weir Declaration, pp. 40 – 41.

[108]   Weir Declaration, p. 41.

[109]   Weir Declaration, p. 40.

[110]   Weir Declaration, p. 41.

[111]   In his declaration, Mr. Weir stated, "I propose the use of conjoint analysis and/or hedonic regression to calculate Price Premium Damages (measured as the value of the price premium they paid solely attributable to the misrepresentation as to the AquaLift feature).   In this litigation, price premium damages for the Class are the portion of the market price of the Whirlpool

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

holding all other factors constant, including other oven attributes, time, and geography.   Within

Mr. Weir's framework, the results of his conjoint analysis and preliminary regression analysis, at

best, represent the average effects of a given attribute (i.e., AquaLift relative to manual clean in

Mr. Weir's regression analysis) or a given representation of a feature (e.g., AquaLift relative to

"AquaLift partial-clean" in Mr. Weir's conjoint analysis) across a subset of putative Class

members, not common effects that are appropriately similar across the putative Class.[112]

Calculating an average effect across a group of individuals does not demonstrate that all

individuals in the group experienced that average effect (as assumed by Mr. Weir).

45.   In calculating claimed price premium damages, Mr. Weir applied his claimed percentage price

premium to prices that are not for similarly-situated ovens.   In other words, Mr. Weir applied an

average claimed percentage price premium to sales of Challenged Products with varying attributes

and prices.[113]   Consequently, Mr. Weir's claimed price premium damages attributable to the

misrepresentation of AquaLift varies across Challenged Product purchases due to variation in

prices unrelated to the alleged wrongful conduct (and, hence, is inflating claimed damages).

46.   Analyses of the available retailer sales data demonstrate that there are significant variations in

retail prices of the Challenged Products across multiple purchase characteristics.   The data

demonstrate that there is a wide distribution of actual prices around a calculated average purchase

---

brand ovens with AquaLift solely attributable to Defendant's misrepresentations, or in other words, the difference in market value between what was promised, and what was delivered." (Weir Declaration, p. 5.)

[112] Mr. Weir asserted that the results of his regression analysis can be applied on a Class-wide basis, including any geographic area and time period.   However, Mr. Weir only calculated an average effect across various brands, oven models, capacities, time, states, and other oven attributes.   He did not perform separate calculations for specific brands, oven models, capacities, years, or states or demonstrate that the results of such calculations would be similar across those dimensions if calculated separately.   In other words, he assumed that the average effects he calculated apply to all purchases, but he did not demonstrate that to be the case.

[113] Mr. Weir asserted that "[v]ariations in purchase price do not prevent the calculation of class-wide damages."   (Weir Declaration, p. 41.)   However, for reasons discussed here and throughout my declaration, there is no reason to believe there would have been one constant percentage price premium for all purchases of the Challenged Products.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

price. Consequently, a single percentage price premium applied to average price data cannot be used to evaluate claimed damages on a Class-wide basis. Based upon the analyses performed, retail prices of the Challenged Products vary (a) over time, (b) across brands, (c) across non-challenged features, (d) across promotional activity, and (e) across geographic area. As discussed below, because of these variations in prices, Mr. Weir's percentage price premium approach incorrectly allocates some portion of these price differences (which are due to considerations unrelated to the alleged wrongful conduct) to claimed damages.

A. **Preliminary Observations Of Price Variation Across Challenged Product Sales**

47.   My review of the H.H. Gregg sales data used by Mr. Weir in his preliminary regression indicates that there was substantial price variation across the sales of Challenged Products.[114, 115]   For example, the distribution of retail prices across all Challenged Product sales at H.H. Gregg is presented in **Figure 1**. The figure demonstrates that the retail prices of the Challenged Products ranged from under $100 to almost $3,500, with approximately 98% of the Challenged Products being sold for between $400 and $1,500. (*See* **Exhibit 8**.)

---

[114] Mr. Weir did not include H.H. Gregg sales for oven models in which he did not collect attributes information in his preliminary regression analysis.   The analyses contained in my declaration (including this section) utilize the H.H. Gregg data merged with Mr. Weir's coded attributes data (unless otherwise stated).   As such, the analyses contained in my declaration are based upon the same data Mr. Weir used in his preliminary regression analysis.

[115] The H.H. Gregg sales data contain some transactions that have negative unit sales and/or negative dollar sales.   These transactions likely represent returns.   Because returns may not be recorded in the same month for which the original sale occurred, I have excluded all such observations for the purpose of providing illustrative examples of price variation.   I also have dropped all observations with nonzero unit sales and zero dollar sales for the purpose of my analysis.   Based upon Mr. Weir's regression analysis code, Mr. Weir did not drop returns from the transaction-level data.   Instead, Mr. Weir aggregated the data to the quarterly level and dropped all quarters that had zero or negative unit sales or dollar sales.   In other words, Mr. Weir dropped all quarters in which returns outweighed sales.   Mr. Weir did not address the reasons for this decision rule in the narrative to his declaration.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018



48.    Price variation also can be evaluated across models within a specific brand. For example,

**Figure 2** presents all prices of Whirlpool Challenged Products sold at H.H. Gregg stores in Florida

during the year 2016.[116] The figure shows significant variation in prices of Whirlpool ovens

equipped with AquaLift sold at H.H. Gregg (even after controlling for year and state). The figure

also demonstrates that "slide-in" ovens (████████ Redacted ████████

---

[116] Florida and New Jersey are the only states out of the six states Plaintiffs are seeking Class certification (i.e., Michigan,
Florida, New Jersey, Arizona, Idaho, and New Mexico) in which oven sales were reported in the H.H. Gregg sales data. For
this figure and all analyses of the H.H. Gregg sales data presented throughout my declaration, when an analysis uses sales
limited to a particular state, the results for Florida sales are presented in the narrative of my declaration as an illustrative example
(as Florida contains a higher number of H.H. Gregg sales than New Jersey). My findings and conclusions presented
throughout my declaration generally are unchanged when similar analyses are performed on sales made in New Jersey.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

████████ were generally higher priced than "freestanding" ovens ████████

████████████████████████████[117]  The figure shows there also was significant

price variation within the two oven types.  (*See* **Exhibit 9**.)



