# Exhibit 24

## (Part 4)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018



### G. Mr. Weir's Market Simulations Are Unreliable for Evaluating The Claimed Price Premium

129.	Mr. Weir proposed to use the results from his conjoint survey (and subsequent Hierarchical Bayesian regression analysis) to perform market simulations to calculate the "economic market value" of AquaLift in a market scenario where "the truth" about the feature is made known to consumers.[280] Mr. Weir later defined the alleged "truth about the AquaLift feature" as the

---

[280] Weir Declaration, p. 18.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

"manual effort … required to clean all but the bottom of the oven cavity."[281]   According to Mr.

Weir, market simulation provides a "statistically robust … estimate of any price premium that

purchasers paid solely as a result of the AquaLift feature."[282]   However, Mr. Weir's proposed

market simulations (based upon his conjoint survey results) suffer from deficiencies that render

them unreliable for evaluating the claimed "percentage price premium."

   a.   Mr. Weir's proposed market simulations do not include competitor products and hence do not
        reflect the market simulation procedure specified by Sawtooth Software (i.e., the software
        package used by Mr. Weir).

   b.   Mr. Weir's discussion of supply-side factors is incomplete as it does not represent supply-side
        factors that would be necessary to determine a market price absent the alleged
        misrepresentation.

   c.   Mr. Weir's proposed market simulations at best measure willingness-to-pay (assuming he
        performed the simulation procedure correctly) but do not measure a "price premium."

   ### 1.   Mr. Weir's Market Simulations Do Not Reflect The Market Simulation Procedure As Described by Sawtooth Software

130.   Mr. Weir stated that he "conducted the measurement of the price premium using a market

simulation tool produced by Sawtooth Software."[283]   Mr. Weir stated that he used Sawtooth

Software to perform market simulations to measure the claimed "price premium" associated with

the alleged wrongful conduct.[284]   However, the market simulation procedure described by Mr.

Weir does not reflect the procedure as described by Sawtooth Software.

---

[281]  Weir Declaration, p. 19.   (Bracketed text added for clarification.)

[282]  Weir Declaration, p. 18.   (Bracketed text added for clarification.)

[283]  Weir Declaration, p. 17.

[284]  Weir Declaration, p. 17.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

131.   Mr. Weir stated that "Sawtooth Software is the world leader in conjoint analysis survey software"

that is "widely used by academics and professionals around the world."[285]   Sawtooth Software

describes the procedure for performing a market simulation as below.

> This approach involves simulating a realistic competitive scenario with a conjoint
> market simulator. Assume four products (A through D) representing the current
> relevant products in the marketplace.   Further assume that the firm is interested in
> offering an additional feature for product A, and wants to estimate what new price
> can be charged while maintaining the same share of preference.   We first simulate
> a base case with products A through D placed in competition with one another,
> where A does not include the new feature.   We record its share of preference (say,
> 15%).   We then conduct another simulation in which we improve A by offering a
> new feature (and hold the competition B through D constant).   The share of
> preference for A should increase (say, to 20%).   We then perform additional
> simulations (again holding competition constant) raising the price of the new
> product A until its share of preference again drops to the original 15%.   The
> difference in price between the more expensive improved Product A that captures
> 15% and the old Product A that captured 15% reflects the incremental monetary
> value that the market will bear for the new feature, given the competitive context
> and the objective of maintaining share constant.[286]

132.   The Sawtooth description of market simulation requires both the product of interest and relevant

competing products be used in the simulator.   A market simulation performed according to this

Sawtooth procedure for use in this matter would require (a) information on products from

competing brands in addition to the Challenged Products and (b) replacing the product with

AquaLift with an alternative product without AquaLift (but otherwise identical) in separate rounds

of simulations, instead of having them compete against each other in the same simulation round.

However, the market simulation procedure used by Mr. Weir did not fulfill either of these

conditions.

a.   Mr. Weir's Market Simulation Procedure Did Not Include Competitive Products.   According
to Sawtooth Software documentation, one of the assumptions that affects the ability of a market
simulation to be informative as to actual market dynamics is the assumption that "the relevant

---

[285]   Weir Declaration, p. 15.

[286]   Assessing the monetary value of attribute levels with conjoint analysis: Warnings and suggestions, 2001, p. 4.
(http://www.sawtoothsoftware.com/download/techpap/monetary.pdf, viewed on February 16, 2018.)

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

competitive offerings are reflected in the simulation model."[287]   However, Mr. Weir's market simulations incorporated only two versions of the Challenged Products that Mr. Weir stated were "Whirlpool branded ovens that are identical in all respects except that one misleadingly offers a 'self-cleaning' AquaLift feature while the other makes plain the alleged truth about the AquaLift feature" (i.e., between otherwise identical ovens for which one bears the "AquaLift self-clean" claim and the other bears the "AquaLift partial-clean" claim).[288]   This market simulation approach eliminates other relevant competitive choices available to actual consumers (e.g., putative Class members).   By eliminating competitive choices from consumers' choice set, Mr. Weir's proposed market simulations failed to reflect the actual market choices that would have been available to consumers and would fail to account for competitive effects such as consumers choosing products other than the Challenged Products.

For example, Mr. Weir's proposed approach would misrepresent preferences of consumers who – if given a choice between (a) an oven with "AquaLift self-clean," (b) an oven with Mr. Weir's created "AquaLift partial-clean," and (c) other competitor products – would have chosen other competitor products, but instead would be forced by Mr. Weir to choose only between an oven with "AquaLift self-clean" and an oven with the claimed "AquaLift partial-clean."[289]   By omitting competing products from his market simulations, Mr. Weir would not accurately represent consumers' choice set and would calculate values based upon some consumers who would not have purchased the Challenged Products regardless of whether they contained AquaLift.[290]   Such an evaluation would be inappropriate for use in quantifying claimed damages on a Class-wide basis.

b.  Mr. Weir's Market Simulations Sought To Obtain Equal Market Shares Rather Than Profit-Maximizing Pricing Decisions.   Mr. Weir asserted that he used "the market simulator to simulate a condition where the price of the second product [i.e., a product identical to the Challenged Product but without the alleged misrepresentations] is reduced to the level where both products obtain equal market share."[291]   However, as discussed above, Sawtooth Software's market simulation procedure assumes an "objective of maintaining" a constant market share in a competitive market setting (i.e., a setting containing a set of competitive

---

[287]  Assessing the monetary value of attribute levels with conjoint analysis: Warnings and suggestions, 2001, p. 4. (http://www.sawtoothsoftware.com/download/techpap/monetary.pdf, viewed on March 21, 2018.)

[288]  Weir Declaration, p. 19.

[289]  For example, consider a respondent who has the following preferences (or utilities) for colors - Blue: 50, Red: 40, and Yellow: 10.   This respondent prefers Blue over Red and Yellow.   If in a market simulation, the respondent is given a choice between Red and Yellow, and Blue is not offered to him, he will choose Red.   Thus, in this case, an incomplete set of market options results in a wrong conclusion about market choices.   (Getting started with conjoint analysis: strategies for product design and pricing research, "Market Simulators for Conjoint Analysis," p. 91.   (https://www.sawtoothsoftware.com/ download/techpap/introsim.pdf, viewed on March 21, 2018.))

[290]  As discussed below, the measure presented by Mr. Weir is a measure of willingness to pay rather than a price premium because it does not account for supply considerations that affect market prices.   Given that the Sawtooth documentation notes the importance of accounting for supply considerations and that the suggested simulation process does not incorporate supply, even if Mr. Weir had followed the recommended procedure from Sawtooth, the results would have been a measure of willingness to pay rather than a price premium.

[291]  Weir Declaration, p. 19.   (Emphasis added.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

products) rather than an objective of equalizing market shares in a non-competitive market setting (i.e., a market consisting of only two products).[292]   Mr. Weir has provided no evidence that an exercise in which prices are adjusted to equalize market shares between two products would yield values representing the profit-maximizing prices and output levels that would have resulted in the market absent the alleged wrongful conduct.[293]

133.   The above discussion shows that Mr. Weir's market simulation procedure does not reflect the assumptions, the objectives, or the procedure as described by Sawtooth Software's documentation. Mr. Weir did not demonstrate the validity of his market simulation procedure (that uses Sawtooth Software's market simulation tool[294] but does not follow its procedure for conducting market simulations) to measure the economic value of the Challenged Product absent the alleged misconduct, let alone the claimed "price premium" attributable to AquaLift.

### 2.   Mr. Weir's Discussion Of Supply-Side Factors Is Incomplete

134.   Mr. Weir claimed he "considered supply side factors in [his] determination of damages."[295]   Mr. Weir identified the following as supply-side factors he considered.[296]

  a.   "[I]n this litigation (i), the historic number of units sold is a fact …; and (ii), the number of units sold to the class will not change as a result of the calculation of the price premium (or in other words, the quantity supplied will not be anything other than the actual number of units sold by Defendant.)."[297]

---

[292] Assessing the monetary value of attribute levels with conjoint analysis: Warnings and suggestions, 2001, p. 4. (http://www.sawtoothsoftware.com/download/techpap/monetary.pdf, viewed on February 16, 2018.)

[293] Citing documents from Sawtooth Software, Mr. Weir claimed that "[f]orecasts based on such market simulations are sufficiently accurate such that businesses like Whirlpool routinely make decisions based on the results of these simulations." (Weir Declaration, p. 18, citing "Getting Started with Conjoint, Chapter 10: Market Simulators for Conjoint Analysis.") However, as demonstrated throughout my declaration, Mr. Weir's proposed market simulation differs significantly from the simulation described by Sawtooth in that document and in the documents discussed above.  Hence, Mr. Weir's reliance upon that document to support his market simulation is inappropriate.

