UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TOBY SCHECHNER, BARBARA BARNES, LAURA BLISS, KATHLEEN JORDAN, KATHRYN LIMPEDE, LOUISE MILJENOVIC, CANDACE OLIARNY, BEVERLY SIMMONS, RICHARD THOME and MARY ELLEN THOME, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) |
| WHIRLPOOL CORPORATION, | ) ) ) |
| Defendant. | ) ) |

Civ. No. 2:16-cv-12409-SJM-RSW

Hon. Stephen J. Murphy, III

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO WHIRLPOOL'S MOTION TO STRIKE THE OPINIONS OF MR. COLIN WEIR

## STATEMENT OF THE ISSUES PRESENTED

(1)     Does Mr. Weir's proposed hedonic regression analysis satisfy Federal Rule of Evidence 702 and the *Daubert* test?

   **Plaintiffs' Answer: Yes.**

(2)     Does Whirlpool present any reason why Mr. Weir's hedonic regression analysis does not satisfy Federal Rule of Evidence 702 and the *Daubert* test?

   **Plaintiffs' Answer: No.**

(3)     Is Mr. Weir's hedonic regression analysis use of facts and sales data a reliable methodology to demonstrate classwide damages?

   **Plaintiffs' Answer: Yes.**

(4)     Do supposed enhancements or trade-offs associated with the AquaLift self-cleaning feature, as proffered by Defendant, render the hedonic regression analysis unreliable?

   **Plaintiffs' Answer: No.**

 (5)     Does Mr. Weir's proposed conjoint analysis satisfy Federal Rule of Evidence 702 and the *Daubert* test?

   **Plaintiffs' Answer: Yes.**

(6)     Does Whirlpool raise any reason why Mr. Weir's conjoint analysis is unreliable, as not based on real world data, discovery, or objective survey data?

   **Plaintiffs' Answer: No.**

(7)     Does Mr. Weir's conjoint analysis fit the facts of the case because it used market choices, including Whirlpool's advertising and representative testimony?

**Plaintiffs' Answer: Yes.**

# STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITY

- *Allan v. RealComp II, Ltd.*, 2013 WL 12333444 (E.D. Mich. 2013 Mar. 30, 2013)(Murphy, J.)

- *Briseno v. ConAgra Foods, Inc.*, 2017 WL 53421 (9th Cir. Jan. 3, 2017)

- *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)

- *Dzielak v. Whirlpool,* 2017 WL 1034197 (D.N.J. Mar. 17, 2017)(Daubert Decision)

- *Dzielak v. Whirlpool,* 2017 WL 6513347 (D.N.J. Dec. 20, 2017)(Class Certification Decision)

- *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014)

- *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, No. 5:17-cv-00564, Order, ECF No. 199 (N.D. Cal., June 26, 2018)

- *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015)

- *In Re: Dial Complete Marketing and Sales Practice Litig.*, 320 F.R.D. 326 (D.N.H. 2017)

- *In re Scotts EZ Seed Litig.,* 304 F.R.D. 397 (2015)

- *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d 724 (N.D. Ohio 2014)

- *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 2017 WL  85640 (D. Conn. Mar. 13, 2017)

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF FACTS ......................................................................2

III.  THE ECONOMIC MODELS UTILIZED BY MR. WEIR ARE IDEAL FOR CALCULATING PRICE PREMIUM DAMAGES ON A CLASSWIDE BASIS ....................................................................4

    A.    Mr. Weir's Qualifications ........................................................4

    B.    Mr. Weir Performed a Hedonic Regression Analysis to Isolate the Price Premium Associated with Whirlpool's AquaLift Self-Cleaning Claim, on a Classwide Basis...................................................5

    C.    Mr. Weir Performed a Conjoint Analysis to Calculate, on a Classwide Basis, the Premium Associated with Whirlpool's AquaLift "Self-Clean" Claim.................................................7

IV.  ARGUMENT...........................................................................................9

    A.    Legal Standard.........................................................................9

    B.    Whirlpool Does Not Establish that Mr. Weir's Analyses Fail to Satisfy the *Daubert* Test....................................................10

    C.    Hedonic Regression Is a Reliable Analysis to Demonstrate Classwide Damages, and Mr. Weir Employed Economic Principles Based on Facts and Actual, Historical Sales Data ............11

           1.    Supposed Enhancements or Trade-Offs Associated With the Aqualift Self-Cleaning Feature Do Not Render the Hedonic Regression Unreliable. ................................11

           2.    The H.H. Gregg Sales Data Amply Supported Mr. Weir's Hedonic Regression Analysis .................................13

    D.    Conjoint Analyses Have Been Accepted by Courts as a Means to Establish and Calculate Classwide Damages, and Mr. Weir

# TABLE OF AUTHORITIES

**Page**

Applied Economic Methodologies Rooted in Facts Obtained Through Discovery and Objective Survey Data ..................................14

1.   Mr. Weir's Conjoint Survey Replicates Whirlpool's Own Market Choices, Making It Inherently Reliable ......................15

2.   Mr. Weir Described the AquaLift Self-Cleaning Feature From Whirlpool's Own Advertising or Statements by its Representatives ..........................................................................17

3.   Mr. Weir's Survey Choices Reflect the Objective Reality Evinced Through Discovery, and He Took the Necessary Steps to Avoid Focalism Bias ...................................................18

4.   Mr. Weir's Market Simulation Accounts for Relevant Supply Side Considerations .......................................................20

V.   MR. WEIR'S PRICE PREMIUM ANALYSIS DOES NOT REQUIRE INDIVIDUAL INQUIRIES .......................................................23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allan v. RealComp II, Ltd.*,
   2013 WL 12333444
   (E.D. Mich. 2013 Mar. 30, 2013) ..........................................................9

*Belfiore v. Procter & Gamble Co.*,
   311 F.R.D. 29 (E.D.N.Y. 2015) ............................................................5

*Briseno v. ConAgra Foods, Inc.*,
   2017 WL 53421
   (9th Cir. Jan. 3, 2017) ..........................................................................5

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ........................................................................1, 17

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
   290 F.3d 768 (6th Cir. 2002) ...............................................................9

*Dei Rossi v. Whirlpool Corp.*,
   2015 U.S. Dist. LEXIS 55574
   (E.D. Cal. Apr. 27, 2015) .....................................................................5

*Dixon v. Grand Trunk Western Railroad Company*,
   259 F. Supp. 3d 702 (E.D. Mich. 2016) ..............................................9

