# EXHIBIT 1

Page 1

1              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF MICHIGAN
2

     TOBY SCHECHNER, BARBARA     )
3    BARNES, LAURA BLISS,        )
     KATHRYN LIMPEDE, LOUISE      )
4    MILJENOVIC, CANDACE         )
     OLIARNY, BEVERLY SIMMONS,   )
5    RICHARD THOME and MARY       )
     ELLEN THOME, Individually    )
6    and on Behalf of All        ) Civil Action No.
     Others Similarly            ) 2:16-cv-12409
7    Situated,                   )
          Plaintiffs             )
8                                )
     v.                          )
9                                )
     WHIRLPOOL                   )
10   CORPORATION,                )
          Defendant.             )
11
12   ****************************************************
13         ORAL AND VIDEOTAPED DEPOSITION OF
14               KEITH R. UGONE, PH.D.
15                  JUNE 7, 2018
16   ****************************************************
17
18
19
20
21
22
23
24
25

Page 6

```
 1              EXAMINATION
 2 BY MR. KARAM:
 3     Q.  Good morning, Dr. Ugone.
 4     A.  Good morning.
 5     Q.  You submitted a declaration yesterday attached
 6 to a surreply submitted by counsel.  Is that right?
 7     A.  I don't know if I would quite use those words
 8 in terms of my own words, but I submitted a surreply
 9 declaration that's dated June 5.
10     Q.  Surreply declaration.  Right?
11     A.  Yes.
12     Q.  It's dated June 5.  Right?
13     A.  Yes.
14     Q.  Do you know when it was filed with the Court?
15     A.  No.
16     Q.  Do you know when it was served on counsel?
17     A.  Is today the --
18     Q.  Today is the 7th.
19     A.  I think it might have been served yesterday,
20 but I'm not sure.
21          (Exhibit 449 marked.)
22     Q.  (BY MR. KARAM)  You read the rebuttal report
23 of Colin Weir.  Correct?
24     A.  Yes.
25     Q.  When did you get that rebuttal report?
```

Page 7

```
 1     A.  I can't tell you the exact date, but I believe
 2 it would be around the time that it was submitted by
 3 Mr. Weir.
 4     Q.  What's the date on Mr. Weir's report?
 5          MR. ELLIS:  Let the record reflect that
 6 the witness is referring to Mr. Weir's report that has
 7 been previously marked as Exhibit 449.
 8     A.  I believe it's May 17.  It says, Reply
 9 Declaration of Colin B. Weir, May 17, 2018.
10     Q.  (BY MR. KARAM)  When did you decide to submit
11 a surreply declaration?
12          MR. ELLIS:  Object to form.
13     A.  I would phrase it as I was asked to submit a
14 surreply.
15     Q.  (BY MR. KARAM)  Who asked you to do that?
16     A.  Counsel for Whirlpool.
17     Q.  What date?
18     A.  I don't know what date that was.
19     Q.  Was it yesterday?
20     A.  No.
21     Q.  Was it May 18th?
22     A.  I can't give you -- you asked me what date.  I
23 can't tell you what date, but it would have been in time
24 for me to do the analysis and then write it up and then
25 submit what I did.  I can't give you the exact date, but
```

Page 8

```
 1 it wasn't within, you know, the week of -- before the
 2 date of my surreply, or it might have been -- the best I
 3 can say is it's sometime between when Mr. Weir submitted
 4 his reply and probably a week after that.
 5     Q.  Okay.  So it was within a week of May 17th?
 6     A.  That would be my best estimate.
 7     Q.  Did counsel give you a reason for asking you
 8 to submit a surreply?
 9          MR. ELLIS:  Object to form.
10     A.  The best I can say is that I was asked to, to
11 the best of my recollection, respond to new assertions
12 being made in Mr. Weir's reply report.
13     Q.  (BY MR. KARAM)  Please identify those new
14 assertions.
15     A.  That's pretty much everything that's -- that's
16 in my surreply.
17     Q.  Well, let's take Mr. Weir's report -- reply,
18 which is 449.
19     A.  Right, but I would -- I need to --
20     Q.  And you say there are new assertions that were
21 not in your first reply, in your report.  Right?
22          MR. ELLIS:  Objection, misstates
23 testimony.
24     Q.  (BY MR. KARAM)  Is that correct?
25     A.  So what I was asked to do was to reply to the
```

Page 9

```
 1 new assertions that were in Mr. Weir's reply report.
 2     Q.  Right.  So by new assertions, you mean points
 3 or positions that were not raised in his original
 4 report.  Right?
 5     A.  I think it would include that, yes.
 6     Q.  And that were not raised in your original
 7 report.  Right?
 8     A.  Well, I didn't say that part.  I --
 9     Q.  Well, I'm asking you that.
10     A.  Okay.  I took your question to be different
11 than the way you phrased it, but I would say there were
12 either arguments or explanations or assertions in
13 Mr. Weir's reply report that were not necessarily
14 articulated in his first report that I was asked to
15 respond to.
16     Q.  And were those arguments, positions,
17 assertions items other than responding to what you
18 raised in your report?  Do you understand what I'm
19 saying?
20     A.  I'm thinking.  Some of them might have been in
21 response, but they were different arguments that he had
22 not put forward previously.
23     Q.  So let's go through.  Take Mr. Weir's reply,
24 449.
25     A.  I got it.  Do you mind -- I am going to --
```

3 (Pages 6 - 9)

1 until I need them, I am going to put these on the floor.
2    Q.   You can put the papers wherever you want.
3    A.   There's a little more room.  I think I'm
4 ready.
5    Q.   So let's open Mr. Weir's reply.  So let's go
6 into the summary part, right?
7    A.   What page are you on?
8    Q.   Page -- page 3.  It says response to Ugone.
9 Right here.  Do you see that?
10    A.   I do.
11    Q.   So it says here, Ugone has not performed his
12 own regression or conjoint analysis.  First of all, is
13 that correct?
14    A.   I don't disagree with that.
15    Q.   So it is correct.  It is correct, right?
16    A.   Yeah.
17    Q.   Is that new?
18    A.   I believe I have an opportunity to make sure I
19 understand your question and answer your --
20    Q.   Sure.  Forgive me.  Do you want me to pause a
21 little longer?
22    A.   Yes.
23    Q.   Okay.
24    A.   So, yes, I agree I have not performed my own
25 regression or conjoint analysis.

1    Q.   And my question is, Is that a new assertion?
2 Is that something you consider new?
3    A.   I don't -- I wouldn't call that a new
4 assertion.  The only thing I would point out is you're
5 also starting on paragraph 9, but if you look at --
6    Q.   Well, we're going to have a lot of time to
7 ask -- to go over everything.  Let me -- let me choose
8 the order in which we proceed on these topics, if you
9 will.  Would you agree to do that?
10    A.   I will do that, but I'm just saying you're
11 skipping some that I consider actually very important
12 before we even get to 9.
13    Q.   Let's go to number 9.
14    A.   But you're stepping on top of my answer again,
15 so --
16    Q.   Second sentence, He has not measured the price
17 premium for AquaLift, open quote -- open paren, the
18 portion of an oven's price specifically attributed to
19 the AquaLift feature, closed paren.
20        Is that statement correct?
21    A.   It's correct, but in isolation it's misleading
22 as to everything that's in my report, but I don't
23 disagree that I haven't measured or isolated a claimed
24 price premium.
25    Q.   So it's a true but misleading statement?

1    A.   Incomplete.
2    Q.   Third sentence, He did not empirically test
3 the impact of any of his criticisms on the results of
4 the regression or conjoint analysis I performed.  Is
5 that correct?
6    A.   Again, the way that's phrased, I believe it's
7 misleading and incomplete, and I can't agree with what
8 he is saying there.
9    Q.   So you did empirically test?
10    A.   The criticism --
11        MR. ELLIS:  Object to form.
12    A.   The statement says, He did not empirically
13 test the impact of any of his criticisms on the results
14 of the regression or conjoint analysis that I performed.
15 That's an inaccurate statement.
16    Q.   (BY MR. KARAM)  Okay.  So please identify for
17 me those areas where you performed an empirical test
18 that changed the results of Mr. Weir's regression
19 analysis.
20    A.   Well, that's not what this sentence says.
21    Q.   That's okay.  That's a question.  Do you want
22 to have the question read back?  Do you need the
23 question read back?
24    A.   No, but I thought you were having a follow-up
25 question to this.  So I apologize.  If you're asking a

1 totally new question, I did not rerun -- this sentence
2 says the impact of any of his criticisms on the results
3 of the regression.  So that's the part that's
4 inaccurate, but I didn't provide any counter
5 regressions, which is a different question than what
6 this sentence is saying.  There was a subtlety there.
7        MR. KARAM:  Let's have the question read
8 back.  May we?
9        (Requested testimony read.)
10    A.   Okay.  So I didn't do that.
11    Q.   (BY MR. KARAM)  And would the same -- would it
12 be -- would that be the same answer for conjoint
13 analysis?
14    A.   With respect --
15        MR. ELLIS:  Objection.  You can answer.
16    A.   With respect to the specific question you
17 asked, correct.
18    Q.   (BY MR. KARAM)  And then he says in the next
19 sentence, He has not expressed that he does not have
20 expert -- forgive me.  Let me rephrase that.
21        He has expressed that he does not have
22 expertise in the area of conjoint analysis.  Is that
23 correct?
24    A.   In another case that Mr. Weir references with
25 respect to conjoint analysis and being a survey expert,

Page 14

1 I have always said I'm not a survey expert, but I am a
2 forensic economist and damage quantifier and that's how
3 I approach my analysis of, frankly, either the
4 regression side or the conjoint analysis side, but I've
5 never said that I'm a survey expert.
6    Q.   Then he says here that he has not conducted
7 any market simulations with regard to this case.
8    A.   That's correct.
9    Q.   So getting back to the issue that we were
10 talking about earlier, can you identify -- other than --
11 you said that there were some explanations on one of the
12 sentences that may have been new.  Identify which of
13 these areas is -- were new to the extent that they
14 required surrebuttal?
15        MR. ELLIS:  Frank, can you clarify that
16 you're referring to the areas in paragraph -- only in
17 paragraph 9?
18        MR. KARAM:  Only in paragraph 9, those
19 several sentences there.
20    A.   Can I just have your question again?
21    Q.   (BY MR. KARAM)  Sure.  Sure.
22        So we went through these sentences.  There's
23 five or six of them.  Right?
24    A.   Yes.
25    Q.   Identify within this paragraph 9 new areas

Page 15

1 that Mr. Weir either did not raise or is not responsive
2 to your report?
3        MR. ELLIS:  Objection.
4    A.   That Mr. Weir did not raise?  That's what I'm
5 missing when you ask that.
6    Q.   (BY MR. KARAM)  All right.  So did Mr. Weir
7 raise -- in his reply -- are any of these new?  Are any
8 of these areas new that were not raised either in his
9 original report or your reply?
10        MR. ELLIS:  Same objection.
11    A.   Well, I don't know which bucket you want to
12 put these into, but this paragraph in isolation and
13 these sentences in isolation have been written by
14 Mr. Weir.  They're not a complete statement of what he's
15 saying, but they're also distortive of what needs to be
16 responded to in this reply declaration.
17    Q.   (BY MR. KARAM)  So the answer is none of them
18 are new.  Right?
19        MR. ELLIS:  Objection.
20    A.   No, I said they were -- the way he does some
21 of his explanations, and, in fact, the way he
22 characterizes some of my work is just inaccurate.  And
23 it was almost like -- all I can say is I don't know what
24 he was thinking.  There's times that he describes my
25 work that is just inaccurate.

Page 16

1    Q.   (BY MR. KARAM)  And that was the reason for
2 the surreply.  Correct?
3    A.   I don't think that was the --
4    Q.   Things in his reply report you believe are
5 inaccurate.  Right?
6    A.   In part, but that's not how I answered the
7 question originally.  There were some new assertions,
8 and also -- and I'm also elaborating with this specific
9 paragraph that you asked me about, that this is
10 incomplete and distortive of what some of my arguments
11 are.
12    Q.   So was the incomplete and distortive, that was
13 a significant reason for the surreply.  Right?
14        MR. ELLIS:  Objection.
15    A.   No, I was asked to do the surreply because of
16 the new assertions that he has in his report.  And in
17 fact, if you go to -- actually, I'm sorry, I might have
18 used the wrong words.  There's some things that are, as
19 I said, incomplete or mischaracterizing what's in my
20 report or distortive of what's in my report, but as I
21 said previously, he's got new assertions in his reply
22 that I addressed in my surreply.
23    Q.   (BY MR. KARAM)  Okay.  But are any of those
24 new assertions in paragraph 9?
25    A.   Well, I mean I've already said in the third

Page 17

1 sentence that that's just inaccurate.
2    Q.   Okay.  Inaccurate is different from new.
3 Right?
4    A.   He is asserting that I did not test the impact
5 of any of his -- of my criticisms on the results of his
6 regression, and I did do that.  He's making this new
7 assertion that I didn't test anything.
8    Q.   Right.  How many depositions have you done?
9 Millions, right?
10        MR. ELLIS:  Objection.
11    A.   Thousands.
12    Q.   (BY MR. KARAM)  Sorry.
13    A.   Since 1990 I've done a lot, yes.
14    Q.   So you know about legal cases.  Right?
15        MR. ELLIS:  Objection.
16    A.   Let's put it this way.  I'm not a lawyer,
17 but --
18    Q.   (BY MR. KARAM)  Okay.
19    A.   -- I'm familiar with -- I'm not sure what
20 you're even asking about.
21    Q.   Right.  So what I'm asking is you understand
22 that just because you disagree with what your adversary
23 says doesn't mean it's new.  Right?  There's a
24 difference?
25    A.   Well, what's new is the distortive way that

5 (Pages 14 - 17)

Page 26

1  tools of an economist in a dispute litigation
2  environment.
3     Q.  Do you cite any economic textbooks?
4     A.  Actually, I think I do in the report.  I cite
5  one.
6     Q.  In the individual damages area?
7     A.  It had to do with one of -- you just asked did
8  I cite an economic textbook, and yes, I did.  I didn't
9  do it in the individual inquiry section.
10    Q.  So in terms of -- you said you used economic
11 methods.  Has the particular method that you used to
12 analyze individual inquiry in this case, has that
13 appeared in any peer-reviewed publication?
14    A.  I can't speak to that.  It's really basic
15 economics.  I don't think anybody would necessarily need
16 to sort to a source document to say that different
17 products with different attributes can have different
18 prices, that some products can be bought on sale or on
19 promotion relative to other products.  And in fact, I
20 empirically show everything that I did in terms of, you
21 know, that analysis.
22    Q.  And does your analysis as a whole have an
23 error rate?
24    A.  It wouldn't have an error rate.  I'm showing
25 all the data.