49.  The price variation across oven models is further demonstrated in **Table 7**, which contains a

summary of retail prices for the top-selling Whirlpool Challenged Products in Florida H.H. Gregg

---

[117] I understand that Whirlpool oven WFI910H0AS has an induction cooktop ████████████████████████
████, which may explain the significantly higher price points compared to other freestanding ovens.  (Whirlpool Model
Number Breakdown.  (WSC0062027.))

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

stores during the year 2016.  For example, the prices of Whirlpool oven WFE540H0ES ranged

from $180 to $800, while the prices of Whirlpool oven WEE730H0DS ranged from $325 to

$1,395.



50.    Significant price variation still is present even when limiting sales to a single oven model.  For

example, **Figure 3** presents all prices of H.H. Gregg sales in Florida of Whirlpool oven

WFE540H0AS (equipped with AquaLift) (i.e., the Challenged Product model with the highest

total dollar sales from January 2012 to June 2017 at H.H. Gregg).[118]  The figure demonstrates

---

[118] When an analyses calls for an evaluation of prices of a single oven (or two ovens when comparing across models), I will
provide one illustrative example in the narrative of the declaration (as done here).   Moreover, I typically use ovens with the
most sales when providing an example.   However, the same analyses can be performed for any and all Challenged Products.
For the analyses that evaluate a single oven (or two ovens when comparisons are needed), I have included additional iterations
of the analyses in the exhibits to my declaration (using different Challenged Products).

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

price variation within specific time periods (e.g., month) and over time.   As an example, the retail price of WFE540H0AS in Florida varied from $477 to $854 in October 2012 (with an average of $685).   Moreover, the average retail price of WFE540H0AS across all states dropped over the time period, from $802 (in 2012) to $493 (in 2016, as the product-model's life cycle ended).[119]



---

[119] *See* **Exhibit 6**.

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

51.   All of the Challenged Products had significant variation in their retail prices similar to that of WFE540H0AS.   Contained in **Exhibit 10** are figures comparable to **Figure 3** for numerous Challenged Products identified by Mr. Weir.   In general, these figures demonstrate significant price variation, even when looking at a single month, for many of the Challenged Products.   In addition, the figures generally show a downward trend in prices over time for each Challenged Product.

52.   The illustrative examples above demonstrate significant price variation in the H.H. Gregg sales data for the Challenged Products.   This significant price variation calls into question two primary assumptions made by Mr. Weir.

   a.   Mr. Weir's proposed percentage price premium approach necessarily assumes that consumer preferences with respect to AquaLift have held constant over the entire putative Class period. Mr. Weir provided no appropriate support for his implicit assumption that the claimed price premium consumers paid as a result of the alleged misrepresentation has remained a constant percentage of retail price over time.[120]   The introduction and discontinuation of models over time (and the associated pricing patterns) belie this assumption.

   b.   The observations above also indicate there is significant variation in retail prices across models and within models.   As discussed below, further evaluation of the retail prices of the Challenged Products indicates that the price variation across models and within models is, in large part, attributable to factors unrelated to the alleged wrongful conduct.   Such reasons for price variations invalidate a percentage price premium approach to reliably calculating Class-wide damages.

   **B.  Price Variation Across Numerous Dimensions Demonstrate That A Single Claimed Percentage Price Premium Would Not Apply To All Challenged Product Sales**

53.   Mr. Weir did not discuss the implications of applying a single percentage price premium to all the putative Class members' purchases across (a) brands, (b) models, (c) promotional status, and (d) different geographies (i.e., states), among other dimensions such as finish and number of burners.

---

[120]   In discussing the "projectability" of his conjoint survey results to the Class and Class period, Mr. Weir asserted that his "eight in-depth telephone interviews of approximately 30 minutes in duration" provided evidence that putative Class members' "feelings" and "decisions" about ovens with AquaLift would not change over time.   Mr. Weir stated in his declaration that the "interviewees indicated unanimous consistency in indicating that their decisions vis a vis AquaLift ovens would be consistent over time, types/finishes, and prices."   (Weir Declaration, pp. 7 and 20.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

Mr. Weir's approach would result in windfall gains to putative Class members. Putative Class members who paid a price with a significant discount may not have placed any value on AquaLift, but would get 10% of the purchase price. Also, putative Class members who bought a more expensive oven because of unrelated features (e.g., brand) would get 10% of the purchase price, an amount much larger than the value of AquaLift once the unrelated features are accounted for. Consequently, Mr. Weir's proposed approach does not have a nexus to Plaintiffs' theory of liability, given the extreme price variations observed in the H.H. Gregg sales data.

54. In the absence of supporting evidence, and in light of significant differences in prices paid across putative Class members, Mr. Weir's assertion that "[n]o individualized analyses, or Class-Member-specific inquiry will be required" is incorrect.[121] Mr. Weir did not analyze in his declaration any of the relevant price variations observed in the data to conclude it would be appropriate to extrapolate the results of his conjoint analysis or preliminary regression analysis to the entire putative Class (i.e., using a common proof approach) and applied across all purchases.

55. As discussed in the remainder of this section, Mr. Weir confounded price differences across numerous dimensions unrelated to the alleged wrongful conduct with a claimed price premium attributable to the alleged misrepresentation of AquaLift.

### 1. Confounded Price Differences Across Brands With Claimed AquaLift Price Premium

56. Analysis of the H.H. Gregg sales data indicates that retail prices of the Challenged Products varied across the four brands under which the Challenged Products are sold: Whirlpool, Maytag, KitchenAid, and Jenn-Air. (**Exhibit 11**.) For the purposes of evaluating price variation across brands, I have identified Challenged Products with the exact same attributes (according to Mr. Weir) except for brand. When analyzing Challenged Products across brands, by controlling for

---

[121] Weir Declaration, pp. 7 and 34.