[294] Weir Declaration, p. 17.

[295] Weir Declaration, p. 21.   (Bracketed text added for clarification.)

[296] Weir Declaration, pp. 21 – 22.

[297] Weir Declaration, p. 21.   (Bracketed text added for clarification.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

b. "[I]f one were to assume, *arguendo*, that Defendant would not have lowered its price in concert with demand …, then the economic outcome would be that many or all of the purchases would not have take[n] place at all."[298]

c. "I [Mr. Weir] conducted research of actual retail sales and market data and included these real world price points in the survey.  These real-world transactions occurred at prices that *already* reflect the supply side factors then extant in the market."[299]

d. "[V]ariability in pricing both at the wholesale level and retail level showed that Defendant's and retailers' pricing was responsive to changing market forces."[300]

e. "Another important supply-side factor that I [Mr. Weir] accounted for was the fact that the quantity of the Whirlpool brand ovens supplied is a known quantity, and fixed as a matter of history."[301]

f. "Defendant does not control the retail price paid by consumers, even if it provides retailers with a Manufacturer's Suggested Retail Price (or MSRP)."[302]

g. "[T]he market for the Whirlpool Brand Ovens was an 'ordinary' market, subject to competitive pressures that both Defendant and retailers identified as risks to their business."[303] Mr. Weir further identified statements from Best Buy, H.H. Gregg, Home Depot, Lowe's, Sears, and Whirlpool demonstrating competition, market risks, and the need to adjust prices to changing market conditions.[304]

135. However, as presented in detail below, Mr. Weir's discussion of supply-side factors is incomplete.

a. Mr. Weir discussed general claimed supply-side factors that are insufficient for determining market prices.

b. Mr. Weir's discussion of supply-side considerations does not address the limitations of his market simulations.

---

[298] Weir Declaration, p. 21.  (Bracketed text added for clarification.  Emphasis in original.)

[299] Weir Declaration, p. 21.  (Bracketed text added for clarification.  Emphasis in original.)

[300] Weir Declaration, p. 21.

[301] Weir Declaration, p. 22.

[302] Weir Declaration, p. 22.

[303] Weir Declaration, p. 22.  (Bracketed text added for clarification.)

[304] Weir Declaration, pp. 22 – 26.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

### i.  Mr. Weir Discussed General Claimed Supply-Side Considerations That Are Insufficient For Determining Market Prices

136.  In his declaration, Mr. Weir presented claimed "supply-side factors" he allegedly considered.[305] However, none of the factors Mr. Weir discussed represent supply-side factors sufficient to determine a market price absent the alleged wrongful conduct (as would be required to determine a claimed price premium).

137.  The supply-side factors needed to determine the equilibrium, market-clearing price absent the alleged wrongful conduct include factors that determine the amount Whirlpool would have been willing to supply at any given market price (and generally rely upon cost considerations).[306]  Such factors include both (i) the relationship between the quantity of ovens Whirlpool produced and the costs to produce them and (ii) information on the reactions of Whirlpool's competitors (and how those reactions in turn affect Whirlpool's incentives).[307]  The claimed "supply-side factors" Mr. Weir presented represent general statements about markets that do not include these required supply-side considerations.[308]

### ii.  Mr. Weir's Discussion Of Supply-Side Considerations Does Not Address The Limitations Of His Market Simulations

138.  Mr. Weir's claimed damages measure does not represent the difference between market-clearing, equilibrium prices that is required for a value to represent a claimed price premium.

a.  Historical Sales And Prices Do Not Represent The Supply-Side Factors That Would Have Been Relevant Absent The Alleged Wrongful Conduct.  Mr. Weir claimed that use of the historical sales and prices incorporated into his analysis provide the necessary relevant supply-side influences to conclude that the results of his conjoint-related analyses yield price premium conclusions.

---

[305]  Weir Declaration, pp. 21 – 22.

[306]  See, e.g., N. Gregory Mankiw, Principles of Microeconomics (Fifth Edition; 2008), p. 73.

[307]  See, e.g., N. Gregory Mankiw, Principles of Microeconomics (Fifth Edition; 2008), p. 73.

[308]  Weir Declaration, pp. 21 – 22.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

> [Mr. Weir] conducted research of actual retail sales and market data and
> included these real world price points in the survey.   These real-world
> transactions occurred at prices that *already* reflect the supply side factors then
> extant in the marketplace.[309]

While historical transactions occurred at prices that reflect historical supply-side factors facing
Whirlpool and retailers, those transactions do not reflect what the prevailing market conditions
would have been absent the alleged wrongful conduct (for the simple reason that none of those
transactions occurred absent the alleged wrongful conduct).   Calculation of a claimed price
premium requires estimations of historical market-clearing equilibrium prices and market-
clearing equilibrium prices absent the alleged wrongful conduct.   Reference to historical
market prices in isolation is insufficient to demonstrate that the claimed damages measure Mr.
Weir calculated would represent the difference between such prices and market-clearing,
equilibrium prices absent the alleged wrongful conduct.   In addition, as discussed in detail
later, results of Mr. Weir's conjoint analysis would not represent such a price difference and
therefore is not a claimed price premium.

Additionally, as discussed previously, the conjoint choice sets presented in Mr. Weir's survey
do not contain a realistic matching of oven attributes and associated pricing.   (For example,
Mr. Weir includes in his choice sets Jenn-Air ovens at prices between $600 and $1,200.   Jenn-
Air ovens sell for significantly higher than $1,200 in the real world.)   Without a realistic
matching of oven attributes and associated pricing, Mr. Weir cannot make the argument that
his conjoint analysis provides price premium information because it uses actual prices.

b.   Variability In Retail Pricing Does Not Demonstrate The Existence Of A Claimed Price
Premium (Nor That The Proposed Measure Is A Claimed Price Premium).   Mr. Weir stated
that "variability in pricing both at the wholesale and retail level showed that Defendant's and
retailers' pricing was responsive to changing market forces."[310]   Mr. Weir further stated that
"the market for the Whirlpool brand ovens was an 'ordinary' market, subject to competitive
pressures" and noted various statements from retailers demonstrating a willingness to change
prices.[311]   Willingness to change prices in response to changing market conditions does not in
isolation establish the existence of a claimed price premium.   Instead, demonstration that
demand for the Challenged Products would have been different absent the alleged wrongful
conduct also is required.   Such a change in demand would then need to be interacted with
existing supply-side factors in order to calculate a claimed price premium (if any) associated
with AquaLift.   As discussed above, Mr. Weir has not performed any such interaction with
supply-side factors.

---

[309]  Weir Declaration, p. 21.   (Emphasis in original.)

[310]  Weir Declaration, p. 21.

[311]  Weir Declaration, p. 22.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

### 3. Mr. Weir's Market Simulations Do Not Provide A Price Premium

139.   Mr. Weir characterized the results of his market simulation approach as "market equilibrium,"

which he used to derive the claimed "price premium" associated with the alleged wrongful

conduct.[312]   However, Mr. Weir's characterization is incorrect and contrary to description of the

output yielded by market simulations per Sawtooth Software documentation.

a.   Sawtooth Documentation Demonstrates That Market Simulators Only Address Demand
Factors.   According to Sawtooth documentation, conjoint analysis "is designed to measure
and simulate demand."[313]   Sawtooth advocates the use of conjoint analysis when one is
"principally interested in relative preference" since "conjoint utilities cannot account for many
real-world factors that shape market shares, such as length of time on the market, distribution,
out-of-stock conditions, advertising, effectiveness of sales force, and awareness." [314]
Sawtooth documentation specifically states that its market simulator concentrates solely on
the demand side of the market while acknowledging the importance of accounting for the
costs of producing different products.   The Sawtooth article cited by Mr. Weir to describe
the market simulation tool he proposed to use[315] states that "[t]he market simulator focuses
on the demand side of the marketing equation; but it is also important to pay attention to the
supply side and take the costs of producing different products/services into consideration."[316]

i.   Sawtooth Documentation Notes That Market Simulations Measure Only What Prices
Could Be Charged And Not What Prices Would Be Charged.   Sawtooth's description of
market simulation (discussed in greater detail above) further supports that the result of such
a simulation is not an actual market price premium but rather is a measure of "what new
price can be charged while maintaining the same share of preference."[317]   Although the
survey may conclude that a higher price could be charged, this does not demonstrate that
such a higher price must be or, historically, was charged in association with a feature (or
label claim).   Such measures of what could be charged represent what consumers may be
willing to pay for the attribute or label claim.   However, measures of what could be

---

[312] Weir Declaration, p. 19.

[313] Proceedings of Sawtooth Software Conference, October 2013, p. 342.   (https://www.sawtoothsoftware.com/download/
techpap/2013Proceedings.pdf, viewed on March 21, 2018.)

[314] Getting started with conjoint analysis: strategies for product design and pricing research, "Market Simulators for Conjoint
Analysis," p. 92.   (https://www.sawtoothsoftware.com/download/techpap/introsim.pdf, viewed on March 21, 2018.)

[315] Weir Declaration, p. 18, n. 22.

[316] Getting started with conjoint analysis: strategies for product design and pricing research, "Market Simulators for Conjoint
Analysis," p. 92.   (https://www.sawtoothsoftware.com/download/techpap/introsim.pdf, viewed on March 21, 2018.)