*Dzielak v. Whirlpool*,
   2017 WL 6513347
   (D.N.J. Dec. 20, 2017) ...................................................1, 5, 23, 24

*Dzielak v. Whirlpool Corp.*,
   2017 WL 1034197
   (D.N.J. March 17, 2017) ...............................................2, 11, 14

*Ebin v. Kangadis Food Inc.*,
   297 F.R.D. 561 (S.D.N.Y. 2014) .........................................................1

*Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*,
  No. 5:17-cv-00564, (N.D. Cal., June 26, 2018) ..........................................*passim*

*Harnish v. Widener University School of Law*,
  833 F.3d 298 (3d Cir. 2006) .................................................................................24

*Herron v. Best Buy*,
  2016 WL 1572909
  (E.D. Cal. Apr. 9, 2016)......................................................................................23

*Hughes v. The Ester C. Co, et al.*,
  317 F.R.D. 333 (E.D.N.Y. Sept. 30, 2016)........................................................17

*In re ConAgra Foods Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ..............................................................5, 14

*In Re Dial Complete Marketing and Sales Practice Litig.*,
  320 F.R.D. 326 (D.N.H. 2017) ....................................................................*passim*

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*,
  2017 WL 1196990
  (N.D. Ill. Mar. 31, 2017)......................................................................................20

*In Re NJOY, Inc. Consumer Class Action Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal 2015) ..........................................................22, 23

*In re POM Wonderful LLC*,
  2014 WL 1225184
  (C.D. Cal. Mar. 25, 2014) ...................................................................................17

*In re Scotts EZ Seed Litig.*,
  304 F.R.D. 397 (2015).......................................................................................1, 5

*In re Scrap Metal Antitrust Litig.*,
  527 F. 3d 517 (6th Cir, 2008) ...............................................................................9

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
  45 F. Supp. 3d 724 (N.D. Ohio 2014) ....................................................10, 15, 18

*Khoday v. Symantec Corp.*,
  93 F. Supp. 3d 1067 (D. Minn. 2015)..................................................................14

*Kumar v. Salov North America Corp.*,
2016 WL 3844334
(N.D. Cal. July 15, 2016)......................................................................5

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)..............................................................................9

*Kurtz v. Kimberly-Clark Corp.*,
321 F.R.D. 482 (E.D.N.Y. 2017)....................................................1, 5

*Langan v. Johnson & Johnson Consumer Companies, Inc.*,
2017 WL 985640
(D. Conn. Mar. 13, 2017).....................................................................5

*Lanovaz v. Twinings North America, Inc.*,
2014 WL 1652338
(N.D. Cal. Apr. 24, 2014) ..................................................................13

*McLean v. 98011 Ontario Ltd.*,
224 F.3d 797 (6th Cir. 2000) .............................................................10

*Saavedra v. Eli Lilly and Co.*,
2014 WL 7338930
(C.D. Cal. Aug. 14, 2015)............................................................22, 23

*Sanchez-Knutson v. Ford Motor Company*,
181 F. Supp. 3d 988 (S.D. Fla. 2016) ...............................................14

*Shaw v. Strackhouse*,
920 F.2d 1135 (3d Cir. 1990) ............................................................10

*Smajlaj v. Campbell Soup Co.*,
782 F. Supp. 2d 84 (D.N.J. 2011).....................................................23

*Townsend v. Monster Beverage Corp*,
2018 WL 1662131
(C.D. Cal. Mar. 20, 2018) ..................................................................18

*TV Interactive Data Corp. v. Sony Corp.*,
929 F. Supp. 2d 1006 (N.D. Cal. 2013).......................................14, 19

## STATUTES, RULE AND REGULATIONS

Federal Rules of Evidence
    Rule 702 ...............................................................................................................9

## I.    INTRODUCTION[1]

Whirlpool cannot credibly strike the appropriateness of conjoint or hedonic regression analyses, which are lauded in econometrics Whirlpool's own experts as valid and routinely approved by courts.[2]  Whirlpool also failed to identify anything that would give rise to striking or excluding Mr. Weir or his analysis *as inherently unreliable*.

Defendant moved to strike the methodologies, data points or assumptions used by Mr. Weir, despite, for example, that: (i) Mr. Weir's methods have been tried, tested and sustained by Courts in class settings akin to the one here; (ii) Whirlpool's experts did not perform any independent analyses in an effort to present competing results; and (iii) Whirlpool's expert Dr. Ugone could only pose theoretical faults in Mr. Weir's work – *e.g.*, "*may* lead to a bias" (Ugone Sur-Reply at ¶11) – without establishing fatal flaw for this Court to strike.  Without an basis to strike Mr. Weir's conclusions or methodologies, Whirlpool proffers a *Comcast*[3]-related argument – in

---

[1]    For ease of reference, unless otherwise noted, abbreviated terms referencing documents filed in this action have the same meaning as those used by Defendant in its Motion to Strike and brief in support (ECF No. 97)(the "Def. Mem.").

[2]    *Dzielak v. Whirlpool,* 2017 WL 6513347 (D.N.J. Dec. 20, 2017); *In re Scotts EZ Seed Litig.,* 304 F.R.D. 397 (2015); *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, No. 5:17-cv-00564, Order, ECF No. 199 (N.D. Cal., June 26, 2018); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482 (E.D.N.Y. 2017); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014).

[3]    *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

1

the form of a "*Daubert* motion" – suggesting that individual inquiries predominate and that the Court should not certify the class when, according to Defendant, consumers do not uniformly define self-cleaning (*a factual question*) or certain purchasers did not weigh self-cleaning functionality as an important attribute (*a proposed question of legal liability*).

To be clear, these arguments have no bearing on Defendant's request to disqualify Mr. Weir, his analyses, or his methodologies. Critiques about how Mr. Weir *could have* done things differently do not influence the admissibility of Mr. Weir's opinions; at most, they are issues that relate to the weight of the evidence. Plaintiffs' theory of liability hinges on the premise that they received and paid for something less (*e.g.*, *little to no cleaning*) than what was advertised (*"self-cleaning"*). Consumers were injured at the moment of purchase. They are, therefore, entitled to damages in the form of the price paid as compared to what they received. The premium exhibited by Mr. Weir's[4] conjoint and hedonic regression analyses – individually or jointly – forms the seamless nexus between Plaintiffs' liability and damages theories.