Page 27

1     Q.  Has this methodology been used outside of
2  litigation?
3     A.  Absolutely.  I mean, we're using real world
4  pricing data that companies collect all the time, and
5  this is H.H. Gregg's pricing data that is at the heart
6  of what Mr. Weir did and what was applied.  So I'm using
7  real world data.  This isn't anything that's been
8  created for litigation.
9     Q.  So the H.H. Gregg data is definitely real
10 world data.  Right?
11    A.  It's my understanding it's the actual line
12 items that they had in their computer system.
13    Q.  And have you analyzed any error rate within
14 that data?
15    A.  Well, I have looked at what I call the
16 anomalies in the data and pointed that out, yes, but in
17 terms of the presentation I'm making, I in some places
18 present all the data so that the reader of the report
19 can see what it is.  I am not doing any manipulations.
20 I am not taking any data that somehow is not real data
21 that was collected in the normal course of business.
22 And then in other sections of my report, I do talk about
23 some interesting data observations that may have an
24 explanation that may not invalidate the data for certain
25 purposes but could invalidate the data for other

Page 28

1  purposes.  So I do describe all of that in my report.
2     Q.  So would it be fair to say what you have done
3  in terms of the data was state it.  Correct?
4     A.  Yes.
5     Q.  And make observations about it.  Correct?
6     A.  Yes.  And then draw ultimate conclusions as to
7  why it's important for the individual inquiry issue.
8     Q.  And your observations are based on your
9  economic knowledge.  Right?
10    A.  My skills, knowledge, education, experience,
11 training, 33 years or maybe more now of --
12    Q.  Yeah, I stopped counting at 30.  So that's
13 allowed.
14    A.  Yeah, once you get to that level.
15       But yes, I bring my -- my knowledge to bear,
16 but I am also not doing anything that would be outside
17 the realm of what an economist would look at.  I'm using
18 generally accepted techniques.
19    Q.  And when you make these observations, you did
20 not do any layer of statistical testing, correct,
21 equivalent to a regression analysis?
22       MR. ELLIS:  Objection.
23    A.  You kind of mixed two different concepts
24 there, but I will try to answer both questions.  There
25 are times that more sophisticated analyses, whether it's

Page 29

1  statistical in nature or regression in nature, while
2  they may make it sound like it's more authoritative,
3  really do not add anything to the analysis and, in fact,
4  mask important information regarding the underlying
5  data.  So just because a regression or a certain
6  statistical analysis seems like that's more
7  sophisticated so it must be right, that is not true.
8  Okay.  And in fact, I would say it's doing a disservice
9  to the data at times to do a regression, not realize
10 what the underlying data is and you don't get a full
11 flavor for that underlying data.  The analysis I did did
12 have summary statistics associated.  At times we looked
13 at averages.  We looked at the distribution or the range
14 of the data.  We looked at certain comparisons of
15 certain prices to what was happening in the marketplace
16 across different dimensions, across different models,
17 across different attributes.
18       So we did an economic analysis, for example,
19 in this area that we're talking about here of pricing,
20 but it did not need to be elevated to a regression.  A
21 regression, in fact, in this case, as we can see with
22 Mr. Weir, leads things astray.  So I am not sure if
23 there's an analogy on the law side, but on the economic
24 side, sometimes the simplest approach is the best way,
25 which is let's just look at the data, and that's what I

8 (Pages 26 - 29)

Page 30

1     did.

2          Q.    (BY MR. KARAM)   So you are making a

3     distinction between instances when a method such as

4     conjoint or hedonic is appropriate and instances where

5     it is not appropriate.   Is that correct?

6          A.    I am making -- I want to augment just a little

7     bit, if I may -- that one of my fundamental approaches

8     here was let's just look at the data.   Let's see what

9     the data tells us.   And tell me if I'm not getting to

10    the heart of your question, but I have no dispute with

11    the concept of regression in general, and I don't have a

12    dispute with the concept of conjoint analysis in

13    general.   I think I even say that in my report.   So I'm

14    not -- I'm not saying that those are not generally

15    accepted techniques.   I do have issues at times when how

16    it's implemented or if there's a better way to look at

17    the problem, and that's what I bring to -- or the

18    question that needs to be addressed, and that's what I'm

19    bringing to bear in my report.

20             So I am not criticizing those techniques as

21    generally accepted.   Now we're morphing a little bit.   I

22    am saying I can draw certain conclusions without going

23    to hedonic regression.   I don't want -- because I don't

24    think you asked me to get into my evaluation of

25    Mr. Weir, but there are certain things that he does

1    where problems are created.  That's in my report.  We'll

2    leave it until later.

3          Q.    So this is my question.  Are there objective

4    factors that you can explain to a layman when a

5    regression analysis is not appropriate or when it's

6    impossible to derive a valid result with a regression

7    analysis?

8          A.    Sure.  Yes.

9          Q.    Explain those to me.

10         A.    Okay.  So in this case --

11         Q.    I am asking you in a general case --

12         A.    Okay.

13         Q.    -- first.  Then we'll talk about this case.

14         A.    Okay.  There's times in a regression that

15    either data may not be available to isolate the

16    quantitative measure you want to -- you want to measure,

17    or it could be that the empirical relationship or

18    association you're trying to evaluate has more in it

19    than what you think you're measuring.  And so you can

20    run a regression.  It may look fine, but it goes to the

21    interpretation of the results that could lead someone

22    astray.

23         Q.    So you've stated something that sounds like

24    philosophy there.  The empirical has more in it than you

25    realize?

```
                                                    Page 43
 1    directly, frankly.

 2         Q.   So if you Googled Aqualift, what do you

 3    think -- do you think the first thing you would find

 4    would be self-clean?

 5              MR. ELLIS:   Objection.

 6         A.   In terms of the rank ordering of what comes

 7    up, is that what you're asking --

 8         Q.   (BY MR. KARAM)  Yeah.

 9         A.   -- in the Google response?

10              MR. ELLIS:   Same objection.

11         Q.   (BY MR. KARAM)  It's kind of a betting

12    question.  Right?

13         A.   I'm not sure.

14         Q.   I am not supposed to ask questions I don't

15    know the answer to.

16         A.   I'm actually thinking back, because I did

17    Google Aqualift, so I am trying to think back to the

18    actual responses that I got.  And, yes, what I would say

19    is in the -- I think in the top three or four, there

20    might have been a description of the AquaLift cleaning

21    technology, but I also think these frequently asked

22    questions.  I don't know how you catalog that, but I

23    know that was in the top couple of responses as well.

24         Q.   Okay.  So every one of these AquaLift -- well,

25    there's how many questions here on this page 144?  One,
```

```
                                              Page 44
 1   two, three, four, five, six, seven, eight questions.

 2   Right?

 3        A.    Yes.

 4        Q.    And seven of them have the word self-clean in

 5   it.  Right?

 6        A.    Right.  So that's the point.

 7        Q.    Right.

 8        A.    That they're speaking to the AquaLift

 9   self-clean technology.

10        Q.    And the other one is how does it work,

11   implicitly asking how self-cleaning works.  Right?

12        A.    Yes.  I would agree with that.

13        Q.    So let's -- and there are a number of other

14   copies of this attached to this complaint, or similar

15   type of things.  So --

16        A.    Well, I think some of them are just expanding

17   on the question.  Like if you click on the question, you

18   get an answer.

19        Q.    Okay.  All right.  So we won't -- we won't

20   spend time on those.

21              So go to page 189.

22        A.    I am sorry.  Bear with me a second.  Okay.  I

23   am there, Exhibit 14.

24        Q.    And that's Exhibit 14 to the amended

25   complaint.  So this is an article or some type of
```

1    writing by something called the Consumerist.  Right?

2         A.   Yes.

3         Q.   And it talks about AquaLift self-cleaning

4    system.  Right?

5         A.   Yes, with respect to a KitchenAid product.

6         Q.   Right.  And there are some pictures here.

7    Right?

8         A.   Yes, on page 190 and 191, if that's what

9    you're referring to.

10        Q.   Okay.  And then I am going to refer you to

11   page 192 and the bottom paragraph, and it says, That's

12   very sad, especially if the oven cooks beautifully.

13        A.   That's what it says.  I would need to read

14   above it to get to the context, but --

15        Q.   Right.  Have you read this before?

16        A.   Yes.  Yes, I have looked at it, but --

17        Q.   All right.  I am not going to ask you about

18   details of it.  Basically, it's about somebody complains

19   about the cleaning, right, of AquaLift?

20        A.   This commentary is on that aspect, yes.

21        Q.   And the conclusion is doesn't clean great, but

22   cooks beautifully.  Right?

23        A.   If you're asking me did this reviewer draw the

24   conclusion that the oven works or cooks beautifully but

25   they're less than happy with the cleaning, yes, that's

Page 126

1 know when looking at this situation here, that it
2 doesn't work here for all the examples I've given in my
3 report.
4    Q.  So let's go back to that example where you
5 agreed that for certain products there could be class
6 wide damages.  What methodology would you use to
7 determine class wide damages?
8    A.  So I think there's a couple of different ways.
9 Now let's make sure we're clear here.  My opinion in
10 this case is that you need individual inquiry, and so
11 you can't use a common proof approach.  Let's put that
12 off to the side and let's say we have a market or
13 products that are entirely different in terms of the
14 underlying attributes.  Then I think you might be able
15 to do, you know, a before and after analysis.  You might
16 be able to make sure you isolate if there's a price
17 difference what's associated with that particular
18 attribute, if you can isolate it.
19    Q.  Can you isolate it using hedonic regression or
20 conjoint?
21    A.  You might be able to, but remember what I said
22 before.  This is in a world where we know our variable
23 is measuring exactly what you want to measure as opposed
24 to it being conflated with other value related
25 attributes.  So I am putting all of that off to the

Page 127

1 side.  So if you don't have the conflation problem in
2 your explanatory variable of interest and if you
3 properly apply it on the expenditure side -- and that
4 can either be a per unit amount or it could be a percent
5 of expenditure amount.  It depends on the facts and
6 circumstances.  But if all the underlying attributes
7 align, then I can see it being applied in that
8 situation.  So you're really talking -- if I could just
9 go a little bit farther.
10    Q.  Go ahead.
11    A.  You know, you're really talking about -- you
12 know, I think of a, you know, a windshield and you've
13 got your windshield wiper going back and forth.  And on
14 one end, you can have products that are very
15 homogeneous, and on the other product, you could have a
16 lot of heterogeneous products.  And so the question is
17 where is that needle?  And there's times -- it doesn't
18 have to be perfect.  I'm not saying it has to be
19 perfect.  But there's times that the underlying
20 attributes are relatively homogeneous, and so that
21 needle will move towards a common proof approach being
22 appropriate.  If you have heterogeneous attributes, then
23 the needle is going to move to you can't do the common
24 proof approach.  So that's kind of how I think about it.
25    Q.  And let's say there is a product that has

Page 128

1 several attributes, one of which is mislabeled.  Would
2 it be theoretically possible to compute using common
3 class damages in a case like that?
4    MR. ELLIS:  Objection.
5    A.  Yeah, if I understand your question saying if
6 you have a product, could theoretically you do a common
7 proof approach.  Yeah, theoretically.  It depends on the
8 facts and circumstances.  So I have never taken the
9 position that you can't ever have class wide damages
10 evaluated through common proof.  I think -- and I really
11 believe this -- that it depends on the facts and
12 circumstances of the product and attribute and the
13 alleged mislabeling that we're talking about.
14    Q.  (BY MR. KARAM)  So we talked earlier about the
15 term "product differentiation."  Right?
16    A.  A little bit.
17    Q.  What is that?  How do you understand that
18 term?
19    A.  I think the easy way to think about it is --
20 and I know I'm going to maybe use some layman
21 terminology here.  You have some products that are
22 competing with each other.  So they may in many respects
23 serve the same purpose or functionality, but they're not
24 like a bucket of wheat from one farmer versus a bucket
25 of wheat from another farmer.  In other words, if you're

Page 129

1 a farmer and you're selling a bucket of wheat and
2 Mr. Ellis is a farmer and he's selling a bucket of
3 wheat, and if we put those on the table, turned you guys
4 around and moved up the buckets, when you guys turned
5 back, we wouldn't know which bucket belonged to whom.
6 So those are perfectly homogeneous products.
7    We can talk about product differentiation
8 where you sell your wheat in a red bucket and Mr. Ellis
9 sells his wheat in a blue bucket.  If we turned you
10 around, switched the buckets around and moved them back,
11 you would still know that there was a difference,
12 whether meaningful or not, in the two products.  So
13 differentiation is saying, hey, my product can serve a
14 certain functionality, but it's a little bit different
15 in these regards.
16    Q.  Would you agree that AquaLift is a way of
17 differentiating a product?
18    A.  Sure.
19    Q.  And -- see, when you give answers like that, I
20 can flip three or four pages in my outline.
21    MR. KARAM:  All right.  Let's take a
22 little break.
23    THE WITNESS:  Okay.
24    THE VIDEOGRAPHER:  Off the record at
25 1:48 p.m.