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

these other attributes, price differentials are attributable (in large part) to a "brand effect" or "brand premium."[122]

57.   An example of price differences across brands is presented in **Figure 4**.  The figure shows the price differential between two Challenged Products that are <u>the same</u> (according to Mr. Weir), except one is a Whirlpool oven and the other is a Maytag oven.  Based upon H.H. Gregg sales in Florida, the Maytag oven was sold for (a) $55 more, on average, than the Whirlpool oven in 2014 and (b) $102 more, on average, than the Whirlpool oven in 2015.  In 2014, prices for these two ovens ranged from (a) $375 to $849 for the Whirlpool oven and (b) $500 to $830 for the Maytag oven.  (*See* **Exhibit 12**.)

---

[122]  I also control for time and geography (i.e., state).

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018



58.     As Mr. Weir relied upon a percentage price premium, in the aforementioned example, he would

        allocate some portion of the price difference across brands to the alleged wrongful conduct (where

        the difference in price is unrelated to the alleged wrongful conduct).   For example, using the 2014

        comparison above, the brand premium for Maytag over Whirlpool is $55 (on average).   Using a

        10% claimed price premium for illustrative purposes, Mr. Weir's claimed damages approach

        would attribute a portion of this brand premium to AquaLift (i.e., $55 x 10% = $5.50 per Maytag

---

[123]  According to Mr. Weir, other than brand, WFE540H0AS and MER8700DS share the following attributes: (i) capacity: 6.2
cubic feet; (ii) fuel type: electric; (iii) single oven; (iv) cleaning feature: AquaLift; (v) convection functions; (vi) finish: stainless
steel; (vii) number of racks: 2; (viii) number of burners: 5; and (ix) controls location: back.

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

oven sold for this model) when the difference in price was due to the brand of the Challenged Product. [124]   In other words, Mr. Weir's claimed percentage price approach inappropriately allocates a portion of the brand premium to claimed damages.

### 2. Confounded Price Differences Due To Non-Challenged Attributes With Claimed AquaLift Price Premium

59.   Similar to the price differences across brands discussed above, various non-challenged attributes lead to price differences across the Challenged Products.   Analysis of the H.H. Gregg sales data indicates that retail prices of the Challenged Products vary due to differences in non-challenged attributes (e.g., finish, convection functions, number of oven racks, number of burners, etc.).

60.   As an illustrative example, I identified two Challenged Products that are the same (according to Mr. Weir) except that one is sold with two oven racks (WFE540H0AS) and the other is sold with three oven racks (WFE710H0AS).[125]   The average retail prices of these ovens are presented in **Figure 5** (for H.H. Gregg sales made in Florida).   The figure shows that the model with the additional rack (WFE710H0AS) was sold at a price that was, on average, (a) $142 higher than the two-rack model in 2013 and (b) $53 higher than the two-rack model in 2014.   In 2013, retail prices for these two ovens ranged from (a) $295 to $849 for WFE540H0AS (two oven racks) and (b) $548 to $1,012 for WFE710H0AS (three oven racks).   (*See* **Exhibit 13**.)

---

[124]   Calculation: $5.50 = 10% × $55.    Model MER8700DS.

[125]   The exhibits to my declaration contain other examples of price differences due to non-challenged attributes.

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018



61.    As Mr. Weir relies upon a percentage price premium approach, in the aforementioned example, he

would allocate some portion of the aforementioned price difference (due to a different number of

oven racks) to the alleged wrongful conduct.   For example, using the 2013 comparison above, the

price difference due to an extra rack was $142 (on average).   Using a 10% claimed price premium

for illustrative purposes, Mr. Weir's claimed damages approach would attribute a portion of this

difference in price to AquaLift (i.e., $142 x 10% = $14.20 per oven with an extra rack sold) when

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

the difference in price was due to the extra rack of the Challenged Product.[126]   In other words,
Mr. Weir's claimed percentage price approach inappropriately allocates a portion of the price
difference attributable to an extra rack to claimed damages.[127]

### 3. Confounded Price Differences Due To Promotional Status And Additional Discounts With Claimed AquaLift Price Premium

62.   Analysis of the H.H. Gregg sales data indicates that retail prices of the Challenged Products varied
significantly depending upon whether or not (a) the purchase was made during an active promotion
and/or (b) the buyer was able to secure additional discounts on the "sticker price" (i.e., the price
offered).   The H.H. Gregg sales data contain four different price categories in which transactions
can be categorized: (1) regular list price; (2) regular list price net a discount; (3) promoted price;
and (4) promoted price net a discount.[128]   As an example, **Table 8** provides a summary of prices
paid by price category for H.H. Gregg sales of Whirlpool oven WFE540H0AS in Florida during
the year 2013.   The summary indicates that the majority of sales of WFE540H0AS were made
during an active promotion.[129]   Moreover, more than half of the sales made during an active
promotion included an additional discount on top of the promotion-related discount.

---

[126] Calculations: $14.20 = 10\% \times $142.   Model WFE710H0AS.

[127] It is recommended to remove all oven racks before performing a cleaning cycle for all cleaning features (i.e., pyrolytic self-clean, steam clean, and low-heat self-clean).   Thus, having an extra rack can in no way increase the value oven owners receive from a cleaning feature.

[128] There is no explanation contained in the data as to why certain sales included an additional discount to the sticker price. Two possible explanations are (a) customers of H.H. Gregg used coupons when purchasing ovens or (b) customers negotiated for and paid lower prices than what was initially offered by the store (regardless of whether there was already a promotion active).

[129] In general, the majority of Challenged Product sales in the H.H. Gregg data were made during an active promotion.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018



63.    As shown in the table above, there is price variation depending upon the additional discounts
       consumers are able to get on the sticker price.  This price variation is further evidenced in
       **Figure 6,** which contains all prices associated with H.H. Gregg sales of Whirlpool oven
       WFE540H0AS in Florida during an active promotion.  The figure shows significant price
       variation due to additional discounts.  While sales at promotional prices (blue circles) vary to
       some degree, the sales at promotional prices <u>with additional discounts</u> (green triangles) vary
       significantly in any given time period (as well as over time).  (*See* **Exhibit 14**.)

---

[130]  The table does not include five sales of WFE540H0AS that were sold above the regular and/or promoted price (i.e., more
than the "sticker price" was paid).    There appears to be a small portion of sales similar to these in the H.H. Gregg sales data.
For the purposes of evaluating price variation across promotional status and additional discounts, I have excluded these rare
anomalies from my analysis.