[317] Assessing the monetary value of attribute levels with conjoint analysis: Warnings and suggestions, 2001, p. 4.
(http://www.sawtoothsoftware.com/download/techpap/monetary.pdf, viewed on March 21, 2018.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

charged are not measures of what ultimately was charged (or, more specifically, measures of a price premium).

ii. Sawtooth Documentation Notes That Market Simulation Approaches Only Address Demand Factors. The Sawtooth article notes that market simulators only address demand factors, for example stating that "[a] good market simulator is like having all of your respondents gathered in one room for the sole purpose of voting on product concepts within competitive scenarios."[318]   A simulation such as this could not account for relevant information on supply factors.   Hence, even absent various limitations of Mr. Weir's methodology (discussed throughout my declaration), the results of his methodology could at best quantify the consumer preferences for AquaLift, which pertains only to the demand side of the market.   Given that Mr. Weir did not formally incorporate any supply side information in his analysis, he measured (at best) the "willingness-to-pay" but not a claimed "price premium."

b. Sawtooth Documentation Demonstrates That Willingness-To-Pay Measures Such As That Proposed By Mr. Weir Overstate The Change In Equilibrium Prices With The Change In A Product Attribute (I.e., The Claimed Price Premium).   Measures of willingness to pay generally overstate claimed price premiums (if any exist).   The difference between a consumer's willingness to pay and the actual price paid is called "consumer surplus" – a universally accepted economic distinction.[319]   Generally, the market price of a product is lower than all but the marginal purchaser's willingness to pay – providing incentives to purchase the product for those consumers with a *higher* willingness to pay (because value received is greater than price paid in such situations).[320]   Willingness to pay for a product actually purchased always would be greater than or equal to market price – or the product would not be purchased.

Sawtooth documentation also states that willingness to pay overstates the change in equilibrium price.

> The problem with both the WTP [Willingness to Pay] and WTB [Willingness to Buy] measures is that they are not equilibrium outcomes. WTP measures only a shift in the demand curve and not what the change in equilibrium price will be as the feature is added or enhanced....
>
> We advocate using equilibrium outcomes (both price and shares) to determine the incremental economic profits that would accrue to a firm as a product is

---

[318] Getting started with conjoint analysis: strategies for product design and pricing research, "Market Simulators for Conjoint Analysis," p. 89.   (https://www.sawtoothsoftware.com/download/techpap/ introsim.pdf, viewed on February 16, 2018.)

[319] *See, e.g.,* Jeffrey M. Perloff, Microeconomics (5th Edition), p. 272.

[320] Market conditions ultimately determine the price of a product.

enhanced. In general, the WTP measure will overstate the change in equilibrium price and profits....[321]

Given that Mr. Weir's proposed damages calculation using the value from his conjoint analysis relies upon measures of willingness to pay, the proposed calculation likely overstates the claimed economic injury (if any) experienced by putative Class members. Mr. Weir's statement that his claimed damages measure is "inherently conservative"[322] directly contradicts Sawtooth documentation. As discussed above, Sawtooth documentation explains that market simulations (such as that proposed by Mr. Weir) yield measures of willingness-to-pay, which overstate the change in equilibrium price with the change in a product attribute – i.e., claimed price premiums.

c.  Mr. Weir Incorrectly Interprets Results Of Market Simulation As "Market Equilibrium." Mr. Weir stated that he used the market simulator to simulate "a condition where the price of the second product [i.e., a product with "AquaLift partial-clean"] is reduced to the level where both products [i.e., products with and without the alleged misrepresentations] obtain equal market share."[323] Mr. Weir referred to this simulation result as the "market equilibrium."[324] However, the statements from Sawtooth discussed above make clear that a product's equilibrium outcomes (i.e., price and quantity) are determined by the interaction of supply factors and demand factors but market simulators only address demand factors.[325] Sawtooth documentation states that computing equilibrium outcomes involves making assumption about the industry and information on factors such as price sensitivity, competitive offers.

> To compute equilibrium outcomes, we will have to make assumptions about cost and the nature of competition and the set of competitive offer.... In particular, greater care to include an appropriate set of competitive brands, handle the outside option appropriately, and estimate price sensitivity precisely must be exercised.[326]

Given that Mr. Weir's market simulations (in addition to all the flaws discussed above) did not (i) formally incorporate any supply-side information and (ii) discuss any assumptions (and

---

[321] Proceedings of Sawtooth Software Conference, October 2013, p. 342. (https://www.sawtoothsoftware.com/download/techpap/2013Proceedings.pdf viewed on March 21, 2018.)

[322] Weir Declaration, p. 21.

[323] Weir Declaration, p. 19. (Bracketed text added for clarification.)

[324] Weir Declaration, p. 19. (Bracketed text added for clarification.)

[325] As discussed elsewhere in my declaration, throughout Mr. Weir's proposed putative Class period the Challenged Products have seen significant price variation, demonstrating that the supply and demand factors can vary across numerous dimensions. This price variation demonstrates that discussion of a general price for a product (absent specification of the specific market and the specific circumstances surrounding a purchase of that product) does not capture the various dynamics that affect the price that any specific consumer may face for that product.

[326] Proceedings of Sawtooth Software Conference, October 2013, p. 342. (https://www.sawtoothsoftware.com/download/techpap/2013Proceedings.pdf viewed on March 21, 2018.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

their validity) about cost and competition, Mr. Weir's interpretation of market simulation results as "market equilibrium" is incorrect.

## XII.   MR. WEIR'S PROPOSED CLAIMED DAMAGES CALCULATIONS UTILIZE AN UNRELIABLE AND OVERSTATED CLAIMED DAMAGES BASE

140.   Mr. Weir proposed to calculate Class-wide damages by multiplying a claimed percentage price premium by retail dollar sales of the Challenged Products during the putative Class period.[327]   Mr. Weir proposed to estimate total retail dollar sales of the Challenged Products (i.e., the claimed damages base) using wholesale shipments and average retail prices from four retailers.

> In order to estimate total retail unit and dollar sales during the January 2012 – January 2017 period, I [Mr. Weir] aggregated the available retail sales data and calculated average retail prices for each oven at issue.   Next, I tabulated Defendant's total retail unit sales using Whirlpool's wholesale shipment records by totaling the number of units shipped of each AquaLift oven.   Finally, I multiplied Defendant's wholesale unit sales by corresponding average retail prices to generate Whirlpool's total retail dollar sales.[328]

141.   Mr. Weir's claimed damages base is unreliable and overstated for at least the reasons detailed below.

a.   <u>Wholesale Shipments Are Not Necessarily Converted Into Retail Sales Or At Prices Containing An AquaLift Premium</u>.   Mr. Weir assumed that all wholesale shipments of the Challenged Products resulted in sales to consumers.   In addition, Mr. Weir assumed that all wholesale shipments of the Challenged Products were sold to consumers at a price level that contained an AquaLift price premium.   Mr. Weir has provided no support for these assumptions.   Wholesale shipments likely overstate the retail sales base upon which to apply Mr. Weir's proposed percentage price premium.

b.   <u>Claimed Retail Unit Sales Include States Not At Issue</u>.   It is my understanding that Mr. Weir's claimed retail unit sales are based upon <u>nationwide</u> wholesale shipments.[329]   However, Plaintiffs seek to certify a Class of persons who purchased a Challenged Product in six states: Michigan, Florida, New Jersey, Arizona, Idaho, and New Mexico.[330]   By using <u>nationwide</u> wholesale shipments to estimate total unit sales of the Challenged Products, Mr.

---

[327]   Weir Declaration, p. 40.

[328]   Weir Declaration, p. 40.   (Bracketed text added for clarification.)

[329]   Mr. Weir claimed the data he used to calculate his claimed damages base "allows for the estimation of retail sales of the Whirlpool brand ovens with AquaLift in both dollars and units **nationwide** during the proposed class period."   (Weir Declaration, p. 40.   (Bold text added for emphasis.))

[330]   Plaintiffs' Motion for Class Certification, p. 26.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

Weir has overstated at-issue unit sales of the Challenged Products (and, consequently, overstated total claimed damages).

c. <u>Unsupported Extrapolation Of Prices From Certain Retailers To All Claimed Unit Sales</u>.  Mr. Weir's estimated total dollar sales of the Challenged Products are based upon the multiplication of wholesale shipments and <u>average retail prices of H.H. Gregg, Sears, Lowe's, and Best Buy</u>.[331]   Total sales of the ovens with AquaLift that Mr. Weir identified in his regression analysis at these four retailers as a percentage of total wholesale shipments is approximately ████[332]   (*See* **Exhibit 19**.)  Mr. Weir provides no support that the average retail prices of this portion of Challenged Product sales can be extrapolated to <u>all</u> retail unit sales.

## XIII. DETERMINATION OF CLAIMED ECONOMIC INJURY AND DAMAGES AS A RESULT OF THE ALLEGED WRONGFUL CONDUCT REQUIRES INDIVIDUALIZED INQUIRY

142.   Based upon the facts and circumstances of this case, determining whether an individual putative

Class member was injured (and the quantum of that injury) as a result of the alleged

misrepresentation of AquaLift requires individualized inquiry into factors and considerations that

vary across putative Class members.   Despite Mr. Weir's claim that his hedonic regression and

conjoint analysis require "[n]o individualized analyses, or Class-Member-specific inquiry,"[333] in

this matter, common evidence cannot be used to evaluate whether individual putative Class

members were injured (and the extent of the claimed injury, if any).   Individualized inquiry and

analysis is needed to determine, among other things:

a. the putative Class member's reason (or reasons) for purchasing a Challenged Product (and whether the reason(s) for purchase was (were) related to AquaLift);

b. the putative Class member's beliefs about AquaLift when they purchased the Challenged Product;

---

[331]  Weir Declaration, p. 40.