## II.    STATEMENT OF FACTS[5]

---

[4]  In *Dzielak v. Whirlpool Corp.*, 2017 WL 1034197, at **21-22 (D.N.J. March 17, 2017), Mr. Weir analyses survived challenges made by the same defendant and counsel. There, like here, quibbling of assumptions and data points were found to inappropriate at the *Daubert* stage of litigation.

[5]  A full discussion of the relevant background and fact is set forth in Plaintiffs'

The AquaLift self-cleaning feature was one of several attributes included in AquaLift's new line of ovens in early 2012 (the "███████"). "███████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████.[6] Each of these ███████████████████ ███████████████████████.

Among the ███████████, AquaLift self-cleaning was singled out by Whirlpool as a "███████████" message to promote to consumers and facilitate the overall sales of the ███████████.[7]  *See* Class Cert. Mot. §II.B.1.d.  Whirlpool advertised and sold the AquaLift Self-Clean attribute as capable of self-cleaning the *entire* oven cavity.[8] Before and after the launch of the ███████ of ovens, ███████

---

Memorandum of Law in Support of Their Motion for Class Certification (ECF No. 71)(the "Class Cert. Mot.").

[6] *See* Ex. 1, ARS0055659 (██████████████████████████████████); Ex. 2, WSC0024609, at 24615 (█████████████████████████); Ex. 3, WSC0013268 at 76 (████████████████████████").  All references to "Ex. __" are to the Index of Exhibits attached hereto.

[7] Advertising of AquaLift as self-cleaning was a focal point of Whirlpool's launch of the ███████████ as the Company ████████████████████████████ ████████████████████.  *See* Class Cert. Mot. §II.A.3.

[8] *See* Class Cert. Mot. §II.A.3 and exhibits 26-27, *including* WSC0020119 ("██████ ████████████████████████████").  All references to "exhibit __" are to the Class Cert. Mot. index of exhibits.

██████████████████████████████████████████████ the

ovens.[9]

The term "self-clean" or "self-cleaning oven" is known to consumers. Whirlpool was well aware of consumers' understanding of what a self-cleaning oven was and the expectations associated with what a self-cleaning oven can do. Whirlpool used the understood meaning of self-cleaning ovens *in the name* of the AquaLift feature. *See* Class Cert. Mot. §II.A.3.

## III. THE ECONOMIC MODELS UTILIZED BY MR. WEIR ARE IDEAL FOR CALCULATING PRICE PREMIUM DAMAGES ON A CLASSWIDE BASIS

### A. Mr. Weir's Qualifications

Economist Colin B. Weir was retained by Plaintiffs to calculate price premium damages, on a classwide basis, paid solely attributable to the misrepresentations as to the AquaLift self-cleaning mechanism. To accomplish that, he used a conjoint analysis and a hedonic regression analysis. Mr. Weir is qualified (as unchallenged by Whirlpool or its experts) to perform both analyses.[10] His damages models, including

---

[9] *See* Class Cert. Mot. §II.A.3 and exhibits 19-20, *including* WSC0016043

(████████████████████████████████████████████████████████
████████████.); WSC0040706-711, exhibit 20 (████████████████████████
████████████████████████████████████████████████████████).

[10] Mr. Weir's academic and professional background, as well as litigation experience and success in gaining approval of his models and methodologies are detailed in the Weir Decl. (including Ex. 1 of his Decl.).

those he performed here, have been used to support class certification in consumer

and, more specifically, false advertising cases.[11]

### B. Mr. Weir Performed a Hedonic Regression Analysis to Isolate the Price Premium Associated with Whirlpool's AquaLift Self-Cleaning Claim, on a Classwide Basis

Courts adopt hedonic regression analyses to value classwide damages relating

to product attributes in false advertising claims.[12]  Hedonic regression is an inherently

reliable statistical calculation as it produces and maintains built-in statistical measures

to confirm reliability (or lack thereof).[13]  For example, the R-squared statistic

identifies the percent in the variation in the dependent variable that can be explained

by the independent variables.   Weir Decl. ¶104.   The F-statistic determines the

"goodness of fit" of the model – *e.g.*, whether the model produces appropriate results

and makes statistical sense.  *Id.* ¶105.  And the T-statistic evaluates if the results are

---

[11] *See e.g., In re ConAgra Foods*, 90 F. Supp. 3d 919 (C.D. Cal. 2015); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 413; *Kurtz*, 321 F.R.D. 482;  *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 2017 WL 985640 (D. Conn. Mar. 13, 2017); *Dzielak*, 2017 WL 6513347;  *See Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29 (E.D.N.Y. 2015); and *Kumar v. Salov North America Corp.*, 2016 WL 3844334 (N.D. Cal. July 15, 2016).

[12] *See, for example, Kurtz*, 321 F.R.D. at 551 (finding hedonic regression could value the premium associated with "flushable" claim); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 413-414 (finding hedonic regression could value the premium associated with "50% thicker" claim); *Dei Rossi v. Whirlpool Corp.*, 2015 U.S. Dist. LEXIS 55574 (E.D. Cal. Apr. 27, 2015) (finding hedonic regression could value the premium associated with ENERGY STAR logo); *Briseno v. ConAgra Foods, Inc.*, 2017 WL 53421 (9th Cir. Jan. 3, 2017).

[13] *E.g.*, the R-squared statistic; F-statistic; and T-statistic.  Weir Decl. ¶103.

statistically significant and the coefficients calculated are meaningful in a statistical sense. *Id.* ¶106. Combined, the statistics substantiate that the preliminary regression analysis was comprehensive and reliable for the purposes of demonstrating that the method can be used to calculate price premium damages on a classwide basis. *Id.* ¶132.

Here, Mr. Weir used hedonic regression to calculate the price difference between the value of Whirlpool brand ovens with and without the "self-clean" attribute. Weir Decl. ¶100. To test whether this could be done, Mr. Weir reviewed the specifications and advertisements for numerous ovens; conducted cognitive interviews with consumers; confirmed identifiable time periods, geographies, and relevant attributes were identifiable; and generated a coded spreadsheet of the claims made by manufacturers in their product advertising. Weir Decl. ¶¶100-102, 114. This enabled Mr. Weir to decipher which product attributes required single versus multiple "dummy variables" aside from or in addition to the cleaning feature.[14] Mr. Weir was thereby able to conclude that the "self-clean" function could be isolated.[15]

---

[14] Weir Decl. ¶115. Dummy variables refer to a variable that takes the value 0 in one instance and 1 in the alternative. For example, AquaLift will be coded as a dummy variable where each observation will be coded as 1 if the products have the feature and 0 if it does not.