33 (Pages 126 - 129)

Page 130

1    (Break from 1:48 p.m. to 2:00 p.m.)
2    THE VIDEOGRAPHER:  Back on record at
3  2 o'clock p.m.
4    Q.  (BY MR. KARAM)  Dr. Ugone, in the same area
5  that we were talking about before, have you ever found
6  common damages in any litigation for a product?
7    A.  Maybe just a clarification.  I'm taking your
8  question to be under any circumstances for any product
9  as opposed to maybe a more narrow question you might be
10  asking.
11    Q.  No, it was a broad question.  We're starting
12  out in the jungle.
13    A.  Right.  I would have to think about it.  I'm
14  not sure.  I -- you know, I recently had a case that --
15  dealing with auto dealerships where like 100 dealerships
16  were suing this one entity.  And in that case, because
17  of differing profitabilities that they had, there was a
18  common proof approach in terms of you need to figure out
19  the lost car sales.  Then you needed to apply the
20  profitability of the dealership when they sold
21  additional cars.  And you had to take into account
22  competition in terms of in certain geographic market
23  areas what would be the percentage of the cars in
24  dispute that were actually lost to the dealership.  So
25  the methodology was the same, but I gave the opinion

Page 131

1  that you couldn't use some national average
2  profitability per car for all the -- you know, for all
3  the different dealerships, or you couldn't assume that
4  all of them would have gotten the same percentage of the
5  cars in dispute as lost sales to them.
6    So the methodology in terms of doing that
7  calculation I don't think I disagreed with, but I did
8  disagree, again, with the inputs.  I'm not sure which
9  category you put that into, but that was sort of a
10  common proof methodology but not on the input side if
11  that makes sense.
12    Q.  So that was not for a product, right?  That
13  was for some type of activity that they were doing or --
14    A.  Actually, it was an alleged false advertising
15  case, but the product was cars.
16    Q.  The entire car was the product?
17    A.  Well, let's see what we can say here.  That --
18  I think I can talk about this.  So there's TrueCar,
19  which advertises or had an advertisement that had a
20  discount coupon when you buy through TrueCar.  And one
21  of the allegations was -- had to do with no haggle
22  pricing.  And there's TrueCar dealers and there's
23  nonTrueCar dealers.  And the nonTrueCar dealers were
24  saying that the no haggle claim, which caused people to
25  go to the TrueCar dealers, was false.  And in the

Page 132

1  absence of the no haggle claim, the people that went to
2  the TrueCar dealers would have gone to the nonTrueCar
3  dealers.  So it was a product.  It was a car sale.  And
4  so the issue was did -- you know, did the no haggle
5  claim -- you know, was there a causal link causing them
6  to go to certain dealers or not?  And even if some did,
7  was there a causal link of a lost sale to nonTrueCar
8  dealers?  Because as you might imagine, car dealers have
9  a geographic market area that have other car dealers as
10  well.  So there's competition even within the geographic
11  area.
12    So in that environment, yes, there was a
13  product.  It was a car.  There was an allegation of
14  false advertising.  I didn't disagree with the general
15  methodology of you need to figure out the lost sales,
16  then the lost profits on the lost sales and what were
17  the lost sales and all of those things.  But as I said,
18  I did disagree that you couldn't just apply a common
19  number for every single dealer.
20    Q.  Any other examples of a product feature that
21  was falsely advertised where you either found common
22  damages or maybe, you know, one expert put in one level
23  of damages, you put in a lower expert -- lower level of
24  damages?
25    A.  Or a different level.  I wouldn't always say

Page 133

1  lower.  I might have been on the plaintiffs' side.  But
2  let's try it this way because here is another
3  distinction in my mind.  I have worked on a lot of false
4  advertising cases, some of which deal with, let's just
5  pretend, consumer class action type cases.  Other ones
6  deal with companies, and some are just one company
7  versus another company.  So I've worked on false
8  advertising cases or alleged false advertising cases
9  dealing with teeth whitening products, dealing with
10  pregnancy tests.  I mean, over the course of my career
11  I've worked on a lot of different false advertising, and
12  it depends on the facts and circumstances.  But with
13  your question about the common proof, the reason why I
14  gave the answer I did was because there were multiple
15  entities on the opposing side as opposed to just
16  competitor to competitor cases.  So that's why I gave
17  that one answer.
18    Q.  All right.  So earlier you had said like
19  certain products are more amenable to a common damage
20  type of calculation or methodology.  Could you give me
21  some examples of products that you believe are amenable?
22    A.  I would give the descriptors that there's, you
23  know, less variability in the reason for purchase, less
24  variability in terms of the knowledge of the product or
25  the interpretation of the claim, relatively less

34 (Pages 130 - 133)

Page 134

1    variability in the prices.  So it's those types of

2    products.  I don't know I can give you an example off

3    the top of my head, and I don't want to reduce it to the

4    absurd.  But if we were talking about, who knows,

5    toothpicks or paper clips, you know -- I am just giving

6    this as an extreme so we can understand that.  You know,

7    that's very different than, you know, an automobile

8    or --

9        Q.   Well -- are you finished?  Go ahead.

10       A.   I was going to say or --

11       Q.   Or?

12       A.   -- an oven.

13       Q.   An oven.  Okay.

14            So let's take the example of a car.  So do you

15   believe that it's -- using your windshield wiper

16   example, a car would be on the far side of the

17   windshield wiper, such that it would be impossible ever

18   to calculate or find a methodology for class wide

19   damages?  So if one aspect of a car didn't work, the

20   brakes --

21            (Cell phone rings.)

22            MR. KARAM:  I thought I turned this off.

23       A.   Yeah, so you'll notice that when I gave my

24   windshield and windshield wiper example, I was talking

25   in terms of sort of relative probabilities, that if the

1  wiper goes over here, you know, there's a higher

2  probability you can use a common proof approach.  Over

3  here, there's a higher probability that you would not be

4  able to use a common proof approach.  So I never made it

5  a, you know, sort of absolute statement, but I was

6  talking about relative probabilities.

7        But having said that, the other issue that

8  comes into play is sort of what's the question that's

9  being addressed?  You could have a complicated product

10  with many different attributes but that the issue that's

11  being addressed might be, you know, relatively simple or

12  is not affected by some of the variability.  So that's

13  why it then becomes much more case or dispute specific.

14  But I just can't sit here right now and say that a car

15  never can one way or always can the other way.  I think

16  it depends on the nature of what's in contention and the

17  attributes associated with it.

18        Q.    All right.  Let me give you an example of a

19  car and -- advertised, for example, as anti-lock brakes

20  and the brakes are not anti-lock brakes.

21        A.    Okay.

22        Q.    Could that product, that feature be amenable

23  to a methodology for calculation of class wide damages?

24              MR. ELLIS:   Objection.

25        A.    I haven't analyzed it.  I can't give you an

Page 136

1    answer sitting here.  I would have to look at all the

2    different considerations.

3         Q.    (BY MR. KARAM)  What about a smart phone?  You

4    would agree that people have many reasons for buying

5    smartphones?

6         A.    In fact, some of them having nothing to do

7    with a phone.  They don't even use it as a phone.

8         Q.    Right.  As a matter of fact, that's probably

9    very low on the list these days?

10        A.    Underneath camera and internet and everything

11   else.

12        Q.    Right.

13        A.    Selfies.

14        Q.    And so let's just say there's a phone with --

15   and the GPS doesn't function.  Do you believe it's

16   theoretically possible to calculate class wide damages

17   in such a case?

18        A.    Yeah, again, I haven't analyzed that.  I look

19   at each case, the facts and circumstances of that case,

20   and I can't just have you say, here is a question, can

21   it be class wide?  That's -- if it was that easy, we

22   wouldn't need all these reports that people issue.

23        Q.    So let's go back to ovens.  Is there any

24   attribute on an oven that you believe could -- where you

25   believe a regression analysis could be used to isolate a

Page 138

1  I've come across hedonic regressions all the time.
2     Q.  And have you actually created hedonic
3  regressions?
4     A.  Generally, I think I have in situations -- in
5  this sort of situation, I'm usually evaluating someone
6  else's hedonic regression.  There may have been times
7  that I made adjustments to it, but I'm usually in the
8  position of somebody else proffering a hedonic
9  regression and then I evaluate it.
10    Q.  All right.  Counsel has given me a question on
11 the former topic.
12    A.  Okay.
13    Q.  So can you identify a case, whether you've
14 worked on it or not, where you agreed with plaintiffs
15 that there were class wide damages for a product or a
16 product attribute?
17       MR. ELLIS:  Objection.
18    A.  Yeah, I don't know the universe of cases, so I
19 wouldn't be able to do that.  I know the cases I get
20 called on and the attributes of the cases that I get
21 called on, I've generally disagreed with the common
22 proof approach.  So -- but that's given the facts and
23 circumstances of the cases I get called on.  I can't
24 speak to all the cases out there.  I know there's times
25 that Courts approve, you know, class certification, and

Page 139

1  there's times that they don't.  And there's times that
2  Courts agree with me, and there's times that they come
3  to some other decision.  But I can't speak about all the
4  cases that are out there.
5     Q.  (BY MR. KARAM)  All right.  But just the ones
6  you worked on.
7     A.  The ones I work on usually have a certain set
8  of attributes.  In other words, there's sort of -- you
9  know, almost a selection process in the marketplace for
10 experts, that I work on certain types of cases where
11 products have certain types of attributes, and then I
12 independently evaluate whether a common proof approach
13 would be reliable or not in that situation.  But the
14 cases I've worked on I've generally come to the
15 conclusion that a common proof approach would not work.
16 And in many of those cases, the Courts have agreed with
17 me.
18    Q.  When you say "generally," you mean every time,
19 right, or you can't identify even one where you've said
20 there is a common approach?
21    A.  Not given the nature of the cases that I get
22 called on.
23    Q.  Have you ever rejected a case where you
24 thought that there was class wide damages?
25       MR. ELLIS:  Objection.

Page 140

1     A.  I'm not sure if I --
2     Q.  (BY MR. KARAM)  Have you ever been offered to
3  be retained on a case or asked to be retained on a case
4  and taken a look at it and said, I can't opine that
5  there are no class wide damages, there are clearly class
6  wide damages?
7        MR. ELLIS:  Same objection.
8     A.  Actually, I don't think that situation has
9  occurred, but the reverse has occurred where I got
10 called on the plaintiffs' side of a case.  I vividly
11 remember this.  And I said to the person, okay, just
12 make sure you understand here is how I do my analysis.
13 So I'm very consistent in my methodology.  And they
14 thanked me and didn't call back.
15    Q.  (BY MR. KARAM)  So no matter who retains you,
16 plaintiffs or defendants, it always happens to be that
17 kind of case where there are no class wide damages?
18    A.  No, no, no.  I'm saying my methodology is the
19 same.  I'm saying I'm consistent in what I evaluate, is
20 what I was saying.
21    Q.  Okay.  Let's go back to hedonic regression.
22 Would you agree it's a commonly used economic method?
23    A.  Let's try it this way.  You know, when you say
24 commonly used, I mean, it's not used every day by every
25 economist.  It's not like the law of demand that we talk

Page 141

1  about every day or elasticity of demand.  But it's a
2  generally accepted technique.  I think that might be the
3  best way to describe it.
4     Q.  And --
5     A.  In fact, I think I even say that in my report
6  that I'm not -- I'm not saying that it's a -- you know,
7  junk science.  I'm not saying it's a not generally
8  accepted methodology.  So that, frankly, should not be
9  on the table at all as an area of dispute.
10    Q.  And in terms of hedonic regression, would you
11 agree that it's based on the concept that different
12 product attributes are measurable?
13    A.  I am just wondering if I would use different
14 words.
15    Q.  Give me your words.  Give me your explanation.
16    A.  Yeah, the concept is can you decompose the
17 price of a product into the price components that are
18 attributable to certain attributes.
19    Q.  We might have talked about this before.  Can
20 you give an example of hedonic regression being used
21 outside of litigation?
22    A.  You know, I don't have all the details, but I
23 think sometimes -- I am trying to think if like
24 sometimes in consumer price indices they might try to
25 decompose some of the prices.  So I think there's times

36 (Pages 138 - 141)

Page 142

1    that the government may even use it.

2         Q.    Is there any -- is there any standard academic

3    journal that kind of focuses on this area where hedonic

4    regressions, where there would be papers written on

5    hedonic regressions used for this purpose or that or --

6         A.    Yeah, I think sometimes hedonic regression is

7    even used in situations where you may not have a

8    measurable price, not as concrete as there is here.  And

9    so you might see it sometimes with natural resources all

10   the way to the other pragmatic side where I think if

11   you -- there's a journal called Journal of Forensic

12   Economics where I think you see articles on hedonic

13   regression.  There's also -- I've forgotten the name of

14   the authors.  A green book about this size, this thick

15   dealing more with wrongful death, personal injury type

16   cases where hedonic regression is used.  But those are

17   the types of areas where you would see it.

18        Q.    Do you remember when the last time you

19   personally conducted a hedonic regression?

20        A.    Usually it's in the environment of critiquing

21   much like I did for Mr. Weir, but -- just give me a

22   second.  I'm sure I've done it a couple of times this

23   year already.

24        Q.    And you made the decision not to do a hedonic

25   regression in this case.  Correct?

1      A.    I mean, that's an interesting phraseology.

2  Mr. Weir did a hedonic regression where he tried to

3  figure out, very loosely speaking, the contributory

4  value of the AquaLift feature, in quotes, to price.  And

5  he was using AquaLift feature as a proxy for AquaLift

6  cleaning feature.  I'm a firm believer that you just

7  don't sort of mindlessly run regressions.  You need to

8  understand the underlying data.  And so when I came to

9  understand that that variable would not do what Mr. Weir

10  was assuming it would do, that I knew the hedonic

11  regression wasn't going to work.  So there was no reason

12  to even go down that path.  So I wouldn't just waste

13  everybody's time and money doing a hedonic regression

14  where the main variable of interest has this conflation

15  problem.

16      Q.    So --

17      A.    So then I decided not to do the hedonic

18  regression.

19      Q.    So, in other words, you feel that it's

20  impossible to do an hedonic regression where you just

21  identify self-cleaning?

22          MR. ELLIS:   Objection, asked and

23  answered.

24      A.    Given my understanding of the data, that's

25  correct.

Page 145

1    Kumar versus Salov North America and Italfoods.  Are you

2    familiar with that case in the Northern District of

3    California?

4         A.   Is that an olive oil case?

5         Q.   I think it might be.

6         A.   I think I catalog them differently than

7    probably you guys do.

8         Q.   Do you remember -- do you remember the case?

9         A.   If it's the olive oil case.

10        Q.   Okay.  Did you do a regression in that one?

11        A.   I'm sorry.  Can you just --

12        Q.   Yeah, it's in Northern District of California,

13   Kumar --

14             Counsel tells me it is an olive oil case.

15        A.   Okay.

16        Q.   Did you do a regression in that one?

17        A.   I don't recall.  It's been, I think, a couple

18   years.  I don't remember one way or another.

19        Q.   Do you remember if Mr. Weir was on the other

20   side in that one?

21        A.   No, I don't --

22        Q.   What about --

23        A.   -- catalog that way either.

24        Q.   Okay.  What about Koller versus Deoleo and Med

25   Foods?

Page 239

KEITH UGONE, Ph.D.