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018



64.  **Figure 7** presents the average prices of WFE540H0AS for sales made on promotion, differentiating between the sales that included an additional discount and those that did not. Based upon these sales, the average price for sales made during a promotion in 2013 (for example) was (a) $729 when no additional discounts were applied and (b) $671 when additional discounts

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

were applied.  This amounts to a price differential of $58 due to additional discounts.  (*See*

**Exhibit 15**.)



65.    Mr. Weir's proposed damages calculation would attribute the same percentage price premium of

the discounted promoted price to the alleged wrongful conduct even though, in the above example,

the ovens were $58 less expensive as compared to the non-discounted promoted price.   However,

Mr. Weir has provided no justification or analysis that a Challenged Product sold with considerable

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

discounts contains the same proportional price premium attributable to AquaLift as a Challenged Product being sold at the sticker price (promoted or not).  For example, Mr. Weir has not addressed in his declaration the possible scenario in which a putative Class member negotiated an additional discount for reasons not proportional to the value of the individual attributes of the oven.[131]   From an economic and damages perspective, if putative Class members were able to bargain and obtain lower prices, one must determine to what extent these discounts are related to AquaLift.[132]   These discounts could include discounts related to promotions, discontinued models, floor models, and/or dented or scratched models.

### 4.  Confounded Price Differences Across States With Claimed AquaLift Price Premium

66.   Analysis of the H.H. Gregg sales data indicates that retail prices of the Challenged Products varied across states.  **Figure 8** presents prices for all H.H. Gregg sales of Whirlpool brand WFE540H0AS by state and online for the year 2013.  The figure shows significant price variation within <u>and</u> across states in a single year.  For example, the retail prices of WFE540H0AS at H.H. Gregg in 2013 ranged from (a) $295 to $849 ($693 on average) for sales made in Florida and (b) $570 to $810 ($674 on average) for sales made in New Jersey.[133]   (*See* **Exhibit 16**.)

---

[131]  Similarly, a putative Class member may have been willing to purchase an oven with AquaLift at a lower price (due to promotional status, additional discounts, or both), even if they already had a negative perception of AquaLift as a cleaning feature.  In other words, the putative Class member did not buy the oven with AquaLift for the AquaLift feature.

[132]  As discussed in **Section XIII.B,** individual inquiry is required to determine putative Class members' knowledge and perception of AquaLift when purchasing the Challenged Products.

[133]  The number of WFE540H0AS unit sales at H.H. Gregg in 2013 were (a) 840 units sold in Florida and (b) 27 units sold in New Jersey.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018



67.   The price differences demonstrated in the figure above (and in the exhibits to my declaration) likely are driven by the various state-specific factors associated with market conditions and different consumer preferences and not by any intrinsic difference in the product sold (and not by any alleged price premium associated with an alleged misrepresentation).[134]   However, under Mr. Weir's proposed approach, higher prices caused by considerations unrelated to the alleged

---

[134] The H.H. Gregg sales data include Challenged Product sales in only two of the six states for which Plaintiffs are seeking Class certification (i.e., Florida and New Jersey).   However, the H.H. Gregg sales data generally provides evidence of price variation across states that likely apply to all states in the putative Class.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

wrongful conduct would be allocated to Class-wide damages (as Mr. Weir is relying upon a percentage price premium approach). Mr. Weir provided no explanation as to why a price differential based upon geography would be attributable to the alleged misrepresentation. There is no a priori reason to believe any of the price differences across states would be attributable to the alleged misrepresentation as opposed to other considerations.

## X.  ECONOMIC EVALUATION OF MR. WEIR'S PRELIMINARY REGRESSION ANALYSIS

68.   Mr. Weir asserted that his preliminary hedonic regression analysis "confirms the existence of a price premium attributable to the AquaLift feature."[135]   However, Mr. Weir's preliminary regression analysis does not address or resolve any of the individual inquiry issues or other deficiencies in his proposed price premium approach that are discussed throughout my declaration. Hence, Mr. Weir's preliminary regression analysis is incapable of providing a relevant or reliable common proof measure of claimed economic harm suffered by putative Class members. Mr. Weir's preliminary regression analysis contains additional flaws that further negate its reliability for demonstrating or quantifying claimed "price premium" damages associated with AquaLift on a Class-wide basis using common proof.

### A.  Mr. Weir's Regression Analysis Inappropriately Compares AquaLift To Manual Clean

69.   Mr. Weir proposed to measure the impact of AquaLift through hedonic regression analysis by comparing "an oven with AquaLift" with an "oven with no cleaning mechanism."[136]   In other words, Mr. Weir calculated a claimed price premium for an over with AquaLift over a manual-clean oven (i.e., an oven with no cleaning mechanism of any type).   However, Mr. Weir's

---

[135]  Weir Declaration, p. 37.

[136]  Weir Declaration, p. 39.

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

proposed comparison between AquaLift and manual clean does not properly account for the value

received by consumers and is unreliable to evaluate damages in this matter.

a. <u>Mr. Weir's Regression Analysis Is Inconsistent With His Conjoint Survey</u>.   In conducting his <u>conjoint analysis</u>, Mr. Weir performed a comparison of (i) ovens with AquaLift self-clean and (ii) ovens with AquaLift partial clean (i.e., Mr. Weir's description of AquaLift as he represents its functioning).[137]   In contrast, Mr. Weir's <u>regression analysis</u> performs a comparison between ovens equipped with AquaLift and ovens with no cleaning feature (i.e., manual clean only).[138]   This comparison (i.e., AquaLift vs. manual clean) is inconsistent with the conjoint analysis performed by Mr. Weir and does not capture the value consumers actually received from AquaLift, even under Plaintiffs' theory.[139]   For example, even several Named Plaintiffs testified that they received some benefit from AquaLift beyond manual cleaning.[140]   Therefore, the comparison performed by Mr. Weir's regression would overstate the putative Class members' claimed economic harm (and is inconsistent with his conjoint analysis).