[332]  While this percentage of wholesale shipments is based upon nationwide wholesale shipments and retail unit sales (as opposed to the six at-issue states), this proportion of retail unit sales to wholesale shipments is indicative of the general limitations of the data used by Mr. Weir to calculate claimed price premium damages (whether calculated nationwide or for specific states).   In other words, it is reasonable to assume that the unit sales at H.H. Gregg, Sears, Lowe's, and Best Buy also are a small percentage of total Challenged Product sales in the six at-issue states.

[333]  Weir Declaration, pp. 7 and 34.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

     c.  whether a putative Class member was satisfied (or the degree to which they were satisfied) with AquaLift;

     d.  the net price paid by each putative Class member for the Challenged Product(s) (including whether promotional discounts or considerations lowered the net price to a putative Class member).

143.    The circumstances surrounding each putative Class member's purchasing and use of the Challenged Products must be evaluated to determine whether and to what extent a putative Class member was injured as a result of the alleged misrepresentation of AquaLift.  Failure to examine the considerations above on an individualized basis would sever the required economic nexus of tying the claimed harm to the alleged misrepresentations.  A common proof approach, such as that proposed by Mr. Weir, would not isolate putative Class members who suffered little or no harm due to the alleged misrepresentation of AquaLift, and, hence, should not be part of a Class-wide, common proof, claimed damages calculation.

### A. Individual Inquiry Is Required To Identify Putative Class Members Who Purchased The Challenged Products For Reasons Unrelated To AquaLift

144.    From an economic perspective, a person who purchased the Challenged Products for a reason or reasons unrelated to AquaLift (e.g., a person who bought solely because of the Whirlpool brand) and who would have purchased the same product(s) at the same price regardless of AquaLift did not suffer injury attributable to the alleged wrongful conduct.  In such instances, because the purchase of the Challenged Products was not based upon AquaLift, these consumers did not receive less than what was bargained for.  Given the numerous factors that influence purchase decisions, inquiry and analyses regarding putative Class members' motivations for purchasing the Challenged Products are determinative as to whether individual putative Class members suffered economic injury attributable to the alleged misrepresentation of AquaLift – which would require individual inquiry with respect to each putative Class member.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

145.  The many purchase drivers for the Challenged Products unrelated to AquaLift are discussed in this section of my declaration.[334]

### 1. Whirlpool's Documents Indicate That Numerous Purchase Drivers Other Than AquaLift Drive Sales Of The Challenged Products

146.  Whirlpool's documents relating to the Challenged Products indicate that putative Class members purchased the Challenged Products for numerous reasons unrelated to AquaLift. Redacted

– indicating that other features drove their purchase.[336]  Examples of Whirlpool documents that identify purchase drivers of ranges include the following.

a.  2008 Whirlpool Presentation.



338

(1)

---

[334] The purchase drivers discussed herein might drive purchasing behavior for some putative Class members but not for others (e.g., some putative Class members may purchase the Challenged Products because the oven was on sale but are not driven by the aesthetics of the oven).  Nevertheless, the observation that numerous factors drive the purchasing behavior of some individuals indicates that some putative Class members purchase Challenged Products for reasons unrelated to AquaLift, that differences exist among putative Class members, and that the assessment of economic injury, if any, resulting from the alleged misrepresentation of AquaLift is not amenable to Class-wide proof.

[335] "Aqualift Usage And Installation."  Draft Whirlpool Presentation.  (WSC0027522 – 534 at 525.)

[336] T Redacted

[337] "Range Feature Optimization Supplemental Information," Whirlpool Presentation dated May 2008.  (WSC0040563 – 568 at 564.)

[338] "Range Feature Optimization Supplemental Information," Whirlpool Presentation dated May 2008.  (WSC0040563 – 568 at 564.)

[339] "Range Feature Optimization Supplemental Information," Whirlpool Presentation dated May 2008.  (WSC0040563 – 568 at 566 – 567.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018



b.   2011  Whirlpool Presentation.





c.   2014  Whirlpool  Presentation.

---

340 "Range Feature Optimization Supplemental Information," Whirlpool Presentation dated May 2008.   (WSC0040563 – 568 at 566.)

341 "Vesta Purchase Influencers," Whirlpool Presentation dated May 2011. (WSC0026642 – 687 at 643.)   (Bracketed text added for clarification.)

342 "Vesta Purchase Influencers," Whirlpool Presentation dated May 2011. (WSC0026642 – 687 at 644.)   (Bracketed text added for clarification.)

343 Redacted

344 "Vesta Purchase Influencers," Whirlpool Presentation dated May 2011. (WSC0026642 – 687 at 662.)

345 "Vesta Purchase Influencers," Whirlpool Presentation dated May 2011. (WSC0026642 – 687 at 644.)

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

**Figure 16**



2.   <u>**Named Plaintiffs' Deposition Testimony Is Supportive Of Numerous Purchase**</u>
     <u>**Drivers Other Than AquaLift**</u>

147.   Consistent with the various purchase drivers discussed above, the Named Plaintiffs in this matter

testified that many features other than AquaLift were (and are) important to them and other

consumers.   While several Named Plaintiffs identified the cleaning feature as an important

346

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.
- 118 -

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

consideration when they purchased the Challenged Products,[347] all the Named Plaintiffs identified

additional, non-challenged purchase drivers that influenced their decision to purchase the

Challenged Products.   Examples are provided below.

a. Mary Ellen Thome.   When asked what first appealed to her about the Challenged Product, Ms. Thome responded, "I first looked at it because it was the black and stainless, which was what we wanted to go with the rest of the appliances, but the thing that most had my attention was the price, quite honestly.   That was -- that was the incentive for me on that one was the price."[348]   Ms. Thome's focus on the price limited her interest in learning about the product's range of features: "Again, price was -- was the big thing, and I liked how it looked.   I liked the price, and so I didn't need anybody to talk to me to give me the sales pitch or anything."[349]

b. Toby Schechner.   Ms. Schechner went to Lowe's in an attempt to purchase a kitchen suite (refrigerator, dishwasher, microwave, and oven).[350]   When Ms. Schechner sat down with the Lowe's sales associate, she explained that she wanted white appliances with stainless steel in order to match the hardware on her existing cabinets.[351]   While Ms. Schechner testified to additional purchase drivers such as price, brand, and the cleaning feature, she confirmed her main priority was aesthetics.[352]

> Q:  And the number one thing was having appliances that matched the cabinets?
> A:  Yes.

148.   Additionally, Ms. Limpede, a sales associate at Home Depot who sells appliances (such as ovens) and who is a Named Plaintiff, testified "I don't think I've had anybody come in and specifically look for that [the AquaLift] feature"[353] – further demonstrating that for many putative Class members, other purchase drivers were more important.   **Table 14** below summarize examples of purchase drivers identified in each Named Plaintiff's deposition.   Named Plaintiffs' deposition

---

[347] For example, Ms. Limpede testified that the two biggest factors in her decision to purchase the Challenged Product were AquaLift and the large oven capacity.   She also testified that other benefits, such as the large oven capacity, "mean nothing if the oven doesn't come clean."   (Limpede Deposition, pp. 72 and 191.)   However, some Named Plaintiffs did not identify AquaLift as an important consideration in the decision to purchase the Challenged Products (e.g., Bliss Deposition, p. 72).

[348] Mary Ellen Thome Deposition, pp. 41 – 42.

[349] Mary Ellen Thome Deposition, pp. 44 – 45.

[350] Schechner Deposition, pp. 27 – 28 and 34 – 35.

[351] Schechner Deposition, pp. 85 – 89.

[352] Schechner Deposition, pp. 92 and 104 – 107.

[353] Limpede Deposition, p. 23.   (Bracketed text added for clarification.)

  Case 2:16-cv-12409-SJM-RSW   ECF No. 94-34, PageID.13827   Filed 06/07/18   Page 20 of 38

  Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

testimony demonstrate that individual inquiry would be required to determine (a) if putative Class

Members considered AquaLift to be a purchase driver and (b) if they did, how important AquaLift

was relative to other factors.