[15] Weir Decl. ¶¶100-101 ("hedonic regression is an ideal technique for calculating the price difference between the value of the Whirlpool brand ovens with and without AquaLift").

Mr. Weir had access to sales data from several Whirlpool retailers to perform the regression.  Weir Decl. ¶¶109, 137-142.  After review and consideration of the data sets from the third party retailers, Mr. Weir utilized the sales data from the retailer H.H. Gregg because it was the most robust in that it included historical pricing, price paid, oven manufacturer, model number, date, and store location for each individual purchase transaction.[16]  Overall, Mr. Weir used 1.15 million lines of historical oven sales data from 2012-2017, which included eight separate brands and more than 200 products.  Weir Decl. ¶¶110, 117.  These reliability metrics confirmed the appropriateness of the premium.[17]

Mr. Weir derived a premium from the hedonic regression at 10.84%.

## C.   Mr. Weir Performed a Conjoint Analysis to Calculate, on a Classwide Basis, the Premium Associated with Whirlpool's AquaLift "Self-Clean" Claim.

Mr. Weir conducted a choice based conjoint ("CBC") study, utilizing Sawtooth software for the programming of the questionnaire, data collection, and analysis of the

---

[16]  Weir Decl. ¶¶110, 117.  Efforts to successfully obtain the most exhaustive retail data available is detailed in the Declaration of Jordan D. Mamorsky (Ex. 4.).

[17]  Weir Decl. ¶133.  For example, the R-squared statistic was 87.8% of the variation of the dependent variable, and the T-statistic indicated that the results are statistically significantly different from zero at the 99% confidence level.

What is more, to further confirm the regression results *specifically in response to* Dr. Ugone's failed criticism (Ugone Decl. ¶61), Mr. Weir ran *four separate regressions* that applied Whirlpool's specific criticisms.  These separate regressions resulted in the same price premium or higher.  Weir Reply Decl. ¶63.

survey results.[18]  As part of his survey design, Mr. Weir researched oven advertising samples and conducted interviews with consumers who had recently shopped for Whirlpool branded ovens.

The cleaning options presented for respondents to choose from were: █

████████████████████████████████████████████████████████

███████████████████████    ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████.[19]  So that the definitions mimicked real world descriptions, Mr. Weir developed the cleaning definitions from Whirlpool's advertising, documents, and deposition testimony.[20]

To analyze the data and test for the existence and the amount of the price premium for AquaLift "self-clean," Mr. Weir took the individual data points of respondent selections and analyzed them through a created a set of "partworths."

Mr. Weir then ran the market simulation to compare two Whirlpool brand ovens that were the same in all respects except one offered AquaLift "self-clean" and the other disclosed the truth about AquaLift (*e.g.* "partial-clean").  Weir Decl. ¶66.  The market simulator used historical market prices to compare the two ovens at market

---

[18]  Weir Decl. ¶52 n.60.  CBC and Sawtooth Software both maintain benchmark acceptability for the purposes of the analysis performed by Mr. Weir.  Weir Decl. ¶39.

[19]  Weir Decl. ¶68; Weir Reply Decl. ¶¶96-97.

[20]  Weir Decl. ¶¶33-35, 73-77; Weir Reply Decl. ¶¶96, 97, 102-107.

equilibrium; meaning, the prices where consumer preferences were indifferent between the two cleaning options. *Id.* Mr. Weir calculated the preliminary price premium by subtracting the highest prices in data set for AquaLift "self-clean" from AquaLift "partial-clean" and dividing it by the AquaLift "self-clean" price. Weir Decl. ¶68. To ensure the price premium was as conservative as possible, Mr. Weir used the highest AquaLift price point on the market (here, $1200). *Id.*

Mr. Weir derived a premium from the conjoint analysis at 10.5833%.

## IV.   ARGUMENT

### A.   Legal Standard

In the Sixth Circuit, "rejection of expert testimony is the exception rather than the rule."[21] *Daubert* factors are not to be applied rigidly; the test of reliability is "flexible."[22] A Court's role in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine "whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation."[23] Mere weaknesses

---

[21] *In re Scrap Metal Antitrust Litig.*, 527 F. 3d 517, 530 (6th Cir, 2008), *citing* Fed. R. Evid. 702 advisory committee's note. 2000 amend; *see also Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002) (finding regression analysis to easily pass *Daubert* reliability)."

[22] *Dixon v. Grand Trunk Western Railroad Company*, 259 F. Supp. 3d 702, 708 (E.D. Mich. 2016) (Murphy, J.), citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

[23] *In re Scrap Metal*, 527 F.3d 517, 529-30 (6th Cir. 2008). *See also Allan v. RealComp II, Ltd.*, 2013 WL 12333444, at *5 (E.D. Mich. 2013 Mar. 30, 2013) (Murphy, J.) (finding that expert decisions to use certain variables and exclude others in a multiple regression analysis is an issue of fact that may be attacked through "vigorous cross examination).

in the factual basis of an expert witness opinion bear on the weight of the evidence rather than on its admissibility.[24]

### B.     Whirlpool Does Not Establish that Mr. Weir's Analyses Fail to Satisfy the *Daubert* Test

The question of reliability in a *Daubert* setting rests solely on principles and methodology, not on the conclusions that they generate.   The crux of Mr. Weir's conclusion is that Plaintiffs can demonstrate classwide damages in the form of a price premium.   Mr. Weir performed, and offered this Court, two acceptable economic measures to support that conclusion.   Whirlpool takes issue with the conclusion itself and seeks to exclude Mr. Weir's findings by cherry-picking certain assumptions, selections, or choices he made to conclude that the AquaLift self-cleaning feature – isolated and standing alone – is valued at either 10.84% or 10.58% of the overall value of a ▮▮▮▮ containing AquaLift.   Whirlpool's economic expert acknowledged that it did not matter which analysis Mr. Weir performed, or method he employed, or assumptions he made, or data points he used.   Deposition of Dr. Keith Ugone (the "Ugone Day 1 Dep."), 22:2-18, 126:4-18, Ex. 5.   According to Dr. Ugone, this case involves individual inquiry and there is no common proof approach.   Whirlpool was going to challenge Mr. Weir regardless of how he reached any form of common damages.

---

[24]   *McLean v. 98011 Ontario Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000)(citing *Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990); *See e.g., In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d 724 (N.D. Ohio 2014).