1  KEITH UGONE, Ph.D.
2 simpler.
3        Did you ask Whirlpool's counsel for
4 any other data points other than what you received?
5    A.  Not from what I received, but I received
6 that which was available in this case.
7    Q.  Did you ask for anything additional?
8    A.  No.
9    Q.  Going back to the sentence that we had
10 read into the record a moment ago, you refer to him
11 transforming his willingness to pay metric.
12        Did Mr. Weir have a willingness to
13 pay metric in his analysis?
14    A.  I would say yes.
15    Q.  Are those his words or yours?
16    A.  He -- I don't think that sentence says
17 anything that Mr. Weir would not say.  He knows that
18 a conjoint analysis gives you a willingness to pay,
19 but my understanding, which I think he would agree
20 with, is that he's taking this willingness to pay
21 framework, but he's saying, aha, but it's really a
22 price premium because I'm using real-world market
23 prices.
24        I believe that is a very fair
25 representation of what Mr. Weir would say.

Page 240

KEITH UGONE, Ph.D.

1  KEITH UGONE, Ph.D.
2    Q.  I'm going to have -- read back part of
3 your answer.  You said, "He knows that conjoint
4 analysis gives you a willingness to pay."
5        Those are your words?
6    A.  Metric, yes.
7    Q.  Is that the only metric that conjoint
8 analysis can provide?
9    A.  Well, there's different -- I mean I
10 suppose you could stop along the way and give you,
11 you know, just sort of general survey results.
12    Q.  The willingness to pay is the ultimate
13 result?
14    A.  As is being -- in -- if you take it that
15 far in the conjoint analysis, yes, that's my
16 understanding.
17    Q.  And it's the only end result, or can it
18 fork off and go in another direction?
19    A.  Well, it depends probably of what you do
20 with the tools.  There's market simulation tools.
21 You can look at this relative market share concept
22 and equalizing it and so forth.
23        But in terms of my understanding of
24 what Mr. Weir is doing, ultimately there's this
25 willingness to pay concept that he -- I say

Page 241

KEITH UGONE, Ph.D.

1  KEITH UGONE, Ph.D.
2 transforms into a price premium metric.
3    Q.  So it's your understanding that
4 Mr. Weir's goal was to use the conjoint analysis to
5 ascertain a willingness to pay; is that correct?
6    MR. ELLIS:  Objection.
7 BY THE WITNESS:
8    A.  I did not say that at all.
9 BY MR. REICH:
10    Q.  So what did you say?
11    A.  I said that he ultimately takes the
12 output of the conjoint survey analysis and claims
13 that it is a -- the equivalent of a price premium
14 because in his conjoint analysis he's using what he
15 claims to be real-world prices, which I think a fair
16 stating of what I believe he's saying is that while
17 there may be times you get a willingness to pay from
18 a conjoint survey analysis, because he says he's
19 using supply side considerations including, he would
20 say market prices, that it then gives you a price
21 premium.  That is his argument.
22        So I didn't say that he said the
23 output is a willingness to pay.  He's saying the
24 output is a price premium.
25        I'm saying as soon as you say that

Page 242

KEITH UGONE, Ph.D.

1  KEITH UGONE, Ph.D.
2 you're into all of the inconsistencies I provided
3 before and you're not using realistic market prices.
4    Q.  How did you get, though, to the
5 willingness to pay aspect of the analysis?
6    A.  Because that's what's generally accepted
7 of conjoint analysis that that's what it provides.
8    Q.  The general acceptance that you're
9 referring to is based on what?
10    A.  You know, any of the literature on --
11 well, actually it's based on all the literature I've
12 seen, which is also -- and it's also based on what
13 I've seen in other cases.
14        Even marketing professors testifying
15 that this is a willingness to pay concept.
16    Q.  If I can ask you to go to Paragraph 18,
17 please.
18    A.  I'm there -- maybe I'll -- let me just
19 read it real quick, and then you can ask your
20 question.
21    Q.  Sure.  I was going to read half of it
22 into the record anyway.
23    A.  Okay.  Go ahead.
24    Q.  We can read it together.
25        You start off by saying "Allowing

9 (Pages 239 - 242)

Page 146

1    A.  Yeah, I think that was the same thing.  That
2   was a sister case.  That was a sister olive oil case,
3   so --
4    Q.  Okay.  Do you remember if you did a regression
5   in those?
6    A.  No.
7    Q.  Is olive oil, is it possible to do a hedonic
8   regression to separate out some aspect of a product like
9   olive oil?
10       MR. ELLIS:  Objection.
11   A.  I am going to give you the best of my
12  recollection.  I haven't looked at that case in a long
13  time.  But remember I gave you an example of if you have
14  an explanatory variable -- maybe you can do a hedonic
15  regression, but somebody has to construct the
16  explanatory variable.  And somebody could look and see
17  that out there there's all natural, there's natural,
18  there's 100 percent natural, there's nonGMO, there's
19  organic.  And somebody could put all of those together
20  into one variable.  My recollection on the olive oil was
21  that there was some very important terminology, like
22  imported from Italy, produced in Italy.  And I don't
23  remember all the attributes because it's been a while,
24  but that was a situation where I think -- with my memory
25  of my memory, at least, is that there was an issue of

Page 147

1   conflating those very different terms.  And so while one
2   may have tried to use a hedonic regression, the input
3   into the hedonic regression was combining these things
4   like imported from Italy versus produced in Italy,
5   because like imported from Italy, the olives could have
6   been made in Morocco, Italy, Sicily or elsewhere, but
7   went through Italy.  So it was imported from Italy, but
8   that's very different from grown in Italy.  The best I
9   remember is I think one of the criticisms is there was
10  conflation of the Italy issue in that case.  That's the
11  best I remember.
12   Q.  (BY MR. KARAM)  But you still don't remember
13  if you did a regression in that case?
14   A.  What I am trying to say is if I did anything,
15  I would have critiqued someone else's regression.  I
16  have a memory of a memory of a memory of this
17  conflation problem.  So I can't -- without going back --
18   Q.  Okay.
19   A.  -- to look, I can't answer beyond what I just
20  gave you.
21   Q.  Have you ever -- other than like taking
22  someone else's regression and doing a counter-regression
23  or modifying it to -- you know, to, in your view correct
24  it, have you ever run a regression from scratch in a
25  case?

Page 148

1    A.  Oh, yeah.
2    Q.  From start -- what cases have you done that
3   in?
4    A.  Oh, a lot of different cases.  You're just
5   talking generally.  Even from the simple case of looking
6   at a relationship between output and cost of production.
7   So you can use a regression there.  So it's a generally
8   accepted technique.  There's a time and place.  You
9   know, does the data allow for it?  But like I said, I'm
10  not disagreeing with the concept of whether it's
11  regression or hedonic regression.  It's just a time and
12  a place to use it.
13   Q.  Is there a particular software that you use?
14   A.  Yes.
15   Q.  What is that?
16   A.  Stata.
17   Q.  And is that one of the more prominent types of
18  software that is used for regressions?
19   A.  Yes.  There's other regressions out there,
20  econometric packages, but we have a tendency to use
21  Stata.
22   Q.  And is there a -- I asked you earlier about
23  peer-reviewed journals.  You mentioned Journal of
24  Forensic Economics.  Is there any resource where if you
25  confronted a question or problem in running a regression

Page 149

1   that you would turn to, whether a textbook, a particular
2   journal or publication related publications?
3    A.  Well -- if I understand your question, there's
4   two ways to answer that.  It's sort of an econometric
5   theory, which would be the textbooks that perhaps are
6   used in a college environment that talk theoretically
7   about issues.  But even something like Stata would --
8   the manuals probably would tell you how to address, you
9   know, various issues.  Like sometimes you might have to
10  weight some of your observations.  And so Stata would
11  say, you know, if you're going to weight them, use
12  something called aweights versus not weighting.  So
13  Stata documentation or SAS, that's another --
14   Q.  What is that?
15   A.  That's another package where you could run
16  econometrics, SAS.
17   Q.  Are there ways to determine the reliability or
18  explanatory power of a regression?
19   A.  Yeah, there's generally accepted -- you're
20  asking a very broad question.  I'm going to give a semi
21  broad answer.  But there's things you typically look for
22  in -- in a regression.
23   Q.  What are those?
24   A.  So generally at the highest level before you
25  run a regression -- so I'm assuming you don't do just

38 (Pages 146 - 149)

Page 150

1  data mining and do a mindless mechanical manipulation,
2  which I call it the three Ms, where you just run things
3  without sort of a purpose in mind. If we put that off
4  to the side, sort of data mining aspects, generally you
5  have a theory. In other words, what are the
6  determinants of or what's associated with the dependent
7  variable? So what are my -- based on theory, what are
8  my explanatory variables? And the point is you would do
9  your analysis, but in your theory of the explanatory
10 variables and how they're associated with the dependent
11 variables, you usually would have a theory of what that
12 relationship is. Is it a positive relationship or a
13 negative relationship? In other words, when one goes
14 up, would you expect the other one to go down or go up?
15 If both go up, that's a positive relationship. If one
16 goes up and the other goes down, that's an inverse or
17 negative relationship. So you develop your theory.
18 That gives you guidance as to what type of regression
19 you might want to run. I think one of the first things
20 you look at is did I get the right signs? Now what does
21 that mean, signs? That means, is it a positive
22 relationship and was I expecting a positive
23 relationship? Or was I expecting a positive
24 relationship and I got a negative relationship? They
25 move in the opposite directions. So at the highest

Page 151

1  level, I think you look at that.
2        Then from there, there's various other things
3  you can do. You can look at what's called the T
4  statistic, which is a value that's associated with a
5  coefficient on a particular explanatory variable. In
6  other words, does that coefficient meaningfully
7  explain -- does that coefficient in isolation
8  meaningfully explain movements in the dependent
9  variable. So you would look for the T statistic there.
10 You could also look for the R-squared. In other words,
11 what percent of variation in the dependent variable is
12 explained by the model that I put together? Is it
13 explaining 50 percent of the variability in the
14 dependent variables. Is it explaining 90 percent? So
15 those are the types of things you might do.
16       You could even -- depending on the
17 application, one could even try holding out some data.
18 In other words, I know an answer, but I'll use as my
19 inputs -- I may use all of the data or I may not use
20 some of the data but run my regression in holding out
21 some of the data and see how well it fits the data that
22 I've held out. So, you know, there's all kinds of
23 different things that one might look at. Some are more
24 concrete. Some are, you know, judgemental.
25    Q.   So you mentioned the R-squared in terms of a

Page 152

1  percentage. So --
2     A.   It's given in decimal form, but it's
3  interpreted as a percent of variation explained --
4     Q.   So an R-square of .5, what does that mean in
5  terms of explanatory power?
6     A.   The model is basically explaining 50 percent
7  of the variation in the dependent variable.
8     Q.   What about R-square of .9?
9     A.   Explaining 90 percent of the variation.
10    Q.   And that would be a good model, right, one
11 that explains 90 percent?
12    A.   Not necessarily. This is where some judgment
13 comes into play. But generally I am not going to
14 disagree with the concept that generally a higher
15 R-squared is better than a lower R-squared. I am not
16 disagreeing with that, but you can run into an
17 overfitting problem.
18    Q.   And you mentioned the T statistic. Would it
19 be correct to say that that is an indication of how
20 statistically significant the result is?
21    A.   Or generally is it statistically significant
22 or not, or is it essentially the same as zero or no
23 impact?
24    Q.   What is the F statistic?
25    A.   So the F statistic, I don't want to say it's a

Page 153

1  close cousin to the T statistics, but it's not. But
2  it's kind of that concept except you're looking at the
3  whole model rather than just a particular coefficient.
4     Q.   Have you discussed -- so we have three
5  statistics here. Right?
6     A.   Yeah.
7     Q.   You have the R-squared, the T and the F. Have
8  you discussed any of those in your report?
9     A.   Let's see here. I don't remember that we
10 commented on them because I have a different opinion.
11 My opinion is the regression doesn't work because of the
12 conflation problem with Mr. Weir's AquaLift variable,
13 and maybe I want to make sure there's no confusion on
14 this. I don't need to go down to do an econometric
15 treatise on all these issues, because, as I've said,
16 it's pretty straightforward what the problem is, not
17 only with his variable, the coefficient, but how he's
18 applying it, which can succinctly be said that there's
19 conflation going on in the coefficient on the AquaLift
20 variable as he defines it and that he takes that
21 coefficient and he misapplies it to the data. I don't
22 need to say anything else about his regression, although
23 I do comment on some of the sign issues.
24    Q.   So what is -- what is conjoint analysis?
25    A.   So if we're talking about a conjoint analysis,

39 (Pages 150 - 153)

Page 154

1  it's -- I'll put it into the survey technique approach,
2  and a conjoint analysis is attempting to get an
3  understanding of people's preferences for various
4  attributes and a -- you know, an associated -- depending
5  on how far you want me to go, but identify those
6  preferences and a, you know, willingness to pay for
7  certain preferences.
8      Q.  So Mr. Weir has quoted some deposition
9  testimony from you saying --
10     A.  Misquoted.
11     Q.  Misquoted, okay.  So are you an expert in
12 conjoint analysis?
13     A.  Actually, what I've always said and I'm pretty
14 clear on this, is that you don't call on me to do a
15 conjoint analysis.  In fact, if you called me to do a
16 conjoint analysis, I have my colleagues in Boston that
17 do that, and I'd send you that way.
18     What I'm an expert in is forensic economics
19 and damage quantification.  So what I do is -- and I've
20 done this for years -- is evaluate conjoint analysis
21 that are put forth from a forensic economics and damage
22 quantification perspective.  I am not going to say I'm a
23 conjoint expert or a survey person to run that conjoint
24 analysis for you.  I am very up-front about that.  But I
25 am absolutely an economist first and foremost, forensic

Page 155

1  economist, damage quantifier, and I can evaluate the
2  inputs in the analysis and I can evaluate the
3  reliability of the outputs to be used as a -- as a basis
4  for a damage calculation.  That's how I would describe
5  what I do.
6      Q.  So do you -- do you have any particular
7  education in conjoint analysis?
8      A.  Yeah, actually all the -- frankly, you know,
9  it's kind of interesting that Mr. Weir even admitted
10 this, but then he discarded it, that when you're doing
11 conjoint, there's -- it's almost like a Venn diagram,
12 that you've got these survey techniques, but you've got
13 a heavy-duty dose of economics in conjoint analysis.
14 And that's where I, you know, put my foot into the water
15 in a sense is on the economics side.  So I would say
16 that in terms of the underlying inputs and the use of
17 the outputs, that I'm actually very well trained in
18 those concepts.  I just don't do the survey part of it.
19     Q.  And you would agree that under certain
20 conditions conjoint analysis can yield reliable results.
21 Right?
22         MR. ELLIS:  Objection.
23     Q.  (BY MR. KARAM)  You're not disagreeing with
24 that?
25         MR. ELLIS:  Same objection.