b. <u>Mr. Weir's Regression Analysis Is Inconsistent With Plaintiffs' Motion For Class Certification</u>.   Plaintiffs' Motion for Class Certification acknowledges that AquaLift provided cleaning benefits to the bottom of the oven cavity, demonstrating that Mr. Weir's comparison between AquaLift and manual clean in his regression analysis is inappropriate.   For example, Plaintiffs' Motion for Class Certification states that "[e]ach AquaLift Oven was designed to perform the same level of cleanability, with a focus on the bottom of the oven cavity and limited, if any, cleanability on the sides, back, top or door portions of the interior of the ovens."[141]   Plaintiffs also assert that consumers of the Challenged Products "were sold ovens that cannot clean the sides, walls, door, or top of the oven cavity, leaving them perpetually dirty."[142]   Plaintiffs' emphasis on this view of AquaLift directly undermines Mr. Weir's decision to calculate the claimed price premium as the difference between AquaLift and manual clean in his hedonic regression analysis.

c. <u>Mr. Weir's Regression Is Contrary To Deposition Testimony And Documentary Evidence</u>.   Mr. Weir's regression analysis is inconsistent with Named Plaintiffs' deposition testimony,

---

[137] Weir Declaration, p. 20.   For Mr. Weir's definitions of "AquaLift Self-Clean" and "AquaLift Partial Clean," see Weir Declaration, p. 12.

[138] Weir Declaration, p. 39.

[139] In his declaration, Mr. Weir stated that the fact that his conjoint analysis and preliminary regression analysis produced similar results is a "measure of convergent validity, lending greater weight to the accuracy of the results."   This statement is inaccurate in light of the observation that his conjoint analysis and preliminary regression analysis attempt to measure two entirely different claimed price premiums attributable to AquaLift.   (Weir Declaration, p. 3.)

[140] For example, Ms. Bliss testified that AquaLift aided in cleaning about 20% of the stains on the oven floor that, prior to using AquaLift, had been baked into the oven surface.   (Bliss Deposition, p. 115.)   Ms. Simmons testified that AquaLift removed approximately 50% of the soiling from the bottom of the oven.   (Simmons Deposition, p. 76.)   *See also* **Exhibit 5**.

[141] Plaintiffs' Motion For Class Certification, p. 22.

[142] Plaintiffs' Motion For Class Certification, p. 2.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

which, in the least, demonstrates that Named Plaintiffs received a product that was better than manual clean.

i. Named Plaintiffs Acknowledged That AquaLift Provided Some Cleaning Benefits Over A Manual Clean Oven.   Named Plaintiffs provided testimony regarding the cleaning proficiency of AquaLift based upon their individualized experience.   Generally, their testimony acknowledges that AquaLift provided some cleaning benefits and was not the same as manual cleaning – demonstrating that Mr. Weir's proposed comparison between AquaLift and manual clean is inappropriate.   For example, Ms. Simmons testified that AquaLift removed approximately 50% of the soiling from the bottom of her oven.[143] Similarly, Mr. Richard Thome testified that AquaLift provided at least 50% cleaning enhancement.[144]   Named Plaintiffs' deposition testimony regarding their experience with AquaLift demonstrate that Mr. Weir's claimed price premium factor of approximately 10.83% is overstated and unreliable – as it is not based upon a benchmark consistent with Named Plaintiffs' testimony.   In addition, Named Plaintiffs' expectations of AquaLift varied (e.g., some expected AquaLift to be similar to steam clean while others expected AquaLift to be similar to pyrolytic self-clean),[145] further demonstrating the need for individualized inquiry.   The claimed economic harm (if any) suffered by the putative Class members would depend upon the specific Class member's experiences and expectations.

ii. Mr. Weir's Claimed Percentage Price Premium Approach Includes Damages Based Upon Certain Benefits To The Cleaning Process That Are Not Challenged (Saves Time, No Odor, Less Heat).   Documentary evidence and deposition testimony of Whirlpool personnel indicate that AquaLift offers various cleaning benefits that are not challenged by Plaintiffs.

- AquaLift provides a low-heat self-clean option that is significantly shorter than pyrolytic self-clean.[146]

- AquaLift does not have many of the drawbacks associated with pyrolytic self-clean, including odors, smoke, potential damage to the oven, and extremely hot surfaces during and after the cycle.[147]

---

[143]  Simmons Deposition, p.76.

[144]  Richard Thome Deposition, pp. 90 – 91.

[145]  *See, e.g.,* Richard Thome Deposition, p. 58; Bliss Deposition, p. 71; Barnes Deposition, pp. 24 – 25, 30 and 53; and Limpede Deposition, pp. 20, 132 – 133, 155, and 196.

[146]  According to a Whirlpool presentation, the top three consumer insights regarding the benefits of AquaLift over other cleaning alternatives were (a) saves time, (b) no odor, and (c) low heat.   ("AquaLift Technology: Get Your Oven Clean In Less Than 1 Hour!" presentation slides.   (Ganus Deposition, Exhibit 32.   (WSC0024334 – 370, at 341.)))

[147]  For example, a Whirlpool presentation notes that there is "no need to remove small children or pets such as birds that may be sensitive to fumes" during the AquaLift self-clean cycle.   ("AquaLift Technology: Get Your Oven Clean In Less Than 1 Hour!" presentation slides.   (Ganus Deposition, Exhibit 32.   (WSC0024334 – 370, at 341.))   *See also* Moore Deposition, pp. 271 – 273.)

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

- 57 -

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

- The entire cooktop (i.e., burners) can be used during the AquaLift self-clean cycle.[148]

I understand that these aspects of AquaLift are not challenged by Named Plaintiffs. Such benefits to the cleaning process are not isolated in the claimed price premium Mr. Weir calculated from his hedonic regression analysis.

70.   A regression analysis comparing AquaLift to manual cleaning is internally inconsistent with Mr. Weir's own conjoint analysis as well as contrary to Named Plaintiffs' deposition testimony. Such a comparison fails to account for the value and benefits that consumers actually received from ovens with AquaLift relative to ovens without AquaLift, even under Plaintiffs' theory.