**Table 14**
**Examples Of Purchase Drivers Identified By Named Plaintiffs**

| Named Plaintiff | Identified Purchase Drivers |
|---|---|
| Barbara Barnes | Electric, freestanding, matched other appliances, stainless steel, self-cleaning, warming drawer, product's size, brand |
| Laura Bliss | 5 burners, aesthetics, location of controls, glass top, oven capacity,[354] brand |
| Kathryn Limpede | AquaLift, gas, brand, large oven capacity |
| Louise Miljenovic | Part of appliance suite, stovetop grille, low energy, brand, self-cleaning, fit into kitchen space, aesthetics, price |
| Candace Oliarny | AquaLift, gas, aesthetics, burner function location, drawer, top looked easy to clean |
| Toby Schechner | Aesthetics, part of a kitchen suite purchase, brand, self-cleaning, price, employee recommendation |
| Beverly Simmons | Capacity, self-cleaning, gas, price, aesthetics |
| Mary Ellen Thome | Price, aesthetics, smooth cooktop, self-cleaning, capacity |
| Richard Thome | Price, aesthetics, electric, 5 burners, smooth cooktop |

149.   Based upon the testimony of the Named Plaintiffs (as representatives of the putative Classes)

regarding reasons for purchase, individual inquiry is required to evaluate whether putative Class

members' purchases of the Challenged Products were (are) attributable to AquaLift.   The

testimony of the Named Plaintiffs indicates that many reasons exist as to why putative Class

members purchase the Challenged Products.   Because purchasers of the Challenged Products

could and did make purchases for reasons unrelated to AquaLift, it would be necessary to examine

why each putative Class member purchased the Challenged Products in order to determine if

AquaLift was a determinative (or even a significant) reason for the purchase of a Challenged

---

[354] Ms. Bliss testified that after purchasing the oven she became dissatisfied with the oven capacity because she felt that the drawer was smaller as a result of the larger oven cavity.   (Bliss Deposition, pp. 72, 74, and 99.)

This Report References Materials Designated "Confidential" or "Highly Confidential" Under the Stipulated Protective Order, dated October 25, 2016.
- 120 -

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

Product.  Such an assessment is required in order to evaluate each putative Class member's alleged injury, if any.

150.   Putative Class members who purchased a Challenged Product solely (or in large part) for reasons other than AquaLift were not injured (or were not injured to the same extent) as putative Class members who purchased solely or in large part due to the alleged misrepresentation of AquaLift. This aspect of the economic injury and causation analysis requires individual inquiry and cannot be determined using common proof.

**B.   Individual Inquiry Is Required To Determine Putative Class Members' Knowledge And Perception Of AquaLift When Purchasing The Challenged Products**

151.   Whether and to what extent a putative Class member was harmed depends (in part) upon that putative Class member's knowledge and perceptions relating to AquaLift.  If a consumer (a) had knowledge relating to how AquaLift functions (i.e., the consumer was not misled) and (b) was willing to purchase the Challenged Products at the actual purchase price, then that consumer did not suffer economic injury.  Alternatively stated, if a consumer had knowledge of the attributes of a product and agreed to purchase that product at a given price, then that consumer valued the product at or above that price and received the full value for the amount paid.  From an economic perspective, putative Class members who were aware of the required cleaning steps for ovens with AquaLift prior to purchase were not harmed – and a common proof approach to evaluating claimed injury and damages would not isolate these putative Class members from any claimed damages calculation.

152.   For each putative Class member, information regarding the concept (or perceived concept) of AquaLift could have come from a multitude of sources including, but not limited to, the following: (a) a review of the user guide associated with the Challenged Products; (b) internet research; (c)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

discussions with sales personnel at retailers (e.g., Home Depot); and (d) ownership of prior

self-cleaning ovens.

### 1. Putative Class Members Who Reviewed Publicly-Available Information Regarding AquaLift Would Have Been Aware Of The Required Cleaning Steps For Ovens With AquaLift

153.    Many consumers who highly valued or to whom the AquaLift feature was important likely would

have engaged in product-related research on this subject before making a purchase.   Information

describing AquaLift and consumers' experiences with the technology is publicly available for

putative Class members interested in researching the subject.   For example, consumers could have

reviewed or obtained (a) Whirlpool instructions regarding post-cycle cleaning and (b) Whirlpool

videos available online.

a.   Whirlpool Instructions.   Whirlpool provides instructions to owners on how to use AquaLift in several mediums including in the Use Care Guide,[355] the Quick Reference Guide,[356] as an instructional label on the doorframe of the oven,[357] and in the cleaning kit that comes with the oven.[358]   Such instructions also are publicly available on Whirlpool's website.[359]   These instructions provide detailed steps about how to use AquaLift and indicate that some manual effort will be required both before and after running the AquaLift cycle.   For example, the user guide notes "Soil baked on through several cooking cycles will be more difficult to remove with the cleaning cycle."[360]   **Figure 17** (next page) describes the first step in cleaning the oven, instructing owners to "[r]emove all racks and accessories from the oven cavity and wipe excess soil.   Use the scraper to remove additional easily-removed soils."   **Figure 18** (next page) describes the seventh step in cleaning the oven advising owners that "[i]f any soils remain, remove them with a non-scratch scrubbing sponge or plastic scraper.   Additional

---

[355] *See, e.g.,* Simmons Exhibit 290, "Gas Range User Instructions."   (WSC0000369 – 404 at 380.)

[356] *See, e.g.,* Simmons Exhibit 289, "Oven Cleaning Quick Reference Guide."   (Whirlpool_Simmons_000008.)

[357] *See, e.g.,* Miljenovic Exhibit 231.   (DSC_0103 – 0059 at 0049.)

[358] *See, e.g.,* Simmons Exhibit 303, "AquaLift Technology Cleaning Kit."   (WSC0000265 – 266.)

[359] *See, e.g.,* User Manual for Whirlpool Oven WFE540H0AS, p. 12.   (Downloaded from https://www.whirlpool.com/results.html?term=WFE540H0AS&showTab=modelContent on April 8, 2018.)   *See also* "Oven Cleaning Quick Reference Guide."   (Downloaded from https://www.whirlpool.com/content/dam/global/documents/201107/quick-reference-W10400066-RevA.pdf on April 8, 2018.)   *See also* "How to perform an AquaLift clean cycle."   (http://producthelp.whirlpool.com /Cooking/Wall_Ovens_and_Ranges/Oven_Cleaning_and_Care/How_to_perform_an_AquaLift_clean_cycle, viewed on April 8, 2018.)   *See also* **Exhibit 31** (Oven Cleaning Quick Reference Guide and excerpt from User Manual for Whirlpool Oven WFE540H0AS).

[360] Simmons Exhibit 290, "Gas Range User Instructions."   (WSC0000369 – 404 at 380.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

Clean cycles may be run to help remove stubborn soils." In addition, the "Notes" section that accompany the cleaning steps includes the following statement: "Nonabrasive scrub sponges or eraser style cleaning pads (without cleaners) can be effective for cleaning the oven cavity walls, oven door and oven bottom for difficult soils."[361] Consumers who reviewed Whirlpool instructions about AquaLift prior to purchasing the Challenged Products, either on floor models or retailers' websites, would know that some amount of scrubbing and scrapping was required to remove some soils. These materials would have shaped consumer expectations. Consumers who were aware of the steps required in running AquaLift and the resulting manual effort that may be required because they reviewed user instructions prior to purchasing the Challenged Product were not harmed (or were not harmed to the same extent) as consumers who did not view such materials and were not aware of the steps required.

### Figure 17
### Range Care Clean Cycle
### Step One In Using AquaLift To Clean Oven[362]



**To Clean:**
1. Remove all racks and accessories from the oven cavity and wipe excess soil. Use a plastic scraper to remove easily-removed soils.

---

[361] Simmons Exhibit 290, "Gas Range User Instructions." (WSC0000369 – 404 at 380.) The "Notes" section also includes the following statement: "affresh™ Kitchen Appliance Cleaner and affresh™ Cooktop Cleaner may be used to clean the oven bottom, walls and door when the oven has finished the cycle and returned to room temperature."

[362] Simmons Exhibit 290, "Gas Range User Instructions." (WSC0000369 – 404 at 380.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

**Figure 18**
**Range Care Clean Cycle**
**Step Seven In Using AquaLift To Clean Oven**[363]



**7.** If any soils remain, remove them with a non-scratch scrubbing sponge or plastic scraper. Additional Clean cycles may be run to help remove the stubborn soils.

    b.  <u>Whirlpool AquaLift Videos</u>. Whirlpool has released various videos detailing how AquaLift functions. One such video, posted in February 2012 to YouTube, explains the "AquaLift methodology."[364] Specifically, the video instructs that the user should "[i]mmediately after the cycle is complete wipe away excess water and loosened soils from the oven cavity including the walls and door with the expanding sponge or soft, dry cloth." It further states that the user should then "[u]se the additional tools provided in the AquaLift technology cleaning kit if necessary *to scrap, scrub, and sponge away any remaining soils or stains*."[365] The same video described above also is available on Whirlpool's website.[366] Consumers who viewed videos such as this likely would have been aware of the manual effort that may be required to clean an oven using AquaLift.

154.  It is likely that at least some consumers to whom the AquaLift feature was (or is) an important

    purchase consideration would have purchased the Challenged Products only after researching the

---

[363] Simmons Exhibit 290, "Gas Range User Instructions." (WSC0000369 – 404 at 380.)

[364] "AquaLift TM Technology Cleaning Methodology," video, dated February 3, 2012. (https://www.youtube.com/watch?v=zfKLpQdZD5c&lc=Ugh7Wq4BZDsT-XgCoAEC, viewed on March 23, 2018.)

[365] "AquaLift TM Technology Cleaning Methodology," video, dated February 3, 2012. (https://www.youtube.com/watch?v=zfKLpQdZD5c&lc=Ugh7Wq4BZDsT-XgCoAEC, viewed on March 23, 2018.) (Italics added for emphasis.)