**C.    Hedonic Regression Is a Reliable Analysis to Demonstrate Classwide Damages, and Mr. Weir Employed Economic Principles Based on Facts and Actual, Historical Sales Data**

Whirlpool presents two arguments as to why this Court should strike Mr. Weir's hedonic regression: (i) AquaLift "self-clean" is "confounded" with other non-cleaning trade-offs; and (ii) the sales data for Whirlpool ovens that was provided to Plaintiffs (and, in turn, to Mr. Weir) in first- and third-party discovery was insufficient data to conduct his regression. Def. Mem. at PgID 14374.

**1.    Supposed Enhancements or Trade-Offs Associated With the Aqualift Self-Cleaning Feature Do Not Render the Hedonic Regression Unreliable.**

Whirlpool's position that trade-offs (no odor) or enhancements (improved aesthetics) are "perfectly confounded" is factually unsupported and, plainly, untrue. *Id.* With respect to trade-offs, it is illogical (and unscientific) to suggest the amount of odor emanated from the self-cleaning mechanism of an AquaLift containing oven is, in and of itself, a standalone feature.[25] Plaintiffs do not dispute that the low odor or less heat "trade-offs" are linked to AquaLift self-clean. But, it has no bearing on the cleanability of the AquaLift feature as an attribute to consumers, or on evaluating the benefit or value of the self-cleaning as an attribute.

---

[25]   Whirlpool has, unsuccessfully, made offsetting arguments on *Daubert* motions before. *See e.g., Dzielak*, 2017 WL 1034197, at *12 (rejecting argument that price premium testimony was inadmissible because it could not account for any "offsetting benefits, such as rebates or utility savings").

With respect to the purported enhancements, Defendant appears to have constructed the fact that the so-called enhancements (*e.g.*, improved aesthetic appeal; improved cooktop performance) are confounded with AquaLift. Defendant's experts have said that, according to information provided to them by Whirlpool, they worked under the assumption – relying solely on what was told to them by Whirlpool or its counsel – that the variables were confounded with one another.[26]  In reality, however, nothing other than what Whirlpool directed to them – no allegations; no testimony by named plaintiff; no advertising or marketing; nothing public – attested to the confoundedness of the variables.  At best, they were part of ████████████████ that were added to the ███████ line.  Nothing more.

Defendant's simply have not shown that Mr. Weir improperly isolated, or failed to isolate, the AquaLift self-cleaning feature.  At best, Whirlpool (and its experts) raise trivial points about how the hedonic regression analysis should have been run differently.[27]  Not one of the three experts retained by Whirlpool conducted an

---

[26]  Dr. Simonson did not independently verify the "████████████████████████
████████.  Ex. 6, June 21, 2018 Deposition of Itamar Simonson (the "Simonson Dep.") at 318:1-319:9 ("████████████████████████████████████████" ); *see also* Ugone Rep. ¶¶71-74; Ugone Day 1 Dep. 110:3-113:1 ("████████████████████████████████████████████████████████████████████████████████████████ ).

[27]  Out of abundance of caution, Mr. Weir conducted four separate regressions to incorporate Dr. Ugone's criticisms that he did not include certain "quantifiable"

independent hedonic regression analysis to refute the reliability of Mr. Weir's method on this point. In the context of a *Daubert* challenge, therefore, Defendant's argument fails and expresses nothing more than a dissatisfaction with Mr. Weir's ultimate conclusion.[28]

### 2.    The H.H. Gregg Sales Data Amply Supported Mr. Weir's Hedonic Regression Analysis

Whirlpool expert Dr. Ugone, on the one hand, says that the sales data relied on by Mr. Weir is inadequate. He then, on the other hand, says that the sales points in H.H. Gregg data are more robust as compared to the data made available to Plaintiffs, through discovery, for other retailers (*e.g.,* Sears, Lowe's).[29] There can be an inherent difficulty in obtaining exhaustive data points from nonparty retailers. *See* Ugone Day 2 Dep. 45:11-21. Dr. Ugone testified that in connection with his own work in this

---

attributes. These four regressions showed either approximately the same price premium (10%) or a higher price premium (13%).

[28] Whirlpool's variable confounding issue relates to a scenario where there are no two product attributes to compare. Here, Mr. Weir is not comparing AquaLift against itself. He is testing the price difference between the value of Whirlpool ovens with and without the AquaLift cleaning feature. Weir Decl. ¶100. The decision in *Lanovaz v. Twinings North America, Inc.,* 2014 WL 1652338 (N.D. Cal. Apr. 24, 2014), as relied on by Defendant (Def. Mem. PgID 14374) is irrelevant, as it hinged on plaintiffs' expert's (admitted) inability to run a regression analysis without any variable in units sold or sales linked to the alleged false statement.

[29] Ex. 7, June 25, 2018 Deposition of Dr. Keith Ugone (the "Ugone Day 2 Dep.") at 195:1-14 (Dr. Ugone agrees there were more data points in H.H. Gregg's data than any other retailers in this case.).

litigation, and his criticism of Mr. Weir's analyses, he too ███████████
██████████████████████. Ugone Day 2 Dep. 192:15-193:9.

Whirlpool implies that H.H. Gregg's impending bankruptcy somehow impacted its sales data or data points. Whirlpool offers no correlation, however, as to whether the bankruptcy actually did impact the sales data or, more importantly, Mr. Weir's analysis. Dr. Ugone could only speculate that the bankruptcy could have impacted the way "H.H. Gregg conducted its business" (Ugone Sur-Reply at 22; Ugone Day 2 Dep. 189), but said he could not go so far as to say that the bankruptcy had an impact on Mr. Weir's calculations or claimed price premium. Ugone Day 2 Dep. 189:19-23.

### D. Conjoint Analyses Have Been Accepted by Courts as a Means to Establish and Calculate Classwide Damages, and Mr. Weir Applied Economic Methodologies Rooted in Facts Obtained Through Discovery and Objective Survey Data

Conjoint is a widely accepted and reliable analysis to value product attributes[30] and is considered an inherently reliable damages methodology that is seldomly denied at the class certification setting, let alone in the context of a *Daubert* motion.[31] Mr.

---

[30] *Dzielak,* 2017 WL 1034197, at *6 ("conjoint analysis has won acceptance from courts and legal commentators"); *In re ConAgra Foods*, 90 F. Supp. 3d at 1028 (conjoint analyses are reliably used for classwide damages).