Page 156

1      A.  I'll give you your short answer in a second
2  here, but the discussion for conjoint is very similar to
3  the discussion for hedonic regression.  I am not sitting
4  here saying it's not a generally accepted technique.  I
5  am not sitting here saying it doesn't -- doesn't have
6  applicability in certain facts and circumstances.  So I
7  am not here saying it's junk science or always
8  unreliable.  I am saying, given the facts and
9  circumstances of this case and how it's been applied in
10 this case, that I have issues with that, but I am not
11 sitting here saying it's not a generally accepted
12 technique.  So hopefully that's clear.
13     Q.  (BY MR. KARAM)  Your criticisms are -- there
14 were criticisms on the survey side of this technique,
15 right, of what Mr. Weir did?
16     A.  But from -- always from an economic -- I know
17 what my limitations are.  I don't lose sight of those
18 limitations.  It's always from an economics and damage
19 quantification perspective.  I always put my criticisms
20 in that bucket and do not stray from that.
21     Q.  Have you ever heard the term "randomized first
22 choice analysis"?
23     A.  I believe I have, yes.
24     Q.  What is that?
25     A.  My recollection of that -- and I don't

Page 157

1  think -- you know, if Mr. Weir did this, he certainly
2  didn't report it.  But you can get certain preferences
3  from -- you can get certain preferences from your
4  conjoint survey.  In other words, that red is preferred
5  to blue.  If you think red is preferred to blue, then
6  when you start to do some modeling, you know, the answer
7  is always red, right.  You wouldn't get anything else if
8  that's what the survey tells you.
9      Now let's take a situation that you prefer
10 Dasani water to coffee, and the utility you get out of
11 Dasani water is greater than the utility you get out of
12 coffee.  Well, when you run your simulations, why does
13 anybody buy coffee?  They would always buy this, the
14 Dasani.  Well, but people realize even though I may have
15 preferences for Dasani over coffee, there may be times
16 that I actually buy the coffee.  It could include, you
17 know, I went into the Circle K.  I don't know if you
18 guys have Circle K in New York or not -- Manhattan and
19 Queens --
20     Q.  The equivalent.
21     A.  Okay.  Or 7-Eleven.  And maybe they didn't
22 have Dasani that day, so I bought the coffee.  The
23 randomized first choice takes that into account.  So you
24 always don't end up with 100 percent versus zero.
25     Q.  What is a hierarchical Bayes regression?

40 (Pages 154 - 157)

Page 158

1    A.  So a hierarchical -- is that what you said,
2  "hierarchical"?
3    Q.  Hierarchical, yeah.  "Hierarchical," however
4  you pronounce it.
5    A.  Bayesian regression, it basically recognizes
6  that you can look at relationships for particular --
7  whether you want to say observations or situations, but
8  it could be that combining all of the observations or
9  all of the relationships also gives you additional
10  information.  So that's what the hierarchical Bayesian
11  regression does or a technique analysis, is it takes
12  into account sort of a grouping versus looking at just
13  individual results.
14    Q.  So you said earlier that if someone wants a
15  conjoint analysis, you'll send them to a colleague.
16  Have you ever worked on a team that did a conjoint
17  analysis?
18    A.  You know, I think the answer is yes, but maybe
19  not in the way that you're asking the question.  There's
20  times that someone is providing a conjoint analysis, and
21  I might consult with my colleagues about that.  So I
22  think there's been a team environment, but, again, I'm
23  always very careful to stay within what I feel my area
24  of expertise is, which is the forensic economics and
25  damage quantification.  But that doesn't mean that at

Page 159

1  times I haven't consulted with my conjoint colleagues.
2    Q.  And have you ever consulted on the issue of
3  construction of a survey?
4    A.  I'm sure I have, but always within the -- you
5  know, the framework that I'm talking about.
6    Q.  Would it be fair to say that your -- when you
7  say your colleagues in Boston, is it another office of
8  yours?
9    A.  Yes, of Analysis Group, yes.
10    Q.  Okay.  But your group at Analysis Group, you
11  don't have a conjoint software license?
12    A.  I don't know one way or another, frankly.  I
13  would be surprised if they didn't, because they work
14  on -- and I need to make sure it's clear here.  Analysis
15  Group has a number of offices around the country, so I'm
16  not talking about my colleagues.  Within the firm in the
17  Boston office and in, frankly, the DC office do
18  relatively more survey related work.  I can't speak to
19  what licenses for software the firm has.
20    Q.  Okay.
21    A.  But it wouldn't surprise me to find out that
22  we did have licenses, just because they do that work.
23    Q.  Do you have anybody in the Dallas office that
24  uses the license or operates conjoint -- operates
25  conjoint software?

Page 160

1    A.  Generally we're economists in the Dallas
2  office.  We have a heavy dosage of economists.
3  Generally, I think if we were going to do any -- you
4  know, there might be a few and far between, but if we
5  were going to do any adjustments with the software, we
6  might make sure that we brought in our colleagues to
7  make sure it was done properly.
8    Q.  Are you familiar with the term "root
9  likelihood"?
10    A.  Yeah.  I don't know that I could give you as
11  good a definition as the other things, but I know
12  that's -- that could be basically a statistic you look
13  at when you're running some of your conjoint analysis to
14  see some of your results.
15    Q.  And how does that relate to conjoint analysis,
16  if at all?
17    A.  I think that would -- generally I would have
18  to do -- I think that would do with some of your
19  explanatory or predictive capabilities of the model
20  you're running.
21    Q.  What is mean absolute error?
22    A.  So you're talking about sort of differences
23  between results you get versus actual observation
24  points.
25    Q.  And how is that used in conjoint analysis?

Page 161

1    A.  Well, it's not clear to me that everybody uses
2  it, but you might use it to -- you might look to it to
3  see, you know, are you far away or are you close to
4  observations you have.
5    Q.  So this is a slight change here.  You have in
6  your report used a phrase "willingness to pay."
7    A.  Yes.
8    Q.  Is that a term of art in economics, or is that
9  just your own language?
10    A.  That's not my own language.  Think of it this
11  way.  Think of a demand curve for a product.  A demand
12  curve doesn't tell you the market price, but it tells
13  you the amount that will be bought at an infinite number
14  of prices.  In other words, with a demand curve,
15  depending on the price, the demand curve will tell you
16  what quantity demand it is.  At a different price, the
17  demand curve tells you what the quantity demanded is.
18  So the demand curve is an infinite number of
19  combinations of prices and corresponding quantities
20  demanded.  Now why is that important?  Because the
21  height of the demand curve tells you the willingness to
22  pay for the particular quantities that are associated
23  with that demand curve.  It's derived from the theory of
24  consumer behavior.  Consumers maximizing utility subject
25  to budget constraints.  All of that stuff that I kind of

41 (Pages 158 - 161)

Page 235

```
 1              KEITH UGONE, Ph.D.
 2 conjoint survey) into a price premium metric."
 3         Did I read that correctly?
 4    A.   Yes.
 5    Q.   Is it your opinion that Mr. Weir did not
 6 use real-world prices?
 7    MR. ELLIS:  Objection.
 8    MR. REICH:  Do you want me to clarify the
 9 question?
10 BY THE WITNESS:
11    A.   No, it's just there's a subtlety to the
12 question that I want to address.
13 BY MR. REICH:
14    Q.   Go ahead.
15    A.   The subtlety is that he didn't use
16 real-world, realistic prices for the choice sets that
17 he was providing given the brands that he was also
18 providing in the choice sets.
19         So I know I don't want to belabor
20 it, but remember I showed you the chart that had all
21 the blue dots, and then the red dots were down here.
22         Well, there were a couple of blue
23 dots still below that, 1.3 percent of the dots for
24 that particular model was below his red dots, okay.
25         If he wants to argue those are
```

Page 236

```
 1              KEITH UGONE, Ph.D.
 2 real-world prices, I'll let him argue it.
 3         The point I'm making is 98.7 percent
 4 in that diagram I showed you prices were above.
 5 That's what he used for the conjoint analysis.
 6    Q.   Are the blue dots representative of
 7 real-world prices?
 8    A.   The blue dots are, yes.
 9    Q.   Where do those blue dots come from?
10    A.   That would be the H.H. Gregg database.
11    Q.   And those would be the price points that
12 were used by Mr. Weir?
13    A.   No.
14    Q.   Mr. Weir did not use the H.H. Gregg price
15 points?
16    A.   I know you don't want me to do this, but
17 this is one where I have to show you the diagram again.
18         Okay.  Let's be very careful.  If we
19 look at this, the blue dots are all the prices for
20 all the transactions in the database.
21    Q.   Which Mr. Weir used?
22    A.   See, I have a problem with the way you're
23 phrasing that.  He didn't use those.
24         He used the red dots.  That's where
25 I was having problems with your question.
```

Page 237

```
 1              KEITH UGONE, Ph.D.
 2    Q.   Okay.  So help me understand the
 3 difference between him using it and him extrapolating
 4 it for his analysis?
 5    A.   Well, I'm more than happy to let the
 6 trier of fact decide this.
 7         He's claiming he's using real-world
 8 market prices in his conjoint analysis, and I'm
 9 saying, well, let's just take a look at that.
10         I started off neutral.  Is he or
11 not?  Well, then I did this for all the Whirlpool, I
12 did it for all the Maytag, I did it for all the
13 Kitchen Aid, I did it for all the Jen Air.
14         And you find out that for Whirlpool and
15 Maytag his red dots are above essentially all of the
16 blue dots.
17         For Kitchen Aid and Jen Air, his red
18 dots are essentially below all of the blue dots.
19         So he's not using realistic prices
20 for his choice sets.
21    Q.   When you say you did it for Maytag and
22 did it for in your response a moment ago, did what?
23    A.   Did this sort of comparison.
24    Q.   With the H.H. Gregg data?
25    A.   Yes.
```

Page 238

```
 1              KEITH UGONE, Ph.D.
 2    Q.   Did you do it with any other data?
 3    A.   Just with the H.H. Gregg data.
 4    Q.   Why did you limit it to the H.H. Gregg
 5 data?
 6    A.   That was the dataset that Mr. Weir
 7 essentially was relying upon.
 8    Q.   Did you have access to any other data
 9 points from other retailers?
10    A.   I think there was some -- there was some
11 other datasets we received.  It wasn't as complete as
12 the H.H. Gregg, but this is what Mr. Weir was using,
13 so that's why I focused on that.
14    Q.   Did you ask both counsel for other
15 datasets from other retailers so you could run your
16 own analysis?
17    A.   I don't think I -- well, let's be
18 careful.  I think I received -- thinking back to
19 other datasets that were provided in the discovery
20 process, in other words, I think there were
21 third-party subpoenas, if I can call it that, for
22 data, and I think I received all that information.  I
23 don't know that Whirlpool would have any information
24 beyond that.
25    Q.   All right.  So my question is much
```

8 (Pages 235 - 238)

Page 243

KEITH UGONE, Ph.D.

2 for unrealistic choices implies that the choices
3 offered to respondents do not reflect real-world
4 market pricing."
5      Do you see that?
6   A.   Yes.
7   Q.   And you agree with your own statement
8 there?
9   A.   Yes, and that's what we talked about
10 previously.
11   Q.   Thank you.
12      And then you noted right afterwards
13 that this was empirically pointed out in the Ugone
14 declaration; correct?
15   A.   Yes.
16   Q.   So this is a point you already made in a
17 prior submission to counsel for plaintiffs?
18   A.   That he wasn't making real-world -- he
19 wasn't including real-world pricing, correct.
20   Q.   My point is that this was something you
21 had the opportunity to already present to plaintiffs
22 and to the court; correct?
23   A.   Yes, but let's make sure there's no
24 misconstruing of this paragraph.
25      The real point is the next sentence

Page 244

KEITH UGONE, Ph.D.

2 which you haven't gotten to.  That's just the
3 preliminary.  That's like the introductory paragraph
4 in the sentence in the paragraph.
5   Q.   Okay.  So finish your thought.
6   A.   No, so I'm saying you got to read the
7 next sentence.
8   Q.   And how does that sentence change the
9 context?
10   A.   Because now he's adding in that it's okay
11 to have unrealistic choices in a conjoint analysis,
12 and he admits there's unrealistic choices.
13      And then on the other hand he's
14 saying, ah, but I've got realistic market prices.
15 That's what makes it a price premium.
16      That's an internal inconsistency.
17 The point I'm making is he can't have it both ways.
18      So that's the point I'm making here.
19      And the point of the unrealistic
20 choices was something he made in his rebuttal to my
21 report.
22   Q.   Just so I -- I understand then.  I don't
23 want to be putting words in your mouth, so I'm going
24 to try to summarize this or paraphrase it, and tell
25 me if I'm getting it right.

Page 245

KEITH UGONE, Ph.D.

2      It is your position that Mr. Weir
3 admits that he used unrealistic choices in his
4 conjoint analysis?
5   A.   I believe so.  I specifically remember
6 the part where he says it's okay to have unrealistic
7 choices.
8   Q.   Well, that was going to be my next
9 choice, so let's take it in reverse.
10      Is it your position that Mr. Weir
11 admits that it is all right to use unrealistic
12 choices in a conjoint analysis?
13   A.   Yes.
14   Q.   So now let me ask the first question
15 again.
16      Is it your position that Mr. Weir
17 admits that there are unrealistic choices in his
18 conjoint analysis?
19   MR. ELLIS:  Objection.  Asked and answered.
20 BY THE WITNESS:
21   A.   I think that would be the -- the -- I
22 don't know if he's used those words.  I don't
23 remember of him exactly using those words, but that
24 would be the inference from -- of what he's trying to
25 say about conjoint analysis.

Page 246

KEITH UGONE, Ph.D.