### B.   Mr. Weir's Regression Analysis Fails To Isolate Cleaning Benefits From Non-Cleaning Attributes Of AquaLift For Which Plaintiffs Are Not Claiming Damages

71.   Mr. Weir claimed that the "positive coefficient for [AquaLift] indicates that consumers place a high value on the AquaLift feature, and that market wide, there is a substantial price premium attributable to this feature."[149]   It is my understanding that the Named Plaintiffs' theory of liability, and thus, Mr. Weir's claimed price premium, only relates to the alleged misrepresentation of the cleaning-related attributes of AquaLift.[150]   However, Mr. Weir's regression analysis failed to parse out the non-cleaning-related attributes associated with AquaLift that add value to the Challenged Products. If the non-cleaning-related benefits are not controlled for, the claimed price premium Mr. Weir attempts to measure through the use of his proposed hedonic regression will be overstated. This is because Mr. Weir's regression attempts to measure the oven price difference between AquaLift (which includes both cleaning-related benefits and non-cleaning

---

[148] "AquaLift Technology: Get Your Oven Clean In Less Than 1 Hour!" presentation slides.   (Ganus Deposition, Exhibit 32. (WSC0024334 – 370, at 341.))

[149] Weir Declaration, p. 39.   (Bracketed text added for clarification.)

[150] It is my understanding that the Named Plaintiffs assert that Whirlpool misrepresented AquaLift as a self-clean feature requiring minimal (to no) manual effort, when (allegedly) AquaLift fails to fully clean the interior of the oven (requiring more manual cleaning than expected).

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

related benefits) and manual cleaning.   The impact of any alleged misrepresentation associated

with the cleaning-related benefits is not isolated.

72.   For example, a 2011 Whirlpool presentation indicates that the AquaLift technology allows for (a)

larger oven capacities, (b) smooth interior of oven doors, and (c) larger oven windows.[151]   Mr.

Moore also testified that Whirlpool was able to offer "more performances in the oven because now

we have this AquaLift self-clean technology that allows us to do other things besides just do the

cleaning."[152]   Specifically, I understand that ovens with AquaLift require less insulation and

ventilation, allowing for improvements in functionality and aesthetics.[153]   Mr. Moore identified

large windows, large oven cavities, and the ability to use the stovetop during the cycle as key

differentiators compared to an oven equipped with pyrolytic self-clean.[154]   In addition to these

benefits, Ms. Klyn testified that, as a result of the small ventilation surfaces, AquaLift-equipped

ovens have better cooktop performance, a better burner layout for the cooktop, and overall better

aesthetic appeal.[155]

73.   Based upon documentary evidence and deposition testimony, Mr. Weir's regression analysis failed

to control for the following non-cleaning benefits enabled by the introduction of AquaLift.

    a.   <u>Improved Aesthetic Appeal</u>.   Based upon the documentary evidence in this matter, I
        understand that the aesthetic appeal of an oven is a key purchase driver for consumers.[156]
        For example, many of the Named Plaintiffs identified the aesthetics of the oven as a reason

---

[151] "Vesta Purchase Influencers," dated May 2011.   (WSC0026642 – 687, at 643.)   *See also* Moore Deposition, p. 271.   I understand that lower temperatures used by AquaLift (as compared to pyrolytic self-clean) require the manufacturers to use less insulation.   As a result, ovens equipped with AquaLift (as opposed to pyrolytic self-clean) are able to have larger cavities. (Klyn Deposition, p. 119.)

[152] Moore Deposition, p. 114.

[153] Ms. Klyn testified that the lower temperatures of AquaLift allowed for a smaller ventilation surface than what would be included with an oven equipped with pyrolytic self-clean.   (Klyn Deposition, p. 355.)

[154] Moore Deposition, p. 114.   *See also* Klyn Deposition, pp. 52 – 53.

[155] Klyn Deposition, p. 355.

[156] For example, various consumer insight and survey documents produced by Whirlpool list aesthetics or the look of specific components of the oven as key purchase drivers or factors that influence price.   (**Section XIII.A.**)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

for their purchase.[157]   It is my understanding that AquaLift was introduced in a new product line (Vesta), which included key improvements in the aesthetics of the ovens.  For example, Mr. Moore testified that the new Vesta product line was introduced with a new aesthetics, noting that "aesthetics was really the big thing."[158]   According to Ms. Klyn, ovens with AquaLift are more aesthetically pleasing because they do not require the large ventilation surface that is needed with ovens with pyrolytic self-clean.[159]   In addition, Mr. Sells testified that ovens with AquaLift have thinner doors and sides (because of the lower insulation requirements), which allowed for an improved aesthetics.[160]

b.  Improved Cooktop Performance.   It is my understanding that cooktop performance, including the layout and functionality of the burners, is a key purchase driver of ovens.[161]   I understand that the Vesta product line improved cooktop performance compared to other ovens.  For example, Mr. Sells testified that the lower insulation and thinner walls made possible by AquaLift allows for the installation of higher-powered burners.[162]   This is supported by the deposition testimony of Mr. Moore who testified that the Vesta product line had "one of the most powerful cooktops in the industry at the time" of its introduction.[163]   In addition, Ms. Klyn testified to the improved cooktop performance of ovens with AquaLift, stating that they had "better cooktop performance" and "a better burner layout for the cooktop."[164]

c.  Larger Oven Door Window.   A 2011 Whirlpool presentation indicates that a key benefit of AquaLift is that it allows for larger oven door windows.[165]   This is consistent with the deposition testimony of Mr. Moore, Ms. Klyn, and Mr. Sells, which all noted that, as a result of the lower insulation requirements, ovens with AquaLift have larger door windows than ovens with pyrolytic self-clean.[166]

74.  Mr. Weir's regression analysis failed to account for the above non-cleaning benefits that are related

to the introduction of AquaLift.  As a result, Mr. Weir's regression coefficient on AquaLift (and

---

[157]  *See* **Section XIII.A.**

[158]  Moore Deposition, pp. 77 – 78.   Mr. Moore further testified that the Vesta ovens "looked completely different" than the older generation ovens.

[159]  Klyn Deposition, p. 355.

[160]  Sells Deposition, pp. 11 – 13.

[161]  For example, various consumer insight and survey documents produced by Whirlpool list cooktop performance in some capacity as a key purchase driver or factor that influences price.   *See* **Section XIII.A.**

[162]  Sells Deposition, pp. 11 – 13.