[366] "Video: What is AquaLift," video. (http://producthelp.whirlpool.com/Cooking/Wall_Ovens_and_Ranges/Oven_Cleaning_and_Care/VIDEO%3A__What_is_Aqualift%3F, viewed on March 28, 2018.) *See also,* "Video: How does AquaLift clean?" video. (http://producthelp.whirlpool.com/Cooking/Wall_Ovens_and_Ranges/Oven_Cleaning_and_Care/VIDEO%3A__How_does_AquaLift_clean%3F, viewed on March 28, 2018.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

product and AquaLift.   At least some putative Class members likely had knowledge of AquaLift from publicly available sources and still chose to purchase the Challenged Products.   Therefore, individualized inquiry and analyses regarding the information putative Class members acquired during the search process for the Challenged Products are important considerations relating to whether individual Class members suffered economic injury attributable to the alleged misrepresentation of AquaLift.

### 2.   Putative Class Members Who Read Online Reviews/Consumer Reports Or Spoke To Owners Of Ovens With AquaLift About AquaLift Would Have Been Aware Of How AquaLift Functions

155.   Many of the Named Plaintiffs testified that they did not look for product reviews or consumer reports about the Challenged Products prior to purchasing them.[367]   However, after they purchased the Challenged Products and had experience with AquaLift, many of these same Named Plaintiffs went online and found negative reviews about AquaLift.[368]   It is likely that many putative Class members would have sought out product reviews or consumer reports prior to purchasing the Challenged Products.   For example, Ms. Miljenovic testified that she typically does go online and read reviews but did not in this particular instance because her kitchen was affected by a hurricane.[369]   Consumers who did seek out product reviews or consumer reports about AquaLift likely would have learned about AquaLift and discovered some consumers' negative reviews.   For example, Consumer Reports published an article in 2012 about AquaLift, stating:

> AquaLift didn't create any noticeable odors and much of the soil that was
> submersed in the water on the oven floor was easily wiped away, but when we used
> a sponge to wipe the oven interior, only a little debris came off the walls, door and

---

[367] *See, e.g.,* Oliarny Deposition, p. 196; Limpede Deposition, p. 130; and Miljenovic Deposition, pp. 128 – 129.

[368] *See, e.g.,* Oliarny Deposition, p. 54; Limpede Deposition, pp. 68 – 69; and Miljenovic Deposition, pp. 365 – 366.

[369] Miljenovic Deposition, pp. 127 – 128.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

oven window. Manual cleaning isn't part of our standard self-cleaning oven tests, but we got out the plastic scraper and scrub sponge that come in the AquaLift oven cleaning kit. It took some effort, but we removed quite a bit of the window soil with the scraper: though very little came off the walls—and that was after running multiple cycles.[370]

156. In addition, putative Class members who knew someone that owned an oven with AquaLift or received a recommendation regarding an oven with AquaLift likely would have been aware of how AquaLift functions and the required cleaning effort. Consumers who read the above referenced Consumer Reports article (or similar reports or reviews) would have understood that ovens with AquaLift come with a cleaning kit and may require some manual effort to clean. Consumers who performed online research or spoke to owners of ovens with AquaLift and were aware of customer complaints regarding AquaLift, but still purchased the product, would not be harmed (or harmed to the same extent) as consumers who were unaware of (or were aware but did not have a correct understanding of) AquaLift.

### 3. Putative Class Members Who Spoke With Sales Representatives Likely Would Have Varying Expectations Regarding AquaLift

157. Many of the Named Plaintiffs spoke with sales associates prior to purchasing the Challenged Products and testified that they relied upon representations made by sales associates when making their purchase decision.[371] Depending upon the representations made by the sales associates, individual Class members likely would have had varying expectations regarding how AquaLift functions and the efforts required to clean the Challenged Products prior to purchase. For example, one of the Named Plaintiffs, Ms. Limpede, is a sales associate at Home Depot and works in the major appliance department.[372] She testified that after her experience with AquaLift, she

---

[370] Limpede Exhibit 68. (WSC0049870.)

[371] *See, e.g.*, Bliss Deposition, pp. 69 – 70; Oliarny Deposition, p. 29; and Simmons Deposition, pp. 36 – 37.

[372] Limpede Deposition, pp. 14 and 16.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

would inform customers that while the oven was a good product, AquaLift did not work and would suggest to customers that they buy a model that has pyrolytic self-clean or use a silicone liner in the bottom of the oven if they really wanted that particular model.[373]

158.  It is likely that many putative Class members learned about AquaLift from sales representatives. If they received information regarding AquaLift,[374] these consumers would not be harmed (or harmed to the same extent) as a consumer who did not receive such information.

### 4.  Putative Class Members Who Had Experience With Or Knowledge About Self-Cleaning Technology Would Have Varying Expectations And Perceptions Regarding AquaLift

159.  Consumers' knowledge, experience, and research (or lack thereof) regarding self-cleaning technology in general, and AquaLift in particular, would influence consumers' expectations regarding AquaLift. These expectations and perceptions also would be dependent upon a consumer's individual standards regarding acceptable levels of cleanliness.

160.  As evidenced by Named Plaintiffs' deposition testimonies, putative Class members had different experience with self-cleaning technology, different standards regarding cleanliness, and different expectations regarding AquaLift and the amount of manual effort necessary for a technology marketed as "self-cleaning." Each Named Plaintiff's experience with self-cleaning technology, standards of cleanliness, and expectations regarding AquaLift are summarized below.

a.  Barbara Barnes. Prior to purchasing the Challenged Product, Ms. Barnes owned an oven with pyrolytic self-clean and expected that AquaLift would require the same amount of effort and deliver similar results.[375] She used the pyrolytic self-clean feature twice a year.[376] It was her experience that after running a pyrolytic cycle on her previous oven, only "very

---

[373] Limpede Deposition, p. 22.

[374] Receiving information from sales associates is dependent upon those individuals having a correct understanding of AquaLift and communicating that information to consumers.

[375] Barnes Deposition, pp. 24 – 25, 30 and 53.

[376] Barnes Deposition, p. 32.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

minimal" wiping down would be required, which she does not consider manual effort.[377] When she purchased her new oven with AquaLift, "the term 'AquaLift technology' had virtually no meaning to [her] at all" and she was of the opinion that a "self-cleaning oven is a self-cleaning oven." [378]   She testified that prior to her purchase, she did not give any consideration to the kind of technology that AquaLift uses.[379]   She testified that a "couple minutes" of wiping an oven out would be acceptable for a manufacturer to call its oven self-cleaning.[380]   She further testified that to some people, ten minutes of manual cleaning over four years might be acceptable for a self-cleaning oven, but for her it was not.

> Q. And so even in your mind, an oven that only requires 10 minutes of manual cleaning over the course of four years isn't acceptable?
> A. No, it isn't.  What's clean to me might not be considered clean to someone else.  So they may have purchased and spent 10 minutes cleaning it and, to them, it's fine. To me, it may not be.[381]

b. <u>Laura Bliss</u>.  Ms. Bliss had extensive experience with pyrolytic self-clean and expected that AquaLift's net cleaning performance and the manual cleaning effort required would be similar to the pyrolytic technology, except that the AquaLift cleaning process would take shorter time.[382]   She also had the expectation that AquaLift would be similar to steam clean.[383] Prior to purchasing the Challenged Product, she used the pyrolytic self-clean feature "every other month or if there was a particular spill" for nearly 20 years.[384]   After the pyrolytic self-clean cycle was finished, she would perform manual post-cycle cleaning that would take no more than 20 minutes.[385]   It was her experience that sometimes after using the pyrolytic self-clean feature, the soils would still leave permanent discoloration or staining on the porcelain enamel that she did not believe she could do anything about.[386]   Ms. Bliss testified that if an oven cleaning technology could remove 90% of stains with 20 minutes or less of manual cleaning, she would be satisfied and would consider the oven "self-cleaning."[387]

c. <u>Kathryn Limpede</u>.  Prior to purchasing the Challenged Product, Ms. Limpede owned an oven with pyrolytic self-clean and expected, based upon her experience with her previous pyrolytic oven and discussions with a Maytag representative, that her new oven with AquaLift would

---

[377] Barnes Deposition, pp. 24 – 25.

[378] Barnes Deposition, pp. 48 and 55.   (Bracketed text added for clarification.)

[379] Barnes Deposition, p. 48.

[380] Barnes Deposition, pp. 160 – 161.

[381] Barnes Deposition, p. 162.

[382] Bliss Deposition, pp. 70 – 71, 205, and 208

[383] Bliss Deposition, p. 71.   (Bracketed text added for clarification.)

[384] Bliss Deposition, pp. 36 – 37.

[385] Bliss Deposition, pp. 46 – 47.

[386] Bliss Deposition, p. 46.

[387] Bliss Deposition, pp. 134 – 135 and 217.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

clean her entire oven and work amazingly.[388]   She had used the pyrolytic self-clean feature every three months.[389]   She agreed that some amount of elbow grease still was required to clean her oven with pyrolytic self-clean.[390]   It is her understanding that the "expectations of the class of Idaho owners" with regards to the "steps they would need to clean their oven, other than just pushing a button" would be wiping out any loose soil, adding water, and turning it on," but she agrees that "it is possible" some people may have different expectations about what steps would be necessary to clean their ovens.[391]   In her opinion, for a manufacturer to call an oven self-cleaning, "very little" elbow grease would be acceptable, which for her meant "30 minutes, max."[392]

d.   Louise Miljenovic.   When Ms. Miljenovic and her husband went to Appliance Gallery, they were interested in purchasing an appliance bundle to replace items lost in Hurricane Sandy.[393]   Upon finding the Challenged Product, Ms. Miljenovic "trusted that it was what it said it was, self-cleaning with a different technology."[394]   She liked the fact that the oven with AquaLift used lower heat and less energy than her previous oven with pyrolytic self-clean.[395]   For Ms. Miljenovic, any post-cleaning time over 10 minutes should not be considered self-cleaning.[396]   When asked if there was likely differing thresholds for one's tolerance of follow-up cleaning, Ms. Miljenovic responded, "Absolutely.   I'm sure there's a wide range."[397]   While she said she would not have purchased the Challenged Product had she known what was involved, Ms. Miljenovic has no intention of replacing her oven with AquaLift "because it works.   It cooks fine."[398]

e.   Candace Oliarny.   Prior to purchasing the Challenged Product, Ms. Oliarny owned an oven with pyrolytic self-clean.[399]   She used the pyrolytic self-clean feature once a month.[400]   She expected that AquaLift would operate the same way as pyrolytic self-clean[401] and would completely clean her oven without any scrubbing.[402]   She was informed by a sales associate

---

[388] Limpede Deposition, pp. 20, 132 – 133, 155, and 196.