[31] *See Khoday v. Symantec Corp.,* 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015). *See also TV Interactive Data Corp. v. Sony Corp.,* 929 F. Supp. 2d 1006, 1026 (N.D. Cal. 2013) (criticisms of conjoint survey design are to be left for consideration by a jury); *Sanchez-Knutson v. Ford Motor Company,* 181 F. Supp. 3d 988, 995 (S.D. Fla. 2016) (leaving dispute over appropriateness of variables or sufficiency of econometric analysis for the jury's consideration); *Dzielak,* 2017 WL 1034197, at *9.

Weir's conjoint analyses, particularly as applied to the price premium allegations, has largely been adopted – and survived *Daubert* challenges – for the same reason.

Whirlpool strains to strike Mr. Weir's conjoint analysis, arguing that he: (1) did not measure AquaLift "as promised" as consumers have different meanings of "self-clean"; (2) inflated consumer preferences for the AquaLift "Self-Clean"; (3) allowed a focalism bias through a lack of focus on "improved aesthetic appeal" and other "enhancements" Whirlpool claims to be part of the AquaLift feature; and (4) measures a consumers' willingness to pay, and did not account for supply side considerations. Def. Mem. at PgID 14364-14370.

Defendant's arguments are not, however, grounds to strike or challenge Mr. Weir on a *Daubert* basis because, at best, it goes to the weight, and not the admissibility, of Mr. Weir's methodologies and conclusions.[32]    What is more, Defendant's points are factually untrue.

### 1. Mr. Weir's Conjoint Survey Replicates Whirlpool's Own Market Choices, Making It Inherently Reliable

Self-cleaning ovens have a long-standing and commonly-held meaning stemming from decades of the term self-cleaning as associated with traditional or

---

[32] *In re Whirlpool Corp. Front-Loading Washer*, 45 F. Supp. 3d 724, 753 (N.D. Ohio 2014) (question as to the appropriateness of using hypothetical, or nonexistent, attribute as part of survey went to the weight of the evidence; *not* its admissibility); *Snapple Group,* Order at 16; *In re Dial Complete Marketing and Sales Practice Litig.,* 320 F.R.D. 326, 332-333 (D.N.H. 2017)(same).

pyrolytic ovens.[33] For the purposes of its briefing, however, Whirlpool claims there are divergent meanings. What is perhaps most remarkable about Whirlpool's argument that there is somehow no common meaning of a self-cleaning oven is that its own representatives formulated AquaLift self-cleaning technology advertising based on consumers' understanding of the meaning of the term.[34]

AquaLift self-cleaning is, and was, advertised by Whirlpool, as a singular attribute. Mr. Weir relied upon Whirlpool's own advertising and representations in crafting and performing his survey. Mr. Weir ensured his survey choices were "grounded in reality" by constructing randomized "choice tasks" to mimic real-world options and consumer preferences.[35] He did so in accordance with economic principles (described, *supra*, at 5-9) and using the same assumption of liability and methodology that courts have consistently found to be acceptable.[36] Mr. Weir's

---

[33] *See* Common Definition of Self-Clean Chart, Ex. 8; *see also* Class Cert. Mot. II.A., exhibit 6, WSC0016488 ("expectation for a 'self clean' cycle's cleaning result" was long established and known to Whirlpool at launch); Class Cert. Mot. II.A.3., exhibit 20, WSC0040706-711 (consumers' expectations of self-cleaning ovens' efficacy knows, and consistent).

[34] Research conducted by or on behalf of Whirlpool confirmed consumers' understanding and expectation of self-cleaning ovens. Class Cert. Mot. II.A.2, exhibit 22, WSC0019803 (explaining Whirlpool's decision to advertise AquaLift as "self-clean" as influenced by consumer research).

[35] Weir Decl. ¶¶33-35, 65-66, 73-77; Weir Reply Decl. ¶¶96, 97, 102-115. As one example, Mr. Weir developed the presented cleaning choices specifically from Whirlpool brand oven advertising and Whirlpool documents he reviewed in this case.

[36] *See e.g.*, *Snapple Group,* Order (court approved similar conjoint methodology conducted here); *In re Dial Complete,* 320 F.R.D. 326 (same).

survey and overall conjoint analysis isolated the attribute as that self-cleaning function. The case law cited by Whirlpool on this point does not support striking Mr. Weir's analysis.[37]

### 2. Mr. Weir Described the AquaLift Self-Cleaning Feature From Whirlpool's Own Advertising or Statements by its Representatives

Mr. Weir detailed that the descriptors he utilized – including, AquaLift "self-clean," AquaLift "partial self-clean," "Pyrolytic self-clean" and manual clean – were derived from his review of public and nonpublic describing the AquaLift self-cleaning feature (*e.g.*, as replacement of pyrolytic)[38] and the capabilities of the feature (*e.g.*, can aid the cleaning of the bottom of the oven cavity, but not the sides or the back).[39]

Without any legal or factual footing, Whirlpool gripes with Mr. Weir over his selection of descriptors, bemoaning their hypothetical nature. The use of a

---

[37] *See Hughes v. The Ester C. Co, et al.*, 317 F.R.D. 333, 355 (E.D.N.Y. Sept. 30, 2016) (no proposed model could satisfy *Comcast* because the "Better Vitamin C" claim did not refer to a specific product feature and could relate to several different representations); *In re POM Wonderful LLC*, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) (clarifying that plaintiffs did not satisfy *Comcast* because no method was proposed to isolate Pom 100% Juice claim with price premium).

[38] Ex. 2, WSC0024609 (WSC0024627): ██████████████████████████ ██████████████████████████); *see also* Class Cert. Mot. §II.A.3. and II.A.1, *including* exhibit 10, WSC0019737 ████████████████████████ ██████████

[39] Class Cert. Mot. §II.A.3., *including* exhibit 99,WSC0022270 ("████████ ████████████████████"); exhibit 23, WSC0016774 (████████████████████████); *Id.* WSC0016776 ("█████████ ██████").

- 17 -

hypothetical is acceptable in a conjoint survey.[40] And, factually, discovery in this case proved that the AquaLift self-cleaning attribute has little to no cleanability value.[41] Mr. Weir's descriptors, therefore, are not hypothetical and, instead, are consistent with the true efficacy of the feature. "AquaLift partial-clean" is not an affirmatively detrimental descriptor (as Defendant claims); it is accurate.[42]

This is what Plaintiffs' alleged, what discovery has borne, and what Mr. Weir incorporated in his analyses. The theory of liability and theory of damages are, therefore, perfectly aligned.