2   Q.   So let's try it this way.
3      It's your inference that Mr. Weir
4 admits that he used unrealistic choices in his
5 conjoint analysis?
6   MR. ELLIS:  Same objection.
7 BY THE WITNESS:
8   A.   I'm sorry.  I missed the question.
9   MR. REICH:  That's all right.
10      Can you read it back, please?
11      (WHEREUPON, the record was
12      read by the reporter.)
13 BY THE WITNESS:
14   A.   I'm sorry.  I'm still missing the
15 question.  Am I --
16 BY MR. REICH:
17   Q.   Is it your -- it's your inference that
18 Mr. Weir used unrealistic choices in his conjoint
19 analysis?
20   MR. ELLIS:  Same objection.
21 BY THE WITNESS:
22   A.   I'll have to agree with that, yes.
23 BY MR. REICH:
24   Q.   Okay.  Let's move on to B in the same
25 section that we're dealing with.  We're still on

10 (Pages 243 - 246)

Page 247

1           KEITH UGONE, Ph.D.
2  Page 25.
3           And this is the portion that you
4  mentioned a moment ago about the book, the Orme
5  Chrzan. I'm probably mispronouncing that.
6      A.  Right.
7      Q.  And for the record it is O-r-m-e and
8  C-h-r-z-a-n, and you wrote this section about --
9  about this book --
10     A.  Yes.
11     Q.  -- in your report; correct?
12     A.  Yes.
13     Q.  Do you recall whether Mr. Weir cited this
14 book in his opening report with declaration?
15     A.  I do not believe it was cited in his
16 opening declaration.
17     Q.  So is it fair to say that the first time
18 that Mr. Weir mentioned this book was in response to
19 either something mentioned by you or something
20 mentioned by Whirlpool's counsel?
21     A.  When you say something mentioned by --
22 you mean like in a deposition?
23     Q.  I could break it out.  I was going to try
24 to streamline it, but it didn't work, so let me
25 strike the question.

Page 248

1           KEITH UGONE, Ph.D.
2           Mr. Weir first mentioned this book
3  in response to a question by Whirlpool's counsel
4  during his deposition; is that correct?
5      A.  I believe -- yes, I believe that's
6  accurate.
7      Q.  And then he provided his own explanation
8  or understanding of what the book said or relayed?
9      A.  I guess we're on -- hung up just a little
10 bit, so my recollection was there was his deposition
11 where he responded, and I think it was two days later
12 is when he provided his rebuttal declaration.
13          I can't get into his head as to his
14 motivations, but factually the answer is, yes, that I
15 believe it seems to at least temporally and causally
16 be related to questions in his deposition and points
17 I would be making in my original declaration.
18     Q.  And this book that -- that we're
19 referring to here, is this a book that you've read
20 prior to this litigation?
21     A.  Yes.
22     Q.  Do you find the contents of the book to
23 be reliable?
24     MR. ELLIS:  Objection.
25

Page 249

1           KEITH UGONE, Ph.D.
2  BY THE WITNESS:
3      A.  I think it's a generally accepted book,
4  yes.
5  BY MR. REICH:
6      Q.  Any portion or portions of the book that
7  you don't agree with?
8      MR. ELLIS:  Objection.
9  BY THE WITNESS:
10     A.  I mean we would have to -- let's put it
11 this way.  Even generally accepted books usually have
12 a sentence here and there where somebody is going to
13 disagree.
14          I don't have anything off the top of
15 my head, but if you were to suddenly show me a
16 sentence, I might say, well -- you know, I'd -- you
17 know, I might tweak that a little bit.
18 BY MR. REICH:
19     Q.  And that's precisely what -- what I was
20 asking.  That's a -- a fair response is whether
21 anything jumps out at you that -- you read that book
22 and you, say, look, I generally agree with this,
23 but -- you know, that kind of?
24     A.  Yeah, not as I sit here.
25     Q.  Okay.  So in Paragraph 20 you're saying

Page 250

1           KEITH UGONE, Ph.D.
2  that the book supports the observation that -- and
3  I'll break up A and B, the first one is "Conjoint
4  simulations yield a measure of willingness to pay."
5           Do you see that?  It's Paragraph 20,
6  subsection (a)?
7      A.  Yeah, conjoint -- if this is what you
8  read.  "Conjoint simulations yield a measure of
9  willingness to pay (not a price premium)."
10     Q.  Okay.  Is that an absolute statement?
11     A.  You're going to have to elaborate a
12 little bit more.
13     Q.  Sure.  Is that all the time?  "Conjoint
14 simulations yield a measure of willingness to pay"
15 all the time?
16     A.  If you take it all the way through to the
17 market simulations, the conjoint simulations, if you
18 get to that end result.  There could be other things,
19 other places where you stop and look at data; but if
20 you take it all the way through to what I'm referring
21 to, I believe that would be an accurate statement.
22     Q.  When you say what I'm referring to, are
23 you referring to something different than what's in
24 the book or something different than Mr. Weir is
25 saying?

11 (Pages 247 - 250)

Page 251

KEITH UGONE, Ph.D.

1
2     A.  No, no, no.  I just -- when you said
3  "always," well, it depends kind of where you stop in
4  the process.
5     Q.  Okay.  And taking it in the reverse, it's
6  your position that this book supports the notion that
7  conjoint simulations do not yield a price premium?
8     A.  That's correct.
9     Q.  In all circumstances?
10     MR. ELLIS:  Objection.
11  BY THE WITNESS:
12     A.  That I'm thinking of and that I'm
13  referring to.
14  BY MR. REICH:
15     Q.  When you say that you're thinking of, you
16  mean just sitting here today that you could recall as
17  opposed to your metric that you're using in
18  connection with this litigation?
19     A.  No, I'm talking about, you know, if you
20  stopped earlier than getting to that end result, it
21  wouldn't give you a willingness to pay.
22     Q.  Okay.  Now let's look at B of that same
23  reference to the book in Paragraph 20.
24        "A lack of competitive products in
25  the simulations overstates the willingness to pay

Page 252

KEITH UGONE, Ph.D.

1
2  metric."
3     A.  Yes.
4     Q.  Can you tell us what that's referring to?
5     A.  Well, this is -- if you go to
6  Paragraph 20b, which is on Page 26 --
7     Q.  I'm with you.
8     A.  -- we even have a quote out of the book
9  that supports that, so 20b directly answers your
10  question.
11     Q.  So, again, taking the question in
12  reverse, where there are competitive products in the
13  market, this does not ring true?
14     A.  Not to the same extent.
15     Q.  Help us understand what you mean by that.
16     A.  It's still a -- it's still a willingness
17  to pay metric.
18     Q.  How does the existence of a competitive
19  product on the market change that willingness to pay
20  analysis?
21     A.  It gives other choices to the consumer if
22  that's what you're asking -- or that's my response to
23  what I think you're asking.
24     Q.  Okay.  Let's move forward if we can to
25  the analysis that you did with respect to the

Page 253

KEITH UGONE, Ph.D.

1
2  supply-side factors.  This is section C on Page 27.
3     A.  I'm there.
4     Q.  Is it your position that Mr. Weir did not
5  use supply-side factors?
6     A.  I would agree with that, yes.
7     Q.  And I'm -- I'm -- there's a nuance to the
8  question just to be clear.
9        Using an accounting for do we agree
10  are two different things?
11     MR. ELLIS:  Objection.
12  BY THE WITNESS:
13     A.  We probably need to have you maybe ask
14  maybe a little bit more explicit questions.
15  BY MR. REICH:
16     Q.  Sure.  Let's -- let's delve all the way
17  down.
18        When we're saying -- strike that.
19        When you wrote "supply-side
20  factors," what did you mean?
21     A.  That which is necessary to frankly
22  transform the demand side considerations and
23  willingness to pay into a price premium.
24     Q.  Such as what?
25     A.  So -- actually, I went into this in great

Page 254

KEITH UGONE, Ph.D.

1
2  detail in my last deposition, but the easiest way to
3  remember it is I think I gave the analogy of a pair
4  of scissors where you need two blades to cut a piece
5  of paper.
6        In a market you need the two blades,
7  one being demand, one being supply, to interact to
8  determine market price.
9        The conjoint analysis just gives you
10  the demand side blade in a sense, the demand curve.
11        So you would need considerations of
12  the supply side to figure out a price premium, which
13  is a change in an equilibrium price as opposed to
14  just a change in a willingness to pay.
15        Because we could all have changes in
16  our willingness to pay, but it's that interaction of
17  that demand curve with a supply curve that would
18  determine the new price.
19     Q.  And I recall your -- your analogy to the
20  scissor.  When we're dealing with the supply side and
21  the demand side of the scissor or the blades, could
22  you tell us what goes into the supply side of the
23  blade specifically?
24     MR. ELLIS:  Objection.  Asked and answered.
25

12 (Pages 251 - 254)

Page 255

1    KEITH UGONE, Ph.D.
2 BY THE WITNESS:
3    A.  So actually I did this quite extensively
4 in my last deposition.  I talked about what are the
5 determinants of supply, and, you know, I talked about
6 cost relationships.
7    Although, I went into a little bit
8 more detail, you have an underlying production
9 function, which is how the companies go about making
10 their products -- but you have to take that physical
11 relationship between inputs and outputs and transform
12 that into cost relationships.
13    And you do that by looking at, you
14 know, the price of raw materials, the price of labor,
15 the price of capital.
16    There's also, you know, what are
17 some, in a sense, rates of return that might be
18 required in the industry to keep the resources in
19 that particular productive activity.
20    So I talked about all of those
21 things.  You could look at -- you know, there might
22 be a different way to look at it.
23    You could look at market prices and
24 try to figure out price points and elasticity of
25 supply.

Page 256

1    KEITH UGONE, Ph.D.
2    In other words, how would, you know,
3 the quantity supplied change in response to a price
4 change.
5    To be a little bit more specific
6 about it, elasticity supply is a percentage change in
7 quantity supply divided by the percentage change in
8 price, holding all other considerations constant.
9    So there's a number of different
10 ways that you might be able to do this.
11    Q.  And it's your position that Mr. Weir did
12 not account for any of those supply-side factors?
13    A.  He'll say he did, so we got to be careful
14 here.  He will say he did because of this argument
15 that supply is fixed, which makes no sense whatsoever
16 in terms of his argument, but he says it.
17    And then he says -- then he will say
18 he did because he says he's using market prices.
19    So this -- this is almost like the
20 Abbott and Costello Who's on First.  It takes us all
21 the way back to the -- to the -- to the market price
22 discussion we had previously.
23    Q.  Right.  And that's why my question was
24 more direct.
25    Is it your position that Mr. Weir

Page 257

1    KEITH UGONE, Ph.D.
2 did not account for any of the supply-side factors?
3    A.  Yes, but I -- I didn't know the nuance of
4 whether you were saying is it my position or does he
5 admit that.  He will not admit that, and so I'm
6 making observations on his position.
7    Q.  Is it your position that Mr. Weir did not
8 have access to any of those supply-side factors?
9    MR. ELLIS:  Objection.
10 BY THE WITNESS:
11    A.  I haven't made that -- I don't know that
12 I've explicitly stated that.  He -- he certainly had
13 access to the pricing data that we talked about, the
14 H.H. Gregg pricing data, but I don't think I quite
15 ever said in my report the question you just asked.
16 BY MR. REICH:
17    Q.  So you don't take a position on that?
18    MR. ELLIS:  Objection.
19 BY THE WITNESS:
20    A.  Let me just hear the question again.  It
21 goes back a while.
22 BY MR. REICH:
23    Q.  Is it your position that Mr. Weir did not
24 have access to any of the supply-side factors?
25    MR. ELLIS:  Same objection.

Page 258

1    KEITH UGONE, Ph.D.
2 BY THE WITNESS:
3    A.  I think my answer again is that I don't
4 believe I ever make a comment on that directly.
5    Although, I might have said in my
6 original report -- we'd have to look -- that's
7 obviously very difficult to get some of that from all
8 the companies that might be providing, you know,
9 ranges to the marketplace.
10 BY MR. REICH:
11    Q.  Would you agree that Mr. Weir used
12 historical pricing in his analysis?
13    A.  We just need maybe a little bit more
14 precise.  We're talking about his conjoint analysis?
15    Q.  Yes.
16    A.  As opposed to regression?
17    Q.  Yes.
18    A.  I just wanted to make sure that was
19 clear.
20    I'm going to say, no, it's -- he did
21 not use historical prices.  It's -- that -- I'll keep
22 going back.  I don't need to show it again -- but
23 that chart where I show all the blue dots of actual
24 prices versus what he used.
25    Q.  Mr. Weir had access to historical pricing

13 (Pages 255 - 258)

Page 259

```
1            KEITH UGONE, Ph.D.
2 for his conjoint analysis; right?
3     A.  Yes.
4     Q.  And Mr. Weir incorporated historical
5 pricing into his analysis; is that right?
6     A.  No.
7     MR. ELLIS:  Objection.
8 BY THE WITNESS:
9     A.  No.
10 BY MR. REICH:
11    Q.  He did not incorporate it at all?
12    MR. ELLIS:  Same objection.
13 BY THE WITNESS:
14    A.  He -- this is where we got to be careful.
15        He will say he did, but I'm
16 saying -- remember what I said.  On Whirlpool and on
17 Maytag he used prices such that 90 percent of the
18 real-world prices were below the prices he used, and
19 on Jen Air and Kitchen Aid he used prices where over
20 90 percent of the prices were above the prices he
21 used.
22        Now, we can quibble whether that
23 means you're using real-world prices or not.  I'm
24 saying if -- if you realistically look at it with an
25 impartial view, you can see he is not incorporating
```

Page 260

```
1            KEITH UGONE, Ph.D.
2 real-world prices into his analysis.
3 BY MR. REICH:
4     Q.  Could you take a look at the next
5 paragraph and just read it to yourself for a minute
6 and then I'll have one quick question on that.
7     A.  Sure.  I'm just not sure which is next.
8     Q.  Sure.  It's 22i of your response.
9     A.  Okay.  I'll read it real quick.
10    Q.  Thank you.
11    A.  Okay.  I think I'm ready for your
12 question.
13    Q.  Does Mr. Weir say, in your opinion, that
14 while the historical quantity supplied of Whirlpool
15 brand ovens is fixed, that has no bearing on whether
16 the appropriate measure of economic harm is
17 consumer's willingness to pay for the AquaLift
18 feature"?
19    A.  Are you asking that question, or are you
20 relating to what's typed here because he -- if I
21 understand the question you're asking, he says
22 because the historical quantity is fixed that that
23 effectively also translates the willingness to pay
24 into a price premium figure.  I think that would be
25 an accurate representation.
```

Page 261

```
1            KEITH UGONE, Ph.D.
2     Q.  He says it affects the willingness to
3 pay?
4     A.  No, that's not what I said.
5        Mr. Weir would say that one reason
6 why he's measuring a price premium is because the
7 historical quantity is fixed.  I think that's an
8 accurate representation of what he says.
9     Q.  You testified in your prior deposition
10 that you're familiar with the Sawtooth Software?
11    A.  Yes.
12    Q.  You've never actually used it yourself?
13    A.  I haven't used it.  I have not, no,
14 but -- and let's be clear because we had a big
15 discussion about this.
16        That I am restricting my comments
17 to, you know, sort of the economics and damage
18 quantification implication of the conjoint survey, so
19 those -- that's the area that I'm commenting on.
20        As opposed to running the software
21 or anything like that.
22    Q.  And you mentioned that if you wanted to
23 run a conjoint analysis, you would ask one of your
24 colleagues or defer to one of your colleagues in
25 Boston?
```