[163]  Moore Deposition, pp. 142 – 143.

[164]  Klyn Deposition, p. 355.

[165]  "Vesta Purchase Influencers," dated May 2011.   (WSC0026642 – 687, at 643.)

[166]  Moore Deposition, p. 271.   *See also* Klyn Deposition, pp. 27 – 28, 52 – 53, and 355.   *See also* Sells Deposition, p. 63.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

resulting claimed price premium) is biased upwards due to an inability to isolate the cleaning aspects of AquaLift from the non-cleaning benefits made possible by the introduction of AquaLift. In other words, the coefficient on AquaLift captured the additional value attributable to the cleaning features <u>and</u> the additional value attributable to the non-cleaning features (for which Named Plaintiffs are not claiming damages). Even if Mr. Weir were to attempt to control for these non-cleaning benefits in an alternative regression analysis, some of the non-cleaning benefits are non-quantifiable, such as the improvements to aesthetic appeal. Thus, Mr. Weir's proposed hedonic regression is incapable of providing a claimed price premium factor that isolates the relevant cleaning benefits of AquaLift apart from the non-quantifiable, non-cleaning benefits that are associated with the introduction of AquaLift.

### C. Mr. Weir's Regression Analysis Failed To Account For Relevant Quantifiable And Non-Quantifiable Attributes That Impact Prices

75. In the process of assembling data and performing his regression analysis, Mr. Weir obtained technical specification data from oven manufacturer websites and identified a number of oven attributes.[167] However, Mr. Weir omitted numerous variables for some of the features and attributes listed in the technical specification data that he identified, which lead to an economic flaw referred to as "omitted variable bias." Omitted variable bias occurs when one or more relevant explanatory variables (e.g., (a) quantifiable attributes in the specification data that Mr. Weir failed to include and (b) non-quantifiable attributes that Mr. Weir cannot include) are omitted from a regression model. If this occurs, the results of that regression generally are biased in that

---

[167] Weir Declaration, p. 33.

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

the impact of the omitted considerations are "spread across" the considerations that are included in the regression analysis.[168]

76.    As discussed in the remainder of this section, Mr. Weir's regression analysis suffers from omitted variable bias for the following reasons:

   a. There exist quantifiable attributes that Mr. Weir could have controlled for but did not in his regression analysis.

   b. There exist non-quantifiable attributes that Mr. Weir could <u>not</u> have controlled for in his regression analysis.

### 1.    Mr. Weir Omitted Numerous Quantifiable Attributes In His Regression Analysis

77.    Mr. Weir claimed in his declaration that "[t]he data necessary to conduct a hedonic regression analysis and damage calculation in this litigation is already available, or can easily be obtained. Such data comes from one of several sources: Defendant's own business records (e.g., pricing data, product attributes, sales volumes); third party competitors (e.g., product specifications); or industry resources and independent market research (e.g., pricing and product attribute information from retailers)."[169]   However, review of these documents indicates that Mr. Weir omitted some key quantifiable attributes from his regression analysis, even though they are listed in the documents he claimed to have reviewed.

   a. <u>Oven Drawer Type</u>.   Mr. Weir cited a 2014 Whirlpool presentation in his declaration, asserting the document "████████████████████████████████████████████████████ "[170] ████████████████████████████████████████ [171]   It is my understanding that there are three different drawer types: (i)

---

[168] *Undergraduate Econometrics*, Second Edition, Hill, R.C., Griffiths, W.C., and Judge, G.G. ("Undergraduate Econometrics"), pp. 185 – 187.   One exception is when the omitted variable is uncorrelated with the included variables. However, "uncorrelated explanatory variables are rare," and unlikely in this context for the reasons discussed in this section of my declaration.   (Undergraduate Econometrics, p. 185.)

[169] Weir Declaration, p. 33.   (Bracketed text added for clarification.)

[170] Weir Declaration, p. 4.   (Bracketed text added for clarification.)   *See also* "Cooking: Cleaning Insights," Whirlpool Presentation dated January 7, 2014.   (WSC0012939 – 966 at 957.)

[171] "Cooking: Cleaning Insights," Whirlpool Presentation dated January 7, 2014.   (WSC0012939 – 966 at 957.)

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

- 62 -

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

storage, (ii) warming, and (iii) broiler. In general, the specification sheets that Mr. Weir claimed to use contain information regarding the type of drawer. Moreover, each drawer type is present in the H.H. Gregg data, and thus, relevant for the purposes of Mr. Weir's regression analysis.[172] However, Mr. Weir did not include drawer type as an explanatory variable in his regression analysis. This calls into question the reliability of Mr. Weir's regression analysis, especially in light of the fact that he included oven capacity in his regression analysis, ███████████████[173]

b. <u>Cooktop Surface And Burner Elements</u>. The same 2014 Whirlpool presentation cited by Mr. Weir indicates that there are numerous design and functionality qualities of the cooktop that drive consumer choice of oven ranges.[174] For example, "Cooktop Material/Color" and "Number/Type of Burners" were identified as the attributes ███████████████████████ ████████████████████████████████████████[176]

Review of the product specification sheets Mr. Weir relied upon confirms that many of these attributes are listed for all eight brands included in the H.H. Gregg sales data.[177] However, Mr. Weir only controlled for the number of burners in his regression analysis, omitting all other cooktop/burner explanatory variables.

c. <u>Other Quantifiable Attributes Omitted By Mr. Weir</u>. Documentary evidence and oven specification sheets indicate several other relevant quantifiable attributes that were either