[389] Limpede Deposition, pp. 133 – 134.

[390] Limpede Deposition, p. 164.

[391] Limpede Deposition, pp. 156 – 158.

[392] Limpede Deposition, pp. 164 – 165.

[393] Miljenovic Deposition, pp. 125 – 126.

[394] Miljenovic Deposition, p. 136.

[395] Miljenovic Deposition, pp. 44 and 136.

[396] Miljenovic Deposition, p. 35.

[397] Miljenovic Deposition, pp. 35 – 36.

[398] Miljenovic Deposition, pp. 404 – 405.

[399] Oliarny Deposition, p. 26.

[400] Oliarny Deposition, p. 40.

[401] Oliarny Deposition p. 25.

[402] Oliarny Deposition, pp. 50 – 51.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

that AquaLift "will clean your oven just like a normal pyro oven."[403]   While she agreed that all self-cleaning ovens require "a little bit" of manual effort "to wipe out,"[404] she believed if an oven requires the consumer to use a scrub or sponge and scrub for over ten minutes, it is no longer considered self-cleaning, but rather a manual clean oven.[405]   She testified that "[e]ach person is different" and may have different expectations about how much manual effort is acceptable for a self-cleaning oven.[406]

f.   <u>Toby Schechner</u>.    Ms. Schechner was a previous owner of an oven with pyrolytic self-clean.[407]   When Ms. Schechner spoke with a Lowe's sales representative regarding the Challenged Product, she understood AquaLift to mean "that it would clean the inside of the oven in one hour, with no chemicals."[408]   She also expected that AquaLift would not require her to perform any manual labor.[409]   While Ms. Schechner only attempted to use AquaLift twice, she was not satisfied with the remaining soils and stains left in her oven.[410]   In response, she made 10 to 15 trips to speak with the Lowe's service manager and placed 3 separate service calls for the alleged issues with AquaLift (all of which were covered under her warranty).[411]   To appease Ms. Schechner, Lowe's offered her a credit for what she spent on the Challenged Product to apply toward a new oven.[412]   Ms. Schechner then purchased a Whirlpool double oven with pyrolytic self-clean.[413]   When Ms. Schechner attempted to use the pyrolytic self-clean feature she had to turn it off within ten minutes as "the fumes that went through the house were terrible."[414]   Ms. Schechner has not attempted to use the pyrolytic self-clean feature again and has since resorted to manually cleaning her oven with chemical cleaners.[415]

g.   <u>Beverly Simmons</u>.    When Ms. Simmons went to purchase a new oven, she knew she wanted one with self-cleaning technology:   "I simply liked the stove and was assured that it was self-cleaning, which was my concern."[416]   While she understood that self-cleaning features still required manual effort, Ms. Simmons expected the post-cleaning process with AquaLift to be

---

[403]  Oliarny Deposition, p. 29.

[404]  Oliarny Deposition, p. 50.

[405]  Oliarny Deposition, pp. 179 and 199 – 200.

[406]  Oliarny Deposition, p. 200.

[407]  Schechner Deposition, pp. 38 – 39.

[408]  Schechner Deposition, p. 108.

[409]  Schechner Deposition, pp. 119 – 124.

[410]  Schechner Deposition, pp. 146 – 147, 152 and 179.

[411]  Schechner Deposition, pp. 67, and 136 – 137.

[412]  Schechner Deposition, pp. 68 – 69 and 167.

[413]  Schechner Deposition, pp. 68 – 69 and 75.

[414]  Schechner Deposition, p. 75.

[415]  Schechner Deposition, pp. 75 – 79 and 214 – 215.

[416]  Simmons Deposition, p. 130.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

similar to her previous experience with pyrolytic self-clean: "I got the impression there would maybe be a little bit of water left in the bottom and I would wipe that up along with the residue."[417]   Instead, she discovered the AquaLift process required her to get "down on [her] hands and knees" to scrub the oven.[418]   Ms. Simmons' disappointment with AquaLift prompted her to replace the oven less than two years after its purchase.[419]

h.   Mary Ellen Thome.   As a previous owner of an oven with pyrolytic self-clean,[420] Ms. Thome purchased the Challenged Product under the impression that AquaLift was a different technology that would deliver the "same kind of result."[421]   Ms. Thome was not concerned with the differences between pyrolytic self-clean and AquaLift at the time of purchase stating, "I don't think anything drew my attention to it being an AquaLift.   It was, oh it's self-cleaning, but it's a new kind of technology.   Oh okay.   Well, as long as it's self-cleaning."[422]   Whereas Ms. Thome's oven with pyrolytic self-clean only required minimal manual effort to complete the process, she claimed that in the three attempts to use her new oven with AquaLift, there were no perceived benefits in cleanliness and additionally the technology left a water stain that had to be manually cleaned.[423]   Ms. Thome acknowledged that a self-cleaning process still requires manual effort, but she does not think that effort should require more than 5-10 minutes.[424]   After "half an hour, 45 minutes, or an hour, then the benefit is nil."[425]

i.   Richard Thome.   In contrast to his wife's testimony, Mr. Thome stated there was a 50% improvement in the Challenged Product's cleanliness after each of the three AquaLift cleaning cycles.[426]   As the primary oven cleaner for the household, Mr. Thome assumed AquaLift was similar to steam cleaning.[427]   He was not daunted by the additional cleaning steps required using AquaLift relative to pyrolytic self-clean: "Yes, I mean, the additional steps weren't much.   I mean, I always cleaned off the heavy stuff before I started the pyrolytic and wiped it -- and wiped the loose debris out before I set the self-clean on that, so this is basically the same thing, scrape with the scraper, the sponge part."[428]   However, Mr. Thome stated the post-clean effort should be minimal and take no more than five minutes.[429]   He was

---

[417]   Simmons Deposition, p. 42.

[418]   Simmons Deposition, p. 43.

[419]   Simmons Deposition, p. 121.

[420]   Mary Ellen Thome Deposition, p. 19.

[421]   Mary Ellen Thome Deposition, p. 50.

[422]   Mary Ellen Thome Deposition, p. 43.

[423]   Mary Ellen Thome Deposition, pp. 70 – 74 and 131.

[424]   Mary Ellen Thome Deposition, p. 136.

[425]   Mary Ellen Thome Deposition, p. 136.

[426]   Richard Thome Deposition, pp. 90 – 91, 95, and 139.

[427]   Richard Thome Deposition, p. 58.

[428]   Richard Thome Deposition, p. 167.

[429]   Richard Thome Deposition, pp. 59 – 60.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

repeatedly dissatisfied with AquaLift's performance and claimed only the bottom of the oven showed improvement.[430]

161.   All nine of the Named Plaintiffs owned or had experience with ovens with pyrolytic self-clean prior to purchasing the Challenged Products.  Each of them had varying levels of acceptable manual effort required for an oven to be termed "self-cleaning" and varying perceptions and expectations of AquaLift.  **Table 15** provides a summary of each Named Plaintiff's acceptable level of manual cleaning for a self-cleaning oven.  (*See also* **Exhibit 5**.)  These varying perceptions among the Named Plaintiffs necessitate individualized inquiry to determine the value each putative Class member likely received from AquaLift and whether any corresponding claimed injury may exist.

**Table 15**
**Named Plaintiffs' Acceptable Levels Of Manual Cleaning**
**For A Self-Cleaning Oven**

| Named Plaintiff | Acceptable Levels Of Manual Cleaning |
|---|---|
| Barbara Barnes | Very minimal, only a "couple minutes" of wiping it down[431] |
| Laura Bliss | < 20 minutes<br>90% of soils removed |
| Kathryn Limpede | < 30 minutes |
| Louise Miljenovic | < 10 minutes |
| Candace Oliarny | 10 minutes |
| Toby Schechner | <10 minutes[432] |
| Beverly Simmons | 5 minutes |
| Mary Ellen Thome | 5 - 10 minutes |
| Richard Thome | 5 minutes or less |

---

[430]  Richard Thome Deposition, p. 91.

[431]  Ms. Barnes testified that she expected to do a "[v]ery minimal" amount of work to manually clean a self-cleaning oven. A couple of minutes of "[s]imply wiping it out" was acceptable.   However, she testified that she does not consider "[w]iping it down" to be manual effort.   (*See* Barnes Deposition, pp. 24 – 25 and 160 – 161.)

[432]  While Ms. Schechner did not state a definitive time frame that she would classify as acceptable for a self-cleaning designation, she felt the 5 minutes of clean up required from her previous oven with pyrolytic self-clean was acceptable, while a 10 minute clean up after an AquaLift cycle was not reasonable.   (*See* Schechner Deposition, pp. 245 – 247.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

### C. Individual Inquiry Is Required To Identify Putative Class Members Who Were Satisfied With AquaLift

162.   Putative Class members who are satisfied with their purchase of the Challenged Products in general, and AquaLift in particular, did not suffer economic harm because satisfied consumers received the economic value for which they bargained.   Documentary evidence indicates that while some customers are dissatisfied with their purchase of the Challenged Products and AquaLift in particular, numerous customers are satisfied with their purchase.   This evidence includes (a) Whirlpool service claims and consumer contacts data related to AquaLift, (b) a Whirlpool customer survey, (c) online reviews, and (d) sales data of ovens with AquaLift.



a.   Service Claims and Consumer Contacts.   [Redacted] [434] [Redacted] [435]   The small proportion of Challenged Product owners who contacted Whirlpool regarding AquaLift indicates that many customers likely did not have negative experiences with the feature.

b.   Whirlpool Customer Survey.   [Redacted] [436] [Redacted] [437]

---

[433]  Ganus Deposition, pp. 55 and 58 and Exhibit 29.

[434]  Ganus Exhibit 29 and Ganus Deposition, p. 58.

[435]  Ganus Deposition, p. 59.

[436]  "Aqualift Usage And Installation" Draft Whirlpool Presentation.   (WSC0027522 – 534 at 523.)

[437]  "Aqualift Usage And Installation" Draft Whirlpool Presentation.   (WSC0027522 – 534 at 526 – 527.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018



**Table 16**



c. Online Reviews.[440]  Online customer reviews of the Challenged Products provide evidence
that numerous putative Class members were (and are) satisfied with their purchase of the
Challenged Products.  For example, the model number WFE540H0ES had 1,773 reviews on
Home Depot's website as of March 14, 2018 and an average product rating of 4.4 stars out of
5.  Out of the 1,773 reviews, 1,108 (or 62.5%) gave the product a five star rating and 465 (or
26.2%) gave the product a 4 star rating.[441]  **Table 17** and **Exhibit 28** compare the overall

---

[438] "Aqualift Usage And Installation" Draft Whirlpool Presentation.  (WSC0027522 – 534 at 526.)

[439] "Aqualift Usage And Installation" Draft Whirlpool Presentation.  (WSC0027522 – 534 at 527.)

[440] I recognize that care must be exercised when interpreting or analyzing or aggregating consumer reviews contained on
websites.  However, while one may challenge the reliability of online customer reviews as a data source for quantitative
analysis (e.g., whether the online reviews are quantitatively representative of the putative class), the online reviews provide
qualitative information and demonstrate the need for individual inquiry.

[441] WFE540H0ES on homedepot.com.  (https://www.homedepot.com/p/Whirlpool-6-4-cu-ft-Electric-Range-with-Self-
Cleaning-Convection-Oven-in-Stainless-Steel-WFE540H0ES/205951848, viewed on March 14, 2018.)

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

satisfaction with the Challenged Products as rated by the Named Plaintiffs to the average rating of the Challenged Products on various retailers' websites. While some customers expressed dissatisfaction with their purchase (and a smaller group mentioned AquaLift in particular),[442] individual inquiry would be required to determine which customers felt dissatisfied with their purchase, and whether that dissatisfaction is due to AquaLift or some other reason.

**Table 17**
**Summary Of Online Reviews And Named Plaintiffs' Satisfaction**
**Regarding The Challenged Products**[443]

| Challenged Product | Named Plaintiffs | | Online Reviews | |
|---|---|---|---|---|
| | Purchased By | Overall Satisfaction | Website | Average Rating (# of Reviews) |
| KERS306BSS | Barbara Barnes | 3 out of 5 | KitchenAid.com Sears.com | 4.0 out of 5 (55) 4.0 out of 5 (99) |
| KGRS202BX40 | Louise Miljenovic | 3 out of 5 | KitchenAid.com SearsOutlet.com | 5 out of 5 (3) 3.5 out of 5 (5) |
| MGR8674AW | Kathryn Limpede | Not Discussed in Deposition | Lowes.com Maytag.com | 4.5 out of 5 (420) 4.5 out of 5 (431) |
| WEG730H0DS | Candace Oliarny | 1 out of 5 | HomeDepot.com Lowes.com Whirlpool.com | 4.4 out of 5 (373) 4.5 out of 5 (363) 4.4 out of 5 (360) |
| WFE540H0AH | Toby Schechner | 1 out of 5 | AjMadison.com Whirlpool.com | 4.5 out of 5 (2,190) 4.5 out of 5 (1,250) |
| WFE540H0AS | Mary Ellen Thome Richard Thome | 3 out of 5 3 out of 5 | AjMadison.com Whirlpool.com | 4.5 out of 5 (1,225) 4.5 out of 5 (1,250) |
| WFE540H0ES | Laura Bliss | 4 out of 5[444] | HomeDepot.com Lowes.com Whirlpool.com | 4.4 out of 5 (1,773) 4.5 out of 5 (1,544) 4.5 out of 5 (1,478) |
| WFG540H0ES | Beverly Simmons | 1 out of 5 | HomeDepot.com Lowes.com Whirlpool.com | 4.4 out of 5 (764) 4.5 out of 5 (716) 4.4 out of 5 (697) |

d. <u>AquaLift Sales Over Time</u>. Analysis of sales data across various retailers indicates that sales of ovens with AquaLift have not decreased over time.[445] **Exhibit 29** contains an analysis of sales of ovens with AquaLift over time using sales data from (i) H.H. Gregg, (ii) Sears, (iii) Best Buy, and (iv) Lowe's. Based upon these retailers' sales data, there is no systematic decline in the number of ovens with AquaLift sold over time (as would be expected if consumers were dissatisfied with AquaLift). In fact, H.H. Gregg and Best Buy each sold

---

[442] For example, Named Plaintiff Laura Bliss left a 1 star review on Home Depot's website, stating that "[t]he Aqua-Lift Self-Cleaning feature is a joke." (*See* Bliss Exhibit 52 (Whirlpool_Bliss_000008 – 010).)

[443] Some websites appear to pull reviews from additional websites. For example, it appears some reviews on Home Depot's website are reviews that were made on Whirlpool's website.

[444] While Ms. Bliss testified that she would rate her overall satisfaction with her new range as 4 out of 5, she posted a review on Home Depot's website giving the product 1 star out of 5. (*See* Bliss Exhibit 52 (Whirlpool_Bliss_000008 – 010 at 010) and Bliss Deposition, p. 139.)

[445] I only evaluated the sales of oven models with AquaLift that Mr. Weir identified in his regression analysis.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

more ovens with AquaLift in 2016 than any prior year.[446]  The fact that the data do not demonstrate a decrease in sales over time (and, if anything, demonstrate an increase in sales over time) indicates that many consumers are satisfied with ovens with AquaLift.

### D. Individual Inquiry Is Required To Determine The Specific Prices Paid For The Challenged Products By Each Putative Class Member

163.   As discussed in detail in **Section IX**, analysis of retail sales data indicates that there are wide variations in final prices paid by consumers associated with the Challenged Products.   The prices putative Class members paid for the Challenged Products differ depending upon the circumstances surrounding their purchases, including (at least) the brand of the purchased oven, model of the oven, whether they paid a promoted (i.e., "on sale") or non-promoted price, the retailer, the state where the purchase was made, and date of purchase.   For example, Named Plaintiffs purchased ovens with AquaLift at prices that were generally higher than the prices paid by putative Class members at H.H. Gregg. [447]   (*See* **Figure 19** and **Exhibit 30**.)   These pricing variations demonstrate that the price paid by one consumer in one place at one time for a Challenged Product is not indicative of the price paid by another consumer in a different location at the same or different time (even for the exact same model and brand of oven).

---

[446]  While the Best Buy data only include sales through October 2017, Best Buy unit sales of ovens with AquaLift were higher during the January through October time period in 2017 compared to 2016.   From January through October, Best Buy sold (a) 10,832 ovens with AquaLift in 2016 and (b) 11,844 ovens with AquaLift in 2017.

[447]  The prices paid by two Named Plaintiffs (i.e., Barbara Barnes and Louise Miljenovic) for ovens with AquaLift could not be compared to prices in the H.H. Gregg sales data as they bought ovens with AquaLift that were not identified by Mr. Weir in the H.H. Gregg sales data.

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018



164.    Knowing the prices paid by individual putative Class members (which differed greatly across Class

members) is an important factor in evaluating whether (and to what extent) an individual Class

member suffered economic harm.   Without individual inquiry, one cannot determine the price an

individual putative Class member paid for the Challenged Products or the extent to which an

individual did or did not pay a "price premium" – rendering attempts to quantify damages based

upon a "constant percentage of price times dollar sales" approach on a Class-wide basis inaccurate

and unreliable.   Because of the wide variations in the Challenged Products' retail prices, putative

Declaration of Keith R. Ugone, Ph.D.
April 9, 2018

Class members' claimed damages cannot be evaluated and quantified reliably on a Class-wide basis using common proof.

\*   \*   \*   \*   \*   \*

165. My analyses, observations, and opinions contained in this declaration are based upon information available to date. I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the Parties to this dispute and to supplement my opinions based upon that review.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in New York City, New York on April 9, 2018.

*Keith R. Ugone*
_____
Keith R. Ugone, Ph.D.
April 9, 2018