### 3. Mr. Weir's Survey Choices Reflect the Objective Reality Evinced Through Discovery, and He Took the Necessary Steps to Avoid Focalism Bias

Whirlpool's 'focalism bias' argument amounts to nothing more than nitpicking by the Company and its expert over *which* "choices" Mr. Weir included in his survey,

---

[40] It has, in fact, been used successfully against Whirlpool. *In re Whirlpool Corp. Front-Loading Washer,* 45 F. Supp. 3d 724 (denying Whirlpool's argument that conjoint analysis did not fit the facts of the case because the conjoint analysis presented respondents with a front loading washing machine requiring no biofilm maintenance that does not exist on the market). *Compare with Townsend v. Monster Beverage Corp,* 2018 WL 1662131, at *5 (C.D. Cal. Mar. 20, 2018) (court only struck expert testimony related to embellishments or fabrications by the expert).

[41] Class Cert. Mot. §II.B.a and II.B.3, *including* exhibit 63, WSC0019372 (███████████████████████████████); exhibit 97, WSC0016335 (███████████████); exhibit 72, WSC0019278 (████████████████).

[42] Class Cert. Mot. §II.B.3, *including* exhibit 19, WSC0016040-3 ("soils on the side and back are not loosened" and "significant scrubbing is required"); exhibit 99, WSC0022270 (AquaLift is "effective on the oven bottom but does not work on the sides of the cavity").

as well as the *number* of choices he presented to respondents, the *manner* in which he presented information (*e.g.*, photographs versus descriptors) and his *selection* of attributes.  The argument ignores the rationale Mr. Weir provided in his reports and deposition for each and every inclusionary and exclusionary decision in his survey.[43] This argument is also routinely rejected by courts as inapplicable to *Daubert* challenges.[44]

Whirlpool relies on its expert, Dr. Ugone, to criticize Mr. Weir's survey for creating potential biases.  Dr. Ugone did not, however, conduct his own conjoint survey to support any purported criticism.[45]  And, Whirlpool cannot cite to a rule or decision that requires the precise approach Dr. Ugone seeks to impose – *e.g.*, a photograph to be shown to survey participants or that there is a required number (minimum or maximum) of attributes that must be presented to respondents.[46]

---

[43]  Weir Decl. ¶¶30-35, 43; Weir Reply Decl. ¶¶96-115,  147-151; Weir Dep. 119:9-120:7, 132:10-134:13, 148:5-150:4, 179:20-181:5.

[44]  *Snapple Group,* Order at 4 (even assuming conjoint analysis  used the wrong number and type of product attributes would not render conjoint survey excludable, Defendant could cross examine expert at trial); *In re Dial Complete,* 320 F.R.D. at 332-333 (nitpicking conjoint survey design and methodology goes to the weight of the evidence, not its admissibility).

[45]  Ugone Rep. ¶¶100-113.  Dr. Ugone testified that he never did.  Ugone Day 1 Dep. 10:11-14.

[46]  Def. Mem. PgID 14369.  But no set number is required.  *See TV Interactive Data,* 929 F. Supp. 2d at 1026 (rejecting argument that conjoint survey presented too few product features because the right number used was classic "battle of the experts" issue).

Whirlpool further alleges Mr. Weir's conjoint survey is "artificially skewed" because it did not consider other ███████ attributes, or enhancements, supposedly intertwined with "self-clean" (*e.g.*, larger window, oven capacity, and cooktop). *See* Def. Mem. PgID 14369. Mr. Weir's conjoint analysis did, however, control for those "non-cleaning benefits." Mr. Weir measured the difference between two Whirlpool branded ovens, one with AquaLift "self-clean" as represented to consumers and the other disclosing the truth about AquaLift's cleaning ability – *with all other attributes included in an AquaLift containing oven held constant, including the "enhancements."* Weir Decl. ¶66; Weir Reply Decl. ¶¶163-172. As a result, there was no difference between the two ovens, aside from the cleaning feature disclosure.[47]

### 4. Mr. Weir's Market Simulation Accounts for Relevant Supply Side Considerations

Whirlpool insists that Mr. Weir's conjoint survey and market simulation were aimed to measure respondents' "willingness to pay" ("WTP") for the oven cleaning features he described in connection with his conjoint analysis. Def. Mem. PgID

---

[47] Adding a litany of product attributes beyond what Mr. Weir provided would only serve to confuse participants and would change the validity his analyses. Weir Reply Decl. ¶¶167-172; Whirlpool's attempts to analogize this case with *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) fails because that case involved a "willingness to pay" and not a price premium analysis, and the court excluded the experts' testimony for extreme reasons, including that respondents were unrepresentative of consumers in the marketplace and the attributes were wholly unrepresentative of real-world conditions.

14371-72.  To be clear, WTP are defendant's words (or the words of Dr. Ugone[48]); not the words of Mr. Weir.  Mr. Weir's conjoint survey was designed to measure ***market outcomes***,[49] as distinct from a WTP.  Weir Reply Decl. ¶133.  Mr. Weir's analysis tested the market outcome of the truth about the AquaLift feature; *e.g.*, that manual effort is required to clean all but the bottom of the oven cavity was disclosed to consumers.  Weir Decl. ¶66.

Mr. Weir's conjoint analysis did not focus on what prices respondents would be willing to pay for the cleaning feature.  Rather, it determined the price premium associated with AquaLift "self-clean" based upon a market simulation comparing AquaLift "self-clean" as promised and AquaLift "partial clean" as received.  He did so while factoring in real world price points.  *Id.*

WTP on the other hand, is the maximum amount an individual would be willing to pay for a good or service.  Weir Reply Decl. ¶152.  Decisional authority has been critical of willingness to pay measures in the context of ***relative valuations*** of consumer demand for a product or feature without considerations of supply side

---

[48]  Ugone Rep. ¶¶11g, 130, 132a and 139.; Ugone Day 2 Dep. 27:1-27:18 (testifying that the conclusion that Mr. Weir had a willingness to pay metric in his analysis was Dr. Ugone's words, not Mr. Weir's).

[49]  Weir Decl. ¶67; Weir Reply Decl. ¶¶101, 133 ("Ugone goes on to suggest that I am proposing a measure of 'willingness to pay'…. As above I am not measuring 'willingness to pay,' I am measuring a market outcome").

pressures.[50]  By characterizing Mr. Weir's analysis in the WTP context, Whirlpool

sought to misapply those cases to criticize his work.  Dr. Ugone conceded, however,

that the characterization of Mr. Weir's analysis as WTP was termed by Dr. Ugone and

was not based on anything Mr. Weir said or wrote.[51]

     At bottom, his conjoint analysis ***was designed to include supply side data from***

***start to finish***.  Mr. Weir researched oven websites to review historical pricing, and

then incorporated real world pricing data into the choice sets respondents selected in

the administration of the survey.  Weir Decl. ¶¶73-77; Weir Reply Decl. ¶¶122-133.

*Third*, Mr. Weir's market simulation, which facilitated the calculation of the price

premium, incorporated real world pricing data to determine the appropriate market

equilibrium for AquaLift "self-clean" and AquaLift "partial clean" where consumers

would be indifferent to purchasing either.  Weir Decl. ¶66.

     <u>Mr. Weir controlled for supply side considerations.</u>  The prices of the AquaLift

ovens Mr. Weir used in his conjoint analysis are fixed as a matter of history and part

of an efficient and competitive market that are reflective of competitive demands.

Weir Decl. ¶¶78-79.  Courts have approved this methodology to be adequate

simulators of supply side pressures.  *Snapple Group*, Order at 15-16; *In re Dial*

---

[50]  Def. Mem. PgID 14372; *see e.g., In Re NJOY, Inc. Consumer Class Action Litig.,* 120 F. Supp. 3d 1050, 1119-1120 (C.D. Cal 2015), *citing Saavedra v. Eli Lilly and Co.,* 2014 WL 7338930, at *4, (C.D. Cal. Aug. 14, 2015).

[51]  Ugone Day 2 Dep.27:1-27:18; *See e.g.,* 28:22-29:12 (clarifying Mr. Weir conducted price premium analysis).

*Complete*, 320 F.R.D. at 332-333.  Here, Defendant relies on cases that do not contain

the missing link[52] – the inclusion of historical prices into the elements of the conjoint

analysis – and are, therefore, inapplicable.

## V.    MR. WEIR'S PRICE PREMIUM ANALYSIS DOES NOT REQUIRE INDIVIDUAL INQUIRIES

Mr. Weir's theory of damages is focused on, and measures, Plaintiffs loss of the

benefit of the bargain.  He says, in line with Plaintiffs' theory of liability, that

Plaintiffs and the putative class members they seek to represent purchased a "self-

cleaning" oven that could not "self-clean" and were thereby damaged.[53]  Mr. Weir's

damages theory echos a long line of false advertising cases that stand for the

proposition that no individual inquiry is necessary in connection with Plaintiffs' loss

of the bargain theory.[54]

---

[52] *Saavedra*, 2014 WL 7338930, at *5 (finding the "numerous complicating factors in the prescription drug market sever the relationship between price and value"); *In re NJOY, Inc.* 120 F. Supp. 3d 1050 (plaintiffs could not and did not incorporate fixed historical market prices into the price premium analysis); *Herron v. Best Buy*, 2016 WL 1572909, at *10 (E.D. Cal. Apr. 9, 2016 ("value equation" which was a relative valuation tool different from the actual sales price of the laptops could not accurately measure damages).

[53] Weir Decl. ¶151 ("As I have discussed at length, if the market price for the Whirlpool brand ovens was higher as the result of the Claim then ALL consumers will have paid a higher price than if the Claim had not been made").

[54] *Dzielak,* citing *Smajlaj v. Campbell Soup Co.,* 782 F. Supp. 2d 84, 97-103 (D.N.J. 2011) (distinguishing benefit of the bargain damages from individualized price inflation theory); *In re Dial Complete,* 320 F.R.D. 326 (certifying class based on conjoint where product did not provide the promised superior efficacy").

Whirlpool ignores Plaintiffs' and Mr. Weir's theory and, instead, contends that consumers must "kn[o]w every relevant fact about AquaLift." Def. Mem. PgID 14377. Remarkably, Whirlpool advances this argument despite knowing that it failed to disclose the most salient fact about the AquaLift feature; specifically, that it does not self-clean or, at most, that it is only capable off aiding the cleaning of the bottom portion of the ▮▮▮▮▮▮▮' cavities. At bottom, each Plaintiff paid more for her AquaLift "self-cleaning" oven then she would have had the oven been advertised truthfully. The damages at issue are universal to the Class, and are directly connected to Whirlpool's false advertising campaign. No individual inquiry is necessary. To be clear, Plaintiffs have not alleged a price inflation suit or a fraud on the market suit, which could require an individualized damage calculations.[55] Here, Mr. Weir calculated the price premium damages on benefit of the bargain theory. Plaintiffs and the class members expected to receive an oven that could self-clean, but did not.

---

[55] Comparing this case with *Harnish v. Widener University School of Law*, 833 F.3d 298 (3d Cir. 2006) is, therefore, misplaced, as it concerns a price inflation theory that gave rise from the law school's use of false statistics to increase its tuition. Whirlpool tried analogizing *Widener* to a price premium case, in *Dzielak*, and failed.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs' respectfully request that the Court deny

Whirlpool's motion to strike the opinions of Mr. Colin Weir.

DATED: July 2, 2018                    Respectfully submitted,

                                       */s/ E. Powell Miller*_____
                                       E. POWELL MILLER (P39487)
                                       SHARON S. ALMONRODE (P33938)
                                       THE MILLER LAW FIRM, P.C.
                                       950 West University Drive, Suite 300
                                       Rochester, MI 48307
                                       Telephone: 248/841-2200
                                       248/652-2852 (fax)

                                       ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       MARK S. REICH
                                       JORDAN D. MAMORSKY
                                       58 South Service Road, Suite 200
                                       Melville, NY 11747
                                       Telephone: 631/367-7100
                                       631/367-1173 (fax)

                                       ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                       PAUL J. GELLER
                                       STUART A. DAVIDSON
                                       CHRISTOPHER C. GOLD
                                       120 East Palmetto Park Road, Suite 500
                                       Boca Raton, FL 33432
                                       Telephone: 561/750-3000
                                       561/750-3364 (fax)

HARFORD P.C.
SCOTT A. HARFORD
299 Broadway, Suite 1310
New York, NY 10007
Telephone: 212/390-8983
646/895-6475 (fax)

*Attorneys for Plaintiffs and the Proposed
Class and Subclasses*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 2, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel registered to receive such notice.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 2, 2018.

*/s/ E. Powell Miller*
E. POWELL MILLER
THE MILLER LAW FIRM, P.C.
950 West University Drive, Suite 300
Rochester, MI  48307
Telephone:  248/841-2200
248/652-2852 (FAX)
epm@milerlawpc.com