Page 262

```
1            KEITH UGONE, Ph.D.
2     A.  Sure.  Yes.
3     Q.  Did you confer at all with any of those
4 colleagues from Boston in connection with this
5 litigation?
6     A.  I'm not sure about in connection with
7 this.  I can just -- what I can tell you is over time
8 in other cases I might have had conversations with
9 them.
10        In fact, I know -- I can't tell you
11 the case, but occasionally I'll talk to them and
12 might have questions, but I don't recall if I did on
13 this case.  I don't think I did specifically on this
14 case.
15    Q.  And in any of those prior cases that
16 you're referring to, did you ask them to run a
17 conjoint analysis?
18    A.  I don't think I ever asked them to do
19 that, no.
20    Q.  Any of your colleagues ask them to do
21 that?
22    A.  I can't speak to that.  I don't know if
23 they ever -- I'm not sure if -- -- in other cases I
24 know I personally have never asked them to run a
25 conjoint analysis or to take the underlying data.
```

14 (Pages 259 - 262)

Page 263

```
1              KEITH UGONE, Ph.D.
2         Whether my staff ever said to them
3  just rerun it to see if you get the same results or
4  something so that there's no mistake, I can't speak
5  to that.
6      Q.  Can you think of a single instance in
7  which it was run regardless of who asked for the
8  conjoint analysis to be run?
9      A.  If it happened, it would be based on the
10 underlying data that was provided by the opposing
11 expert.
12         You know, the best I can tell you --
13 I'm not going to sit here and say my staff never had
14 them check something, so -- but I don't know that I
15 can give you a specific example of where they
16 checked.  I -- but I'm not going to disagree with the
17 concept that on other cases they might have asked
18 them to do that.
19     Q.  Okay.  Let's stick with Subsection C for
20 one second, moving on to Page 28.  This continues
21 with -- I'm sorry you --
22     A.  I might have lost -- go ahead.  I might
23 have lost where you were.
24     Q.  Sure.  You were on 22i, and now we're
25 moving on to 22ii?
```

Page 264

```
1              KEITH UGONE, Ph.D.
2      A.  Romanette (ii).
3      Q.  Okay.  A much better way of saying it.
4         You refer to the fact that Mr. Weir
5  used "arbitrary prices."
6         Do you see that in your first full
7  bullet point?
8      A.  Let me find that.
9         Right.  "However, simply using five
10 arbitrary prices..."
11        If that's what you're asking, yes.
12     Q.  Right.  Is it your opinion that none of
13 those prices, the five arbitrary prices, as you
14 called them, are based on reality?
15     A.  Well, I have the open paren "which
16 themselves are not representative of the actual
17 market prices of the challenged products."
18        And that -- we're going back to
19 Who's on First, but that's the blue dot, red dot
20 diagram.
21     Q.  I understand, but are they based on
22 reality?
23     A.  I would say no.
24        He hasn't said -- he didn't really
25 provide an explanation of why he used 600, 750, 900,
```

Page 265

```
1              KEITH UGONE, Ph.D.
2  1050, 1200, nor did he provide an explanation of the
3  differences, why he went up in 150 dollar increments.
4  He didn't provide either of those.
5      Q.  Okay.  So it's your position that he made
6  them up?
7         MR. ELLIS:  Objection.  Misstates testimony.
8  BY THE WITNESS:
9      A.  I think your -- the flavor of the
10 question you're asking -- or at least how I'm taking
11 the flavor of the question is to get me something
12 that I never said.  That he just made up prices.
13        There's no justification for the
14 prices or the price differential, and I'm saying that
15 they're not representative of the market prices.
16        I'm not going to go so far as to say
17 he just willy-nilly made up prices, but the rationale
18 for those prices is not provided, and when I look at
19 those prices -- and I'm more than willing to let the
20 trier of fact agree or disagree with me -- but
21 they're not representative of the market prices.
22        That's what my opinion is.  I'm not
23 going to say he just made them up, but I did say that
24 they were arbitrary, and I'll continue to say they
25 appear to be arbitrary.
```

Page 266

```
1              KEITH UGONE, Ph.D.
2  BY MR. REICH:
3      Q.  And, Doctor, that's perfectly fine.  If
4  you don't appreciate the question that I asked -- and
5  I'll read it again -- I said, so it's your position
6  that he made them up.
7         If that's not what you said, you can
8  simply say, no, that's not what I said; and that's
9  perfectly -- that's perfectly acceptable.
10        I'm not asking a question here.  You
11 can object all you want.  I'm just saying that you
12 gave a lengthy response to a question I didn't ask,
13 assumed that I asked something that I didn't.
14        If you don't agree with the question
15 or can't understand it, ask me to clarify it; or if
16 you're saying that I'm leading to something, let's
17 have a discussion about that.
18        But I wasn't inferring anything, and
19 I wasn't asking you to throw stones at Mr. Weir.
20 That's not what I asked.
21        A simple question.  I'll ask it
22 again, and you can answer the same thing again if you
23 want, or you can actually answer the question.
24        Here's the question:  So it's your
25 position that he made them up?
```

15 (Pages 263 - 266)

Page 375

KEITH UGONE, Ph.D.

1        KEITH UGONE, Ph.D.
2 how far you are taking it, but it would still have
3 all the other problems that I identify including the
4 highest level one of he's got a problem with the
5 constant percentage price premium approach, but I
6 didn't know if you were including that in the
7 analysis or not, but it doesn't obviate the biggest
8 criticism that I have.
9 BY MR. REICH:
10     Q.  Okay.  So let's ask it differently.
11          Would you agree with any aspect
12 of -- of his analysis had that been his objective?
13     MR. ELLIS:  Objection.
14 BY THE WITNESS:
15     A.  Would I agree with any aspect of it?
16     Q.  Yes.
17     A.  You know, at the -- at the highest level
18 two I don't disagree with the concept that AquaLift
19 ovens, whether you're measuring the one attribute or
20 four, but you really kind of have to realize it's got
21 the four features as we've been talking about it,
22 that those cost more.  I've never disagreed with
23 that.  I've never tried to say there wasn't a price
24 differential.
25          Now, we can quibble around the edges

Page 376

1        KEITH UGONE, Ph.D.
2 as to the best way to do the regression or does he
3 have the appropriate explanatory variables?  Does
4 there -- you know, is that difference under the
5 predicate you asked me to accept, does it differ
6 across states.  I mean there's still all of that, but
7 I -- I'm not here saying that those ovens don't cost
8 more.
9     Q.  If I could ask you to please move to (c)
10 on Page 15.
11     A.  All right.  Let me catch up with you.
12          Okay.  I think I'm ready.
13     Q.  Okay.  Obviously after I ask my question
14 you can read whatever you need to put it
15 into context, but in connection with this claim and
16 response, are you saying that Mr. Weir ran additional
17 variables in an effort to respond to your criticism?
18     A.  Actually I'm saying more than that.  He
19 did do that, but this is what I said previously
20 because these are all interrelated.
21          That he didn't try to do anything
22 with respect to the most important point I was making
23 about aesthetic appeal, cook top performance, and the
24 larger oven door window.
25     Q.  And why is that the most important point?

Page 377

1        KEITH UGONE, Ph.D.
2     A.  Because that's his variable of interest.
3     Q.  That's Mr. Weir's variable of interest?
4     A.  The AquaLift variable, explanatory
5 variable that he has.
6          I was saying there was omitted
7 considerations with respect to that variable.
8          He chose to rerun his regression,
9 including oven drawer type and cook top type, but he
10 was silent on the most important part that he's
11 conflating across different attributes the impact on
12 price.
13     Q.  The explanatory variable, what are you
14 referring to there?
15     A.  Those are -- I'll just take two seconds
16 here.  So you've got price, which is what we'll call
17 the dependent variable, and you're trying to explain
18 the components of price by what's called independent
19 or explanatory variables.
20          So when you use the term explanatory
21 variables, they literally -- the attempt is to
22 explain portions in price.  That's why they're called
23 explanatory variables.
24     Q.  But how do you decide which are the
25 explanatory variables?

Page 378

1        KEITH UGONE, Ph.D.
2     A.  That's -- that price would be a function
3 of or determined by number of burners, whether it's
4 gas or electric, whether it's got -- loosely
5 speaking -- the AquaLift feature or not.
6          So it would be both theoretically
7 and based on perhaps survey results, consumer
8 responses as to what's important for determining
9 price.
10     Q.  How did you determine that aesthetic
11 appeal would be one of the explanatory variables?
12     A.  Based on document --
13     MR. ELLIS:  Objection.
14 BY THE WITNESS:
15     A.  Based on documentation.
16          So I -- well -- yeah, I don't know
17 if you want to say whether I determined or just based
18 on the documents that I reviewed my understanding was
19 that the implementation of AquaLift, which includes
20 those other things we talked about, lower price --
21 I'm sorry -- lower temperature, less need for
22 insulation enabled other things, like either
23 aesthetic appeal or the larger oven door window or
24 the different cook top performance, but that was in
25 documentation.

43 (Pages 375 - 378)

Page 379

KEITH UGONE, Ph.D.

2    But my point was, and the real point
3 is, from that documentation it wasn't like there was
4 just this cleaning feature.  There four things that
5 happened, loosely speaking, four things that happened
6 at once.
7 BY MR. REICH:
8    Q.  So for the purpose of the analysis, the
9 explanatory that are both associated with AquaLift
10 ovens had four components?
11    MR. ELLIS:  Objection.
12 BY THE WITNESS:
13    A.  Yes.  Now, I'm not going to get into a
14 debate about how you count like a heating element or
15 something else, but there were four different things
16 that I've seen identified.
17    The cleaning feature plus the three
18 we've been talking about.
19 BY MR. REICH:
20    Q.  Is it your understanding that the
21 cleaning feature plus the three that we've been
22 talking about were marketed to consumers?
23    A.  In one way or another.  I mean some of it
24 is through visual inspection when people are trying
25 to buy an oven or a range I should say.

Page 380

KEITH UGONE, Ph.D.

2    You know, they're going to notice a
3 bigger window; you know, aesthetics is a little bit
4 harder; but do they like it or not.
5    Obviously these ranges, the unit
6 sales have been increasing quite a bit over time
7 since they've been out, but yet I would say either
8 directly or indirectly.
9    Q.  How would the aesthetics, by way of
10 example, link to AquaLift to consumers?
11    A.  I'm not sure if I can give you all the
12 technical linkages, but my understanding is that when
13 the AquaLift cleaning feature was implemented, that
14 it gave designers -- this is my words -- flexibility
15 in what they could do in terms of designing the oven.
16    For example, you know, the fact it
17 needs less insulation allowed them to do other
18 things.  That's my understanding.
19    Q.  Right.  And I guess my question is more
20 focused on how that message was conveyed to consumers
21 in the form of advertising, labeling, marketing, and
22 so on that the aesthetics was linked to AquaLift?
23    MR. ELLIS:  Objection.
24 BY THE WITNESS:
25    A.  It was -- I don't know if I can answer

Page 381

KEITH UGONE, Ph.D.

2 that question directly, but it would be observed
3 through what I call revealed performance.
4    In other words, what do consumers do
5 while they're buying these ovens in greater and
6 greater quantities every year.
7 BY MR. REICH:
8    Q.  Explain revealed performance and how it
9 applies here?
10    A.  Reveal -- I should have said revealed
11 preference.  I said performance.  I meant revealed
12 preference.
13    Q.  Okay.
14    A.  In other words, preferences are revealed
15 in the marketplace by the behavior of consumers
16 that -- and this is an economic term, revealed
17 preference, so I may not know what your taste is
18 preferences are; but I can tell in the aggregate what
19 consumers are doing, and they're buying certain
20 products with certain features, and so it's been
21 revealed in the marketplace, revealed preference, for
22 at least the aggregate of the features associated
23 with the Whirlpool, Maytag, Kitchen Aid, and Jen Air
24 ovens.
25    Q.  But, again -- and maybe you don't know --

Page 382

KEITH UGONE, Ph.D.

2 how is the message marketed to consumers linking
3 AquaLift to any one of the three enhanced attributes?
4    A.  I'll try again.
5    So what I was trying to say is I
6 don't know that I can point to a marketing
7 literature, but we do know that ovens are something
8 that generally people will sort of look at before
9 they buy, and I think a lot of these attributes, the
10 larger window and so forth, would be revealed through
11 visual inspection when they're trying to pick which
12 oven to purchase.
13    Q.  Well, let me ask it a different way.
14    How does a consumer know that
15 AquaLift-containing ovens contains the self-cleaning
16 feature and these three enhancements as you've
17 characterized them in your reports as opposed to some
18 new line of ovens that Whirlpool put out that
19 includes AquaLift and these three other enhancements?
20    MR. ELLIS:  Objection.
21 BY THE WITNESS:
22    A.  My understanding is -- and I can't say
23 with 100 percent certainty -- but I think it's the
24 Vesta or the AquaLift line that has these additional
25 dimensions.

44 (Pages 379 - 382)

Page 383

KEITH UGONE, Ph.D.

1    KEITH UGONE, Ph.D.
2         I don't think the other lines have
3    the combination that we've been talking about because
4    it's enabled by the AquaLift technology.
5         THE WITNESS:  I'm not saying we take a lunch
6    or anything, but maybe we can just take a short
7    break.  It's been an hour or so.
8         MR. REICH:  Let's go off the record and
9    discuss it.
10        THE WITNESS:  Yeah.
11        THE VIDEOGRAPHER:  This marks the end of
12   Media No. 3.  The time is 12:46 p.m.
13        We are off the record.
14            (WHEREUPON, a lunch recess
15            was had.)
16        THE VIDEOGRAPHER:  This marks the beginning
17   of Media No. 4.  The time is 1:39 p.m.
18        We are on the record.
19   BY MR. REICH:
20        Q.  We can go back to your sur-reply,
21   Dr. Ugone, and I'm going to direct you to
22   Paragraph 12, Page 17.
23        A.  I am there.
24        Q.  Okay.  In this section you have a
25   discussion relating to LG's EasyClean; correct?

Page 384

1    KEITH UGONE, Ph.D.
2         A.  Yes.
3         Q.  What do you know about LG's EasyClean
4    feature?
5         A.  Without looking back to my original
6    report, I think it's described in my original report,
7    but it's a -- I think it's a cleaning feature, but I
8    don't think it's, you know, the 800-degree
9    traditional.  I think it's a different type of
10   cleaning feature.
11        Q.  More akin to the AquaLift?
12        A.  Loosely speaking, I would agree with you,
13   yes.
14        Q.  Do you know if LG labels it as a
15   self-cleaning mechanism?
16        A.  I would have to go back and look as I sit
17   here.  Do you want me to look and see if it's in my
18   report?
19        Q.  No, that's all right.
20            Do you know whether the LG EasyClean
21   has other attributes that are enabled by the
22   EasyClean feature?
23        A.  No.
24        Q.  You don't know or it doesn't?
25        A.  I don't know.

Page 385

1    KEITH UGONE, Ph.D.
2         Q.  Is it something you want to refer back to
3    your report for?
4         A.  No.  I mean my point was that, as you
5    know in my commentary, that EasyClean generally would
6    be viewed as a positive feature.
7             Now, it wasn't in the same category
8    of AquaLift as used by Mr. Weir in the sense that,
9    you know, beyond just what type of relationship it
10   has to price.
11            You know, I wasn't concerned whether
12   there was a conflation or not, but what did concern
13   me is that it was a positive feature, but Mr. Weir's
14   regression had it showing up as a negative impact on
15   price.
16            That tells me that some -- we may
17   not know what it is, but something is going on in the
18   regression where it doesn't treat EasyClean as a
19   positive price effect or influence.
20            I didn't need to know if it had
21   other features because that would just make the
22   positive impact on price even greater versus no
23   additional features.
24            What was odd to me was the fact that
25   you add this cleaning feature above manual, which was

Page 386

1    KEITH UGONE, Ph.D.
2    Mr. Weir's comparison, and his regression results
3    said that having easy clean would actually lower the
4    price.
5         Q.  Assuming here now if this is true, isn't
6    it possible that an ancillary aspect to EasyClean
7    caused that negative regression?
8         A.  You mean that they added features that
9    consumers -- that would cause people to pay less?
10            I mean that -- that doesn't seem
11   like a profit-enhancing change to the design to add a
12   positive cleaning feature, but then add other
13   features that would make people want to pay less.
14   That doesn't -- that doesn't make sense to me.
15        Q.  So --
16        A.  But at least if that -- I haven't seen
17   that explanation by Mr. Weir.
18        Q.  Let's ask it differently.
19            What if the EasyClean, similar to
20   the way AquaLift, caused other features to come into
21   play, EasyClean caused other features to come into
22   play as well, and that was the explanation for the
23   result or the conclusion that was drawn?
24        MR. ELLIS:  Objection.
25

45 (Pages 383 - 386)

Page 407

```
 1          KEITH UGONE, Ph.D.
 2  refund that he would claim if he was just doing
 3  online sales by itself.
 4      Q.  Did you do anything other than what you
 5  outlined in this sur-reply report to evaluate that
 6  issue?
 7      A.  No, I think I -- either in my report or
 8  what I've said verbally is what I've done.
 9      Q.  Okay.  On the next page in the response
10  to (b) you made mention about the fact that Mr. Weir
11  claimed that he looked at the retailer data for the
12  Whirlpool branded ovens, right, and this is other
13  than H.H. Gregg?
14          Do you see where I'm referring to?
15      A.  Just one second.
16      Q.  Sure.
17      A.  Okay.  I think I'm ready for your
18  question.
19      Q.  You made mention of the fact that
20  Mr. Weir claimed that he looked at retail data for
21  the Whirlpool branded ovens; correct?
22      A.  Yes.
23      Q.  Do you have any reason to doubt that he
24  looked at other data other than H.H. Gregg?
25      A.  No, I'm willing to take his
```

Page 408

```
 1          KEITH UGONE, Ph.D.
 2  representation on face value.  I'm not going to say
 3  he says that and didn't do it, but there was no
 4  analysis of that to my recollection.
 5      Q.  Analysis of what he looked at?
 6      A.  Comparisons.
 7      Q.  What impact, if any, do you think H.H.
 8  Gregg's filing for bankruptcy had on its data?
 9      A.  The way I've kind of thought about it is
10  that generally companies don't go into bankruptcy on
11  a dime, you know, everything is fine, and then
12  tomorrow suddenly they file for bankruptcy.
13          There's usually economic conditions
14  within the company that are leading up to the
15  bankruptcy filing that may occur, and so what
16  Mr. Weir does not want to apparently recognize is
17  that even though the H.H. Gregg bankruptcy occurred
18  on the tail end of all the data we have, there could
19  be a likelihood that some of the dynamics of how they
20  were running the company, including their pricing,
21  could have put themselves in a position over time
22  where they ultimately did have to file for
23  bankruptcy.
24          And so the real issue is does that
25  have an impact on his calculations at all in his
```

Page 409

```
 1          KEITH UGONE, Ph.D.
 2  claimed price premium.
 3      Q.  Does it?
 4      A.  No, and I'm saying he hasn't investigated
 5  that.  So I'm saying when you look at the H.H. Gregg
 6  data, and this is taking it in its totality, the
 7  point I'm making in this is all in the same section.
 8          Is it doesn't cover the states.
 9  It -- there's the issue of the -- you know, the
10  bankruptcy and whether there were prior pricing
11  policies that could have contributed to that and
12  everything that I'm saying here.
13          So it's a -- it's a -- and, in fact,
14  he's incorporating states that are not part of the
15  class.
16          And so that's what I'm saying is
17  looking at it in the totality.
18          I'm not separating out any
19  individual component.
20          What I'm doing is saying, well, he's
21  got H.H. Gregg data, and I'm not going to deny --
22  just let's assume that he did his -- for the purposes
23  of the question let's say he did everything correctly
24  on H.H. Gregg, but it's not clear to me that that can
25  be extrapolated to the whole for the reasons that
```

Page 410

```
 1          KEITH UGONE, Ph.D.
 2  I've said.
 3          Even if you wanted to accept the
 4  H.H. Gregg data, which I've done for purposes of my
 5  answer here.
 6      Q.  Well, let's look at the pricing policy
 7  issue that you've raised as an example.
 8          Do you have any reason to believe
 9  that the pricing policies were different at all?
10      A.  Well, they ended up going bankrupt.
11  Also --
12      Q.  I'm sorry.  What is -- they ended up
13  going bankrupt.  What does that have to do with
14  pricing policies?
15      A.  Well, if companies don't make a normal
16  return on their investments and don't at least earn a
17  normal rate of return on their business, then -- this
18  is jargon -- economists say that resources gravitate
19  to their highest valued use, which means they go out
20  of business and do something else with those
21  resources.
22          But, again, what I was trying to say
23  before, that doesn't occur overnight.  There's
24  usually things that lead up to that sort of state.
25      Q.  Do you have any evidence that there were
```

51 (Pages 407 - 410)

Page 411

KEITH UGONE, Ph.D.
1    KEITH UGONE, Ph.D.
2 pricing policies at H.H. Gregg that impacted their
3 data in any way whatsoever?
4      MR. ELLIS: Objection.
5 BY THE WITNESS:
6      A.  There was -- I've always noted that
7 there's a very, very large variation in their prices,
8 so I'm not quite sure how they went about pricing the
9 ranges at the level that they priced them at; but I
10 think, as you're probably aware from my original
11 report, I mean there was a substantial variation in
12 prices.
13          I don't have the underlying
14 explanation for that, but one could hypothesize a
15 world where if there wasn't those variations or at
16 least they were narrower or at a different level,
17 then at least with respect to this line of business
18 that this line of business would not have contributed
19 to the bankruptcy.
20 BY MR. REICH:
21      Q.  You had access to the underlying data
22 associated with H.H. Gregg; right?
23      A.  Yes.
24      Q.  Did you do anything with that data to try
25 to confirm or deny whether or not there was any

Page 412

1    KEITH UGONE, Ph.D.
2 impact on the data by the pricing policies?
3      A.  You mean any impact on the company as
4 opposed to the data?
5      Q.  No, I'm talking about the data.
6          We're talking about the data that
7 Mr. Weir was -- was using.
8      A.  Well, the pricing pol -- it is what it
9 is.  We have the points.
10          So whatever strategy they involved
11 or implemented to price their ranges manifests itself
12 in the data points that we see, and that's what I was
13 saying in those data points we're able to observe, we
14 may not know their thinking in terms of how they were
15 doing the pricing, but we do observe the data points,
16 which were -- the variation was quite substantial.
17      Q.  Was the variation that you're referring
18 to more substantial than for other retailers?
19      A.  I don't have that comparison.  I'm
20 just -- I'm just saying in isolation when you look at
21 it.  You know, I don't -- I would just show you the
22 same diagram that we showed before, but there could
23 be thousands of dollars of difference in prices
24 across those.
25      Q.  Is what you're showing me in relation to

Page 413

1    KEITH UGONE, Ph.D.
2 other retailers?  That's my question.
3      A.  No, that's in relation to themselves.
4      Q.  Right.  So that's like -- you can show
5 anything you want to me, but that's not my question.
6      A.  I think I answered your question.
7          You asked did I compare it to other
8 retailers, and I'm saying, no, I don't have that
9 comparison.
10      Q.  You did answer.  I'm just not sure why
11 you're opening your report.  It's up to you.  You're
12 welcome to show it to me, but I think you provided
13 the answer.
14      A.  No, because half way through I said,
15 well, I will just show you the same chart that I
16 showed you before.  So I don't know --
17      Q.  You can if you'd like to.
18      A.  I'm okay.
19      Q.  Okay.  You had access to the other
20 retailer data points?
21      A.  We had access to some other files.  I
22 think there was different degrees of information that
23 was provided.
24          So sometimes it might have been hard
25 to make those comparisons.

Page 414

1    KEITH UGONE, Ph.D.
2          There might not have been some
3 information on models or just various attributes, so
4 I think we all know because of my observations on
5 applying the constant percentage price premium that
6 that is inappropriate because of this huge variation
7 or the reasons for the huge variation we didn't
8 always have in the other pricing data.
9      Q.  So is it fair to say that the other
10 pricing data that you had for other retailers were
11 not as robust as the H.H. Gregg data?
12      A.  And if we substitute complete for robust,
13 I'll agree with you.  But I would -- yes, I would use
14 the term robust, but I don't know if everybody else
15 knows what that means.
16          So for the purposes of our
17 conversation, complete, detailed was not the same as
18 H.H. Gregg.
19      Q.  There were more data points in H.H.
20 Gregg's data than any other retailers in this case;
21 is that right?
22      A.  I think I would agree with that.
23      Q.  Just curious, and this can just be a
24 housekeeping issue, your initials appear under
25 Romanette i in the response on Page 22?

52 (Pages 411 - 414)

Page 415

KEITH UGONE, Ph.D.
2   A.   Yes.  That's a little bit --
3   Q.   You did that without even opening up your
4 report.
5   A.   This actually proves to you that I did
6 type this myself because what I do is when I'm going
7 back and forth in the report, if I always want to get
8 back to the place where I was, I type my initials;
9 and if I go somewhere else, in the find function I
10 type in my initials, and it takes me back there.
11       So it's just a technique that I use,
12 and when you do that, you're supposed to then erase
13 your initials, and one time I forgot to do it.
14   Q.   That's a great explanation.
15   A.   The only thing I'm going to add to that
16 answer is where things get complicated is when you
17 have a report that uses the word bankruptcy a lot
18 because there is a KRU in the middle of bankruptcy,
19 so it doesn't always take me directly to that spot.
20 I have to go through a lot of bankruptcy words first.
21   Q.   Not to waste time on the precious record,
22 but if you do space, then your initials, it will
23 resolve that problem.
24       Are you familiar with the term
25 unquantifiable variable bias?

Page 416

KEITH UGONE, Ph.D.
2   A.   Yes.
3   Q.   And what is that?
4   A.   That would be the -- could be a couple of
5 different ways to look at it, but there could be
6 omitted variable bias where an important influence of
7 price may not be directly quantifiable, like other
8 explanatory variables you might have in the
9 regression.
10   Q.   Can the larger window in the
11 AquaLift-containing ovens be an example of an
12 unquantifiable variable bias?
13   A.   It could be unless you somehow develop a
14 proxy measure of it, but it could be.
15   Q.   In connection with your work in this
16 litigation, did you review any consumer reports
17 associated with AquaLift ovens?
18   A.   I think I did, yes.
19   Q.   Did you glean an understanding or
20 definition of the meaning of self-cleaning from
21 either of those reports or any of those reports?
22   A.   I wouldn't say gleaning a definition.
23       I think the consumer reports that
24 I'm aware of, in a sense, evaluated ranges on their
25 cleaning capabilities.

Page 417

KEITH UGONE, Ph.D.
2   Q.   Are you aware that consumer reports
3 insisted on using a certain cleaning methodology for
4 ovens that are labeled self-cleaning?
5   A.   I am aware that consumer reports use the
6 same methodology across ovens that they tested.  I
7 don't know if they call it this monster mash stuff
8 that that would coat the ovens with.
9   Q.   And they used it on all ovens?
10   A.   I believe so, yes, that they tested.
11   Q.   Did they use it on LG EasyClean?
12   A.   That's why I said on --
13   MR. ELLIS:  Objection.
14 BY THE WITNESS:
15   A.   -- ovens that they tested.  I don't
16 recall whether they tested EasyClean or not.
17   MR. REICH:  Can we go off the record for a
18 second?
19   THE VIDEOGRAPHER:  We are off the record at
20 2:20 p.m.
21       (WHEREUPON, a recess was
22        had.)
23   THE VIDEOGRAPHER:  We are back on the record
24 at 2:27 p.m.
25   MR. REICH:  Thank you for your time today,

Page 418

KEITH UGONE, Ph.D.
2 Doctor.
3   THE WITNESS:  Good seeing you.
4   MR. REICH:  You too.
5   THE VIDEOGRAPHER:  We are off the record.
6   MR. ELLIS:  Hold on.
7       Dr. Ugone, thank you for your time
8 today, and I have no questions.
9   THE VIDEOGRAPHER:  We are off the record at
10 2:28 p.m., and this concludes today's testimony
11 given by Keith Ugone, Ph.D.
12       The total number of media units used
13 was four -- or three and will be retained by Veritext
14 Legal Solutions.
15       (Whereupon, at 2:28 p.m.
16        the deposition was
17        concluded.)

53 (Pages 415 - 418)