---

[172] For example, Whirlpool ovens WFG320M0BB and WEE730H0DS and Samsung oven NX58H9500WS are included in Mr. Weir's regression analysis: (a) WFG320M0BB has a broiler drawer, which is for cooking purposes; (b) WEE730H0DS has a storage drawer, which is solely for storage purposes; and (c) NX58H9500WS has a warming drawer, which is used to maintain the freshness of food before serving. ("Whirlpool 5.1 cu. ft. Freestanding Gas Range with Under-Oven Broiler." (https://www.whirlpool.com/kitchen/cooking/ranges/single-oven-freestanding/p.5.1-cu.-ft.-freestanding-gas-range-with-under-oven-broiler.wfg320m0bb.html, viewed on March 6, 2018.) *See also* "6.2 cu. ft. Front-Control Electric Stove with Fan Convection | Whirlpool." (https://www.whirlpool.com/kitchen/cooking/ranges/slide-in/p.6.2-cu.-ft.-front-control-electric-stove-with-fan-convection.wee730h0ds.html, viewed on March 6, 2018.) *See also* "5.8 cu. ft. Slide-In Gas Range with True Convection Ranges - NX58H9500WS/AA | Samsung US." (https://www.samsung.com/us/home-appliances/ranges/gas/nx58h9500ws-slide-in-gas-range-with-true-convection-nx58h9500ws-aa/, viewed on March 24, 2018.) *See* also "The True Purpose of the Drawer Underneath Your Oven." (https://www.msn.com/en-us/foodanddrink/tipsandtricks /the-true-purpose-of-the-drawer-underneath-your-oven/ar-AAnGKas, viewed on March 24, 2018.))

[173] "Cooking: Cleaning Insights," Whirlpool Presentation dated January 7, 2014. (WSC0012939 – 966 at 957.)

[174] "Cooking: Cleaning Insights," Whirlpool Presentation dated January 7, 2014. (WSC0012939 – 966 at 961.)

[175] "Cooking: Cleaning Insights," Whirlpool Presentation dated January 7, 2014. (WSC0012939 – 966 at 961.)

[176] "Cooking: Cleaning Insights," Whirlpool Presentation dated January 7, 2014. (WSC0012939 – 966 at 961.)

[177] For example, with respect to cooktop surfaces, Maytag oven MGR8674AW has a cooktop surface material of porcelain-coated steel; Whirlpool oven WEE730H0DS has a cooktop surface material of ceramic glass; and Samsung oven NX58H9500WS has a cooktop surface material of stainless steel. ("5.8 cu. ft. Capacity Gas Range with 17,000-BTU Speed Heat™ Burner | Maytag." (https://www.maytag.com/kitchen/cooking/wall-ovens/single-oven/p.5.8-cu.-ft.-capacity-gas-range-with-17,000-btu-speed-heat-burner.mgr8674aw.html, viewed on March 24, 2018.) "6.2 cu. ft. Front-Control Electric Stove with Fan Convection | Whirlpool." (https://www.whirlpool.com/kitchen/cooking/ranges/slide-in/p.6.2-cu.-ft.-front-control-electric-stove-with-fan-convection.wee730h0ds.html, viewed on March 6, 2018.) "5.8 cu. ft. Slide-In Gas Range with True Convection Ranges - NX58H9500WS/AA | Samsung US." (https://www.samsung.com/us/home-appliances/ranges/gas/nx58h9500ws-slide-in-gas-range-with-true-convection-nx58h9500ws-aa/, viewed on March 24, 2018.))

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

- 63 -

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

identified by consumers as important purchase drivers or listed on the product specification sheets, but omitted by Mr. Weir in his regression analysis. These attributes include but are not limited to: Frozen Bake™ technology (i.e., baking without a preheat period), door type and finish, door window size and finish, timer, and warranty coverage, among others.[178]

78. Mr. Weir's failure to include a significant number of key attributes identified in the documentary evidence and specification sheets, many of which he claimed to have reviewed, leads to omitted variable bias. As an illustrative example of this critical flaw with Mr. Weir's regression, two Frigidaire ovens, FFEF3043LS and FFEF3011LW, are identified by Mr. Weir as being the same (according to his list of attributes) except for finish (with the former stainless steel and the latter white). However, Mr. Weir's attributes list (and, consequently, his regression analysis) did not account for at least the following differences between these two models. (*See* **Figure 9**.)

   a. <u>Cooktop Surface</u>. The FFEF3043LS oven has a cooktop surface of "Upswept Black Smoothtop," while the FFEF3011LW oven has a cooktop surface of "Slabtop Coil with Chrome Bowls."

   b. <u>Oven Window Size</u>. As evidenced by the product image in the figure below, the FFEF3043LS clearly has a significantly larger oven window than that of the FFEF3011LW.

---

[178] *See, e.g.*, "Vesta Consumer Expectations & Communications," presentation, dated October 2010.   (WSC0016040 – 045 at 044.)   Most of the attributes listed also are identified in the specification sheets for various oven models.

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

**Figure 9**
**Frigidaire Ovens With Same Attributes Except For Finish (According To Mr. Weir)**

| Model Number FFEF3011LW<br>Finish: White<br>Cooktop Surface: Slabtop Coil&Chrome Bowls | Model Number FFEF3043LS<br>Finish: Stainless Steel<br>Cooktop Surface: Upswept Black Smoothtop |
|---|---|



79.     Not surprisingly, the smoothtop model with a larger oven window is sold at a MSRP price of $749, while the coil model has a MSRP of only $499.[179]   The price difference between these two models is further evidenced by **Figure 10**, which presents all transactions of the two Frigidaire ovens in the H.H. Gregg data.   The figure demonstrates that the stainless steel oven with a smoothtop surface and larger oven window is typically sold at a higher price than the white oven with coil burners and smaller oven window.   (*See* **Exhibit 17**.)   However, because Mr. Weir has failed to control for cooktop surfaces and oven window size, it is likely his regression analysis attributes much of the price differential to the finish of the oven (given that it is the only difference between

---

[179] "Frigidaire 30" Freestanding Electric Range Stainless Steel-FFEF3043LS."   (https://www.frigidaire.com/Kitchen-Appliances/Ranges/Electric-Range/FFEF3043LS/, viewed on March 19, 2018.)   *See also* "Frigidaire 30" Freestanding Electric   Range   White-FFEF3011LW."   (https://www.frigidaire.com/Kitchen-Appliances/Ranges/Electric-Range/FFEF3011LW/, viewed on April 4, 2018.))

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

these two models captured in Mr. Weir's regression).   By omitting key purchase drivers such as

the cooktop surface and oven window in this example, Mr. Weir's regression analysis produces

unreliable results.

**Figure 10**



